IN THE UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT

**UNITED STATES OF AMERICA,**

**Respondent-Appellee,**

**vs.**

**BRANDON BERNARD,**

**Movant-Appellant.**

_____

On Appeal from the United States District Court
for the Western District of Texas at Waco
W-99-CR-70(02)

The Honorable Walter S. Smith, Jr.
United States District Judge

_____

## *DRAFT* BRIEF IN SUPPORT OF
## APPLICATION FOR CERTIFICATE OF APPEALABILITY

_____

Robert C. Owen
Capital Punishment Clinic
The University of Texas at Austin
727 East Dean Keeton Street
Austin, TX 78705-3224
Phone: (512) 232-9391
Email: robowenlaw@gmail.com
Texas Bar No.: 15371950

John Carpenter
Federal Public Defender
1331 Broadway, Suite 400
Tacoma, WA 98402
Phone: (253) 593-6710
Email: John_Carpenter@fd.org
Washington Bar No.: 23301

# TABLE OF CONTENTS

Table of Authorities.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . vi

I. Jurisdiction. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

II. Issues Presented. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

III. Statement of the Case. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

IV. Standard for Issuing a COA. . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

V. Statement of Facts.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

VI. Summary of Argument. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

VII. Argument.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

    A. A COA should issue regarding the district court's denial of a
       hearing.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

    B. Bernard's IAC claims warrant a COA. . . . . . . . . . . . . . . . . . . . . . 18

       1. The law governing IAC claims. . . . . . . . . . . . . . . . . . . . . . 18

       2. A COA should issue regarding Bernard's claim that trial
          counsel failed to provide effective assistance prior to and
          during the guilt phase.. . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

          a. Deficient performance. . . . . . . . . . . . . . . . . . . . . . . . 22

          b. A COA cannot be avoided by characterizing
             counsels' errors and omissions at either
             phase as the product of reasoned strategic
             choice. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

          c. Prejudice.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

3.      A COA should issue regarding Bernard's penalty-phase IAC claim. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

     a.      Deficient performance. . . . . . . . . . . . . . . . . . . . . . . . . 34

           i.      Counsel delegated the mitigation investigation to persons who did not conduct a thorough inquiry, failed to uncover much meaningful information about Bernard, and missed the significance of important facts that sources disclosed.. . . . . . 35

           ii.      Counsel performed deficiently in securing mental health expertise. . . . . . . . . . . . . . . . . . . . 39

           iii.      Counsel failed to prepare to challenge the Government's aggravating evidence, and performed deficiently in meeting that evidence when it was presented in court.. . . . . . 41

           iv.      Counsel performed deficiently in the conduct of the sentencing hearing.. . . . . . . . . . . 45

     b.      Prejudice.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 51

           i.      Bernard endured a turbulent and deprived childhood marked by family violence, which shaped his path into depression, drugs, and crime; yet, he retained hopes of a normal law-abiding life and showed positive character traits. . . . . . . . . . . . . . . . . . . . . . . . . . 52

           ii.      Evidence of Bernard's neurocognitive dysfunction would have helped persuade jurors that a life sentence was appropriate. . . . . 57

iii. Counsel could have protected Bernard from unreliable "scientific" predictions of his future dangerousness in prison.. . . . . . . . . . . . . . . . . . 58

iv. Evidence of Bernard's successful adjustment to confinement awaiting trial, and his positive response to structure and supervision in the past, would have rebutted the Government's "future dangerousness" claims as well as shown that Bernard's life would have positive value in prison if he were not condemned. . . . . . . . . . . . . . . . . . . . . . 61

v. Available evidence would have shown that Bernard's "gang" membership was highly unlikely to exert long-term influence over his behavior. . . . . . . . . . . . . . . . . . . . . . . . . . . . 63

vi. Properly prepared, counsel could have impeached Government witnesses on other important points. . . . . . . . . . . . . . . . . . . . . . . . . . 67

vii. Improper and excessive victim impact evidence could have been excluded. . . . . . . . . . 67

viii. The jury could have heard detailed descriptions of Bernard's deep remorse for his actions.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . 68

iii

ix.    A COA should issue because the mitigation case presented by trial counsel was grossly inaccurate and pitifully inadequate as a portrait of Bernard's human qualities, life experiences, and moral culpability; had the jury been introduced to the real Brandon Bernard, there is every reason to believe that at least one juror would have voted to spare his life.. . . . . . . . . . . . . . . . . . . . . . . . . . . 70

C.    A COA should issue regarding Bernard's *Brady* claims. . . . . . . . . . 73

1.    Factual Background. . . . . . . . . . . . . . . . . . . . . . . . . . . . . 73

a.    The Government decided not to memorialize what Brown and Lewis said during their meetings with Government agents.. . . . . . . . . . . . . . . . . . . . . . . . . . 73

b.    How the Government portrayed Brown and Lewis's criminal histories at trial.. . . . . . . . . . . . . . . . 74

c.    Notes from Brown's attorney indicate that the Government knew about Brown's history of serious violent crimes.. . . . . . . . . . . . . . . . . . . . . . . 74

d.    Below, the Government did not deny that it possessed the impeachment information recorded in Brown's attorney's notes. . . . . . . . . . . . . . . . . . . . . 75

e.    Brown's serious mental illness, use of psychotropic medication, and diagnosis as someone who tended to minimize and rationalize his own wrongdoing . . . . . . . . . . . . . . . . . . . . . . . . . . 75

2.    The law governing *Brady* claims . . . . . . . . . . . . . . . . . . . . . . 76

3. The Government's suppression of evidence about Brown's violent past enabled it to mislead the jury regarding Brown's character. . . . . . . . . . . . . . . . . . . . . . . . . 78

4. Brown's improbable story about how the fire was set would have directly impeached him on the very theory on which the Government relied to secure Bernard's death sentence.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 79

5. The Government suppressed critical impeachment evidence regarding Brown's mental health. . . . . . . . . . . . . . 80

6. The suppressed evidence cannot be considered cumulative.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 81

D. A COA should issue regarding the district court's blanket denial of discovery. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 83

E. Reasonable jurists could debate whether Bernard's conviction violates the Fifth Amendment. . . . . . . . . . . . . . . . . . . . . . . . . . . 84

F. Reasonable jurists could debate whether Bernard's conviction and sentence resulted from cumulative error. . . . . . . . . . . . . . . . . . 86

VIII. Conclusion.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 86

CERTIFICATE OF COMPLIANCE.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . 87

CERTIFICATE OF SERVICE. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 88

# TABLE OF AUTHORITIES

## FEDERAL CASES

*Anderson v. Sirmons*,
476 F.3d 1131 (10th Cir. 2007). ................................................................ 38

*Armienti v. United States*,
234 F.3d 820 (2nd Cir. 2000). .................................................................. 14

*Avila v. Quarterman*,
560 F.3d 299 (5th Cir. 2009). .................................................................... 3

*Baldwin v. Adams*,
899 F. Supp. 2d 889 (N.D. Cal. 2012). ...................................................... 42

*Banks v. Dretke*,
540 U.S. 668 (2004) ..................................................................... 76, 77, 82

*Benn v. Lambert*,
283 F.3d 1040 (9th Cir. 2002). .................................................................. 77

*Berryman v. Morton*,
100 F.3d 1089 (3rd Cir. 1996). .................................................................. 48

*Bond v. Beard*,
539 F.3d 256 (3d Cir. 2008). ..................................................................... 46

*Brady v. Maryland*,
373 U.S. 83 (1963)................................................................................. *passim*

*Browning v. Trammell*,
__ F.3d __, 2013 WL 1867412 (10th Cir. May 6, 2013)............................ 81

*Cargle v. Mullin*,
317 F.3d 1196 (10th Cir. 2003). .......................................... 21, 68, 71, 80, 86

*Chang v. United States*,
250 F.3d 79 (2nd Cir. 2001). ........................................................................ 14

*Collier v. Turpin*,
177 F.3d 1184 (11th Cir. 1999). ............................................................. 40, 71

*Draughon v. Dretke*,
427 F.3d 286 (5th Cir. 2005). ...................................................................... 24

*East v. Johnson*,
123 F.3d 235 (5th Cir. 1997). ...................................................................... 81

*East v. Scott*,
55 F.3d 996 (5th Cir. 1995). ..................................................................... 9, 83

*Foust v. Houk*,
655 F.3d 524 (6th Cir. 2011). ............................................... 35, 36, 46, 70

*Freeman v. United States*,
284 F. Supp. 2d 217 (D. Mass. 2003). ......................................................... 81

*Gardner v. Johnson*,
247 F.3d 551 (5th Cir. 2001). ...................................................................... 70

*Giglio v. United States*,
405 U.S. 150 (1972)................................................................................ 76, 78

*Haliym v. Mitchell*,
492 F.3d 680 (6th Cir. 2007). ...................................................................... 19

*Hardwick v. Crosby*,
320 F.3d 1127 (11th Cir. 2003). ............................................................ 25, 58

*Harris v. Nelson*,
394 U.S. 286 (1969).................................................................................... 83

*Hooks v. Workman*,
689 F.3d 1148 (10th Cir. 2012). ................................................................. 72

*Hooper v. Mullin*,
    314 F.3d 1162 (10th Cir. 2002). ..................................................... 48

*Horton v. Zant*,
    941 F.2d 1449 (11th Cir. 1991). .................................................... 62

*Jells v. Mitchell*,
    538 F.3d 478 (6th Cir. 2008). ................................................. 36, 38

*Jermyn v. Horn*,
    266 F.3d 257 (3d Cir. 2001). ....................................................... 71

*Johnson v. Bagley*,
    544 F.3d 592 (6th Cir. 2008). ..................................................... 36

*Jones v. United States*,
    526 U.S. 227 (1999)................................................................... 84

*Kimmelman v. Morrison*,
    477 U.S. 365 (1986)................................................................... 24

*Kyles v. Whitley*,
    514 U.S. 419 (1995)....................................................... 76, 77, 78

*Lafler v. Cooper*,
    132 S. Ct. 1376 (2012)............................................................... 20

*Lewis v. Dretke*,
    355 F.3d 364 (5th Cir. 2003). ................................................. 25, 71

*Littlejohn v. Trammell*,
    704 F.3d 817 (10th Cir. 2013). .................................................... 40

*Lockett v. Ohio*,
    438 U.S. 586 (1978)................................................................... 72

*Lockyer v. Andrade*,
    538 U.S. 63 (2003)....................................................................... 5

*Loyd v. Smith*,
    899 F.2d 1416 (5th Cir. 1990). ..................................................................... 20

*Machibroda v. United States*,
    368 U.S. 487 (1962). ................................................................................... 13

*Mackey v. Russell*,
    148 Fed. Appx. 355 (6th Cir. 2005). .......................................................... 42

*Mason v. Mitchell*,
    543 F.3d 766 (6th Cir. 2008). ..................................................................... 38

*Mayes v. Gibson*,
    210 F.3d 1284 (10th Cir. 2000). .................................................................. 72

*Mayfield v. Woodford*,
    270 F.3d 915 (9th Cir. 2001). ..................................................................... 45

*Miller-El v. Cockrell*,
    537 U.S. 322 (2003). ................................................................................. 3, 4

*Missouri v. Frye*,
    132 S. Ct. 1399 (2012). ............................................................................... 19

*Montgomery v. United States*,
    469 F.2d 148 (5th Cir. 1972). ..................................................................... 17

*Moore v. Johnson*,
    194 F.3d 586 (5th Cir. 1999). ............................................... 21, 25, 44, 48

*Murphy v. Johnson*,
    205 F.3d 809 (5th Cir. 2000). ..................................................................... 83

*Musladin v. Lamarque*,
    555 F.3d 830 (9th Cir. 2009). ..................................................................... 42

*Napue v. Illinois*,
    360 U.S. 264 (1959). ................................................... 27, 77, 78, 79

*Payne v. Tennessee,*
501 U.S. 808 (1991)..................................................................... 44

*Peavy v. United States,*
31 F.3d 1341 (6th Cir. 1994). ....................................................... 15

*Reid v. True,*
349 F.3d 788 (4th Cir. 2003). ........................................................ 4

*Ring v. Arizona,*
536 U.S. 584 (2002)..................................................................... 84

*Sager v. Maass,*
84  F.3d 1212 (9th Cir. 1996). ..................................................... 48

*Sears v. Upton,*
130 S. Ct. 3259 (2010).......................................................... 35, 71

*Skinner v. Quarterman,*
528 F.3d 336 (5th Cir. 2008). ....................................................... 3

*Skipper v. South Carolina,*
476 U.S. 1 (1986)....................................................................... 43

*Slack v. McDaniel,*
529 U.S. 473 (2000)..................................................................... 3

*Smith v. United States,*
348 F.3d 545 (6th Cir. 2003). ..................................................... 17

*Smith v. Wainwright,*
741 F.2d 1248 (11th Cir.1984). ................................................... 21

*Soffar v. Dretke,*
368 F.3d 441 (5th Cir. 2004). ..................................................... 25

*Stevens v. Epps,*
618 F.3d 489 (5th Cir. 2010). ....................................................... 3

*Stirone v. United States*,
361 U.S. 212 (1960)................................................................ 85

*Strickland v. Washington*,
466 U.S. 668 (1984)........................................................... *passim*

*Tassin v. Cain*,
517 F.3d 770 (5th Cir. 2008). ................................................ 78

*Thornburg v. Mullin*,
422 F.3d 1113 (10th Cir. 2005). .............................................. 4

*United States v. Auten*,
632 F.2d 478 (5th Cir. 1980). ................................................ 13

*United States v. Barham*,
595 F.2d 231 (5th Cir. 1979). ................................................ 78

*United States v. Bernard*,
299 F.3d 467 (5th Cir. 2002). ............................... 2, 44, 60, 84

*United States v. Briggs*,
939 F.2d 222 (5th Cir. 1991). ................................................ 13

*United States v. Brumfield*,
686 F.3d 960 (8th Cir. 2012). ................................................ 79

*United States v. Cotton*,
535 U.S. 625 (2002)........................................................... 84

*United States v. Culverhouse*,
507 F.3d 888 (5th Cir. 2007). ................................................ 14

*United States v. Fields*,
483 F.3d 313 (5th Cir. 2007). .................................................. 6

*United States v. Gonzalez*,
493 Fed. Appx. 541(5th Cir. 2012)............................................ 3

*United States v. Hayes*,
532 F.3d 349 (5th Cir. 2008). ...................................................................... 14

*United States v. Martinez*,
181 F.3d 627 (5th Cir. 1999). ...................................................................... 12

*United States v. Rivas-Lopez*,
678 F.3d 353 (5th Cir. 2012). ................................................................. 3, 12

*United States v. Robinson*,
367 F.3d 278 (5th Cir. 2004). ...................................................................... 84

*United States v. Rodrigues*,
347 F.3d 818 (9th Cir. 2003). ...................................................................... 18

*United States v. Scruggs*,
714 F.3d 258 (5th Cir. 2013). ...................................................................... 85

*United States v. Sipe*,
388 F.3d 471 (5th Cir. 2004). ...................................................................... 77

*United States v. Smith*,
73 F.3d 511 (D.C. Cir. 1996). ...................................................................... 81

*White v. McAninch*,
235 F.3d 988 (6th Cir. 2000). ...................................................................... 42

*White v. United States*,
366 F.3d 291 (4th Cir. 2004). ...................................................................... 13

*Wiggins v. Smith*,
539 U.S. 510 (2003) ................................................................ 18, 20, 21, 39

*Williams v. Allen*,
542 F.3d 1326 (11th Cir. 2008). ............................................................. 35, 39

*Williams v. New York*,
337 U.S. 241 (1949) ................................................................................... 72

*Williams v. Taylor*,
     529 U.S. 362 (2000)............................................................................... 5, 21, 43

*Woodford v. Visciotti*,
     537 U.S. 19 (2002) ...................................................................................... 4

**STATE CASES**

*In re Avena*,
     909 P.2d 1017 (Cal. 1996). ....................................................................... 19

*Coble v. State*,
     330 S.W.3d 253 (Tex. Crim. App. 2010)..................................................... 59

*Davis v. State*,
     87 So.3d 465 (Miss. 2012)......................................................................... 44

*Ex parte Land*,
     775 So. 2d 847 (Ala. 2000)........................................................................ 44

*In re Lucas*,
     94 P.3d 477 (Cal. 2004). ........................................................................... 39

*People v. Ruiz*,
     686 N.E.2d 574 (Ill. 1997). ....................................................................... 40

*State v. DiFrisco*,
     804 A.2d 507 (Pa. 2002). .......................................................................... 19

*State v. Martin*,
     69 So. 3d 94 (Ala. 2011)............................................................................ 44

**FEDERAL STATUTES**

18 U.S.C. § 3005.................................................................................... 6

18 U.S.C. § 3591................................................................................... 84

18 U.S.C. § 3592................................................................................... 84

18 U.S.C. § 3593................................................................................... 84

28 U.S.C. § 1291.................................................................................... 1

28 U.S.C. § 2253................................................................................ 1, 4

28 U.S.C. § 2254................................................................................ 4, 5

28 U.S.C. § 2255......................................................................... *passim*


**MISCELLANEOUS**

Blume, John H.; Garvey, Stephen P.; and Johnson, Sheri Lynn,
    "Future Dangerousness in Capital Cases: Always 'At Issue,'"
    86 Cornell L. Rev. 397 (2001). .................................................... 44

Cunningham, M.D., Sorensen, J.R. & Reidy, T.J.
    "Capital Jury Decision-Making:  The Limitations of Predictions of Future
    Violence,"  15 Psychology, Public Policy & Law 223 (2009)..................... 59

Dudley, Richard G. And Leonard, Pamela B.,
    "Getting it Right: Life History Investigation as the Foundation for a
    Reliable Mental Health Assessment,"
    36 Hofstra L. Rev. 963 (Spring 2008). ........................................ 39

Eisenberg, Theodore; Garvey, Stephen P.; and Wells, Martin T.,
    "But Was He Sorry?  The Role of Remorse in Capital Sentencing,"
    83 Cornell L. Rev. 1599 (1998). ................................................ 68

Liebert, Douglas & Foster, David,
    "The Mental Health Evaluation in Capital Cases:  Standards of Practice,"
    15 Am. J. Forensic  Psychiatry 4:43 (1994)..................................................... 39

Sundby, Scott E.,
    "The Capital Jury and Absolution:  The Intersection of Trial Strategy,
    Remorse, and the Death Penalty," 83 Cornell L. Rev. 1557 (1998). ............. 68

U.S.S.G. 1§4A1.2(d)...................................................................................... 84

# I.  Jurisdiction

The district court had jurisdiction under 28 U.S.C. §2255.  It entered judgment on September 28, 2012, and denied a Certificate of Appealability on all issues.  USCA5 8:157.  Bernard's Motion to Alter or Amend the Judgment was denied on February 8, 2013.  USCA5 9:392.  Bernard gave timely notice of appeal on March 28, 2013.  USCA5 9:393.  Upon granting a COA, this Court will have jurisdiction under 28 U.S.C. §§1291 and 2253.

# II.  Issues Presented

Bernard seeks a COA on each of the following issues.  Thus, the Court must decide whether reasonable jurists would find the merits of the following questions debatable:

A. Did the district court err in denying Bernard a hearing on any of the claims in his §2255 motion?

B. Was Bernard denied his constitutional right to the effective assistance of counsel at the guilt phase and/or the penalty phase?

C. Was Bernard denied his constitutional rights under *Brady v. Maryland*, 373 U.S. 83 (1963), and its progeny?

D. Did the district court err in denying Bernard all discovery with respect to the claims in his §2255 motion?

E. Was Bernard denied his rights under the Fifth Amendment's Indictment Clause?

F. Was Bernard denied his rights as a result of cumulative error?

1

### III.  Statement of the Case

Brandon Bernard appeals from the denial, without any hearing, of his initial motion for relief under 28 U.S.C §2255.

Bernard was convicted of carjacking and first-degree murder and was sentenced to death in the Western District of Texas in 2000.  This Court affirmed. *United States v. Bernard*, 299 F.3d 467 (5th Cir. 2002).  In 2004, Bernard sought post-conviction relief, requesting discovery and an evidentiary hearing to fully develop and prove his allegations.  The Government responded.  In 2005, Bernard filed a reply.  Nothing further happened until September 2012, when the district court denied Bernard's §2255 motion, denied all associated motions, and refused permission to appeal.  Bernard moved unsuccessfully to alter and amend that judgment. This appeal follows.

### IV.  Standard for Issuing a COA

Under 28 U.S.C. §2255(c)(2), leave to appeal should be granted if Bernard has made a "substantial showing of the denial of a constitutional right."  He need not demonstrate that he will prevail upon remand, but only that "reasonable jurists could debate . . . whether the petition should have been resolved in a different manner or that the issues presented were adequate to deserve encouragement to proceed further." *Slack v. McDaniel*, 529 U.S. 473, 483-84 (2000) (internal

quotation marks omitted); *see also Miller-El v. Cockrell*, 537 U.S. 322, 336-38 (2003) ("a claim can be debatable even though every jurist of reason might agree, after the COA has been granted and the case has received full consideration, that petitioner will not prevail"), *Avila v. Quarterman*, 560 F.3d 299, 304 (5th Cir. 2009) (same); and *Skinner v. Quarterman*, 528 F.3d 336, 344 (5th Cir. 2008) (granting a COA on ineffective assistance of counsel (IAC) claim despite recognizing that proof of prejudice would require "considerable speculation").

A COA may issue with respect to procedural issues, such as the denial of an evidentiary hearing on a §2255 movant's IAC claim, if reasonable jurists could debate both the merits of the underlying claim and the correctness of the district court's procedural ruling. *Slack*, 529 U.S. at 484. *See also*, *e.g*., *United States v. Gonzalez*, 493 Fed. Appx. 541, 543 (5th Cir. 2012) (noting that the Court had earlier granted COA to decide whether the district court erred in denying movant's IAC claim without an evidentiary hearing); *United States v. Rivas-Lopez*, 678 F.3d 353, 356 (5th Cir. 2012) (same).

The fact that Bernard faces execution if this appeal is unsuccessful is a proper consideration in deciding whether to grant COA, and "[i]n a death penalty case any doubts as to whether a COA should issue must be resolved in the [movant's] favor." *Stevens v. Epps*, 618 F.3d 489, 502 (5th Cir. 2010) (internal quotation, citations and alterations omitted).

Further, a COA should issue even if only a single judge finds Bernard's claims debatable. Because §2253(c) requires only "a judge" for issuance of a COA, a panel majority is not required. *See Miller-El*, 537 U.S. at 335-36 (prisoner who seeks to appeal must first "obtain a COA from *a* circuit justice or judge") (emphasis added); *Thornburg v. Mullin*, 422 F.3d 1113, 1118 (10th Cir. 2005) (noting that "a member" of the court granted COA in capital case); *Reid v. True*, 349 F.3d 788, 796 (4th Cir. 2003) (if the movant's showing regarding a particular issue satisfies "any member of the panel," then "the court will grant a COA as to that issue").

A final observation about the scope of review is appropriate. This is an appeal from an initial motion under 28 U.S.C. §2255, not an appeal by a state prisoner under §2254. Before the district court's decision denying relief, no court had passed on Bernard's claims of ineffective assistance of counsel ("IAC claims") or violations of *Brady v. Maryland*, 373 U.S. 83 (1963). As a result, this Court should exercise caution in applying its post-AEDPA decisional law to resolve Bernard's claims for relief, because review in those §2254 cases was almost always constrained by the deference to prior state-court adjudications that is compelled by AEDPA. In such appeals, the issue is not whether the state court has *correctly* interpreted and applied the federal constitution, but whether it has *unreasonably* done so. *Woodford v. Visciotti*, 537 U.S. 19, 24-25 (2002). An

4

"unreasonable" application of federal law is more than an "erroneous" application, *Williams v. Taylor*, 529 U.S. 362, 410 (2000). *See also Lockyer v. Andrade*, 538 U.S. 63, 75 (2003) (warning federal habeas courts against "conflating error (even clear error) with unreasonableness").

Thus, §2254 cases involve "highly deferential" review of state court judgments for unreasonableness, *Visciotti*, 537 U.S. at 24, rather than a straightforward application of constitutional principles to the facts of the underlying trial. As a result, this Court should exercise caution in determining how much weight to accord those precedents in the present context, where no such systemic deference applies.

## V. Statement of Facts

Bernard will describe the relevant facts in detail as he addresses each issue upon which he seeks a COA. To set the stage for that in-depth discussion, he first provides a brief overview of the facts.

Bernard was indicted on three offenses for which the Government would seek the death penalty.[1] These were the murders of Todd and Stacie Bagley, and the carjacking that resulted in their deaths.

---

[1] The indictment lacked essential allegations to charge a capital offense. *See* Section VII.C, *infra*.

5

The Bagleys were abducted in Killeen, Texas, by three teenagers – Christopher Vialva, Christopher Lewis and Tony Sparks, who then forced the Bagleys into the trunk of their car after robbing them. Eventually, Sparks was dropped off and Bernard and Terry Brown were summoned by Vialva to join them. At Vialva's direction, the group drove in two cars to a remote location on Fort Hood. There, Vialva shot both Bagleys in the head, killing Mr. Bagley instantly and immediately rendering Ms. Bagley unconscious. The Bagleys' car was then set on fire. At trial, Lewis and Brown testified for the Government, providing the only sources of information about who did what during the crimes.

Without consulting the local Federal Public Defender as required by 18 USC §3005,[2] the district court appointed a single attorney to represent Bernard. That attorney handled Bernard's case alone until shortly before trial, when he sought and obtained his son's appointment as co-counsel. USCA5 1:116. By the time Bernard's counsel wrote his two-page letter in August 1999 asking the Government not to seek death, time records suggest that he had spent less than one hour reviewing evidence and records. Prior to trial, Bernard's lawyers collectively logged about 307 hours in out-of-court time, just one-fifth of the 1,480 hours

---

[2] *See* USCA5 5:1088; *see also United States v. Fields*, 483 F.3d 313, 347 (5th Cir. 2007) (in later federal capital prosecution, same district judge acknowledged that he had appointed counsel without conferring with the FPD).

typically spent by defense counsel in preparing a federal death penalty case, according to contemporaneous data. USCA5 4:878-81.

Counsels' performance at trial reflected how little time they had expended on Bernard's case. They offered no opening statement at either phase. Among other errors, counsel (1) failed to challenge evidence presented in the guilt phase that led directly to Bernard's death sentence, including evidence identifying him as the person who set fire to the Bagleys' car, and evidence of the fire as a contributing factor in Ms. Bagley's death, (2) failed to contest much of the Government's evidence in aggravation, and (3) failed to develop and present readily available mitigation that had a reasonable probability of persuading at least one juror to spare Bernard's life; they did not pursue either witnesses or available documentary records concerning Bernard's family background, education, work history, medical history, or contact with the criminal justice system. *See* USCA5 5:915.

Vialva and Bernard were jointly tried. Sentencing deliberations began around 4 p.m. on June 12, 2000. Before breaking for the night at 7 p.m., jurors condemned Vialva to death on all three death-eligible counts. USCA5 2:318, 331 344. During the same session, and despite the horrific nature of the crime, jurors sentenced Bernard to life for his part in the carjacking and in Todd Bagley's murder. USCA5 2:358, 371. Only after unsuccessfully requesting the autopsy

report on Stacie Bagley and returning for further deliberations the following day did jurors impose a death sentence on Bernard for Ms. Bagley's murder. USCA5 2:383.

## VI. Summary of Argument

A COA must issue where reasonable jurists could disagree about the merits of the constitutional claims or procedural issues presented. Under this standard, Bernard submits, the record entitles him to a COA on each of the following claims.

First, reasonable jurists could, at a minimum, view as improper the district court's complete denial of a hearing on Bernard's §2255 motion. Bernard presented detailed allegations of constitutional violations, including both IAC claims and claims under *Brady*; he supported them with extensive documentary evidence, including numerous sworn declarations by both experts and lay witnesses. The Government offered no evidence whatsoever in response. Under §2255, a hearing was plainly required and reasonable jurists could conclude that the district court erred in refusing one. This Court should grant COA and remand for a hearing.

Reasonable jurists likewise could disagree with the district court's blanket denial of discovery. Because Bernard made a strong showing that the Government had suppressed favorable impeachment evidence about codefendant witness Brown, reasonable jurists could conclude that the district court abused its

discretion in denying every requested item of discovery. *See East v. Scott*, 55 F.3d 996, 1001 (5th Cir. 1995) (refusing discovery that is indispensable to a fair, grounded development of the material facts is an abuse of discretion). The Court should grant COA and order the district court to grant Bernard's discovery requests.

This Court should also issue a COA to address Bernard's claim that his trial counsel failed to provide effective assistance at both phases of trial. Counsels' guilt-phase errors and omissions include unreasonably failing to investigate and present readily available scientific evidence to counter the Government's highly prejudicial assertions that Bernard set the fire that consumed the Bagleys' car, and that the fire directly contributed to Ms. Bagley's death. Expert testimony would have established that there was no scientific basis for the Government's claim that only Bernard could have lit the fire. Nor was there any scientific basis for the claim that the fire contributed to Ms. Bagley's death – a claim based on the theory that the soot in her breathing passages could only have resulted from live breathing, as opposed to other biological processes. Counsel also failed effectively to cross-examine the codefendant witnesses using their numerous prior inconsistent statements and other impeachment evidence, or to emphasize the exculpatory aspects of their other statements. Bernard's guilt-phase IAC claim warrants a COA.

At the penalty phase, counsels' failure to investigate and present compelling mitigating evidence likewise merits a COA, along with counsels' failure to contest much of the Government's evidence in aggravation, which claimed that Bernard was a member of a nationally organized gang, and that this membership guaranteed that Bernard would commit future violent crimes. Counsel failed to conduct an investigation consistent with prevailing professional norms, by improperly delegating the core investigation tasks and relying solely on Bernard's mother to identify potential mitigation witnesses. Counsel undertook no meaningful investigation and failed to make appropriate use of experts. In the end, counsel presented just eight witnesses, all of whom testified only briefly and several of whom relayed nothing meaningful about Bernard. Counsels' presentation left unexplained how this young man could have been drawn into this criminal act. In contrast, a competent investigation would have produced a compelling portrait of Bernard as someone who was harmed in his early teens by his exposure to the turbulent breakup of his parents' marriage and who spent his adolescence becoming increasingly withdrawn and depressed, eventually becoming involved with the youth "gang" that had no real association with the national gang that it mimicked. At the same time, counsel could have shown the jury that Bernard retained numerous positive character traits, was deeply remorseful for his role in the crime, and was very unlikely to pose a threat of continuing violence to anyone.

10

Reasonable jurists could disagree with the district court's apparent view that everything trial counsel did was strategic, and that no mitigating evidence could conceivably have changed Bernard's fate. Particularly given that the jury struggled to reach their sentencing decision as to Bernard, those conclusions are debatable and warrant a COA.

Bernard also seeks COA on his claim that the Government violated *Brady* by failing to disclose vital impeachment evidence concerning key prosecution witness Brown. The Government possessed information, *inter alia*, that Brown was seriously mentally ill, was taking psychotropic medications both during the crime and when he testified, had a long history of violent and intimidating conduct, and had made statements in interviews with Government agents that were belied by undisputed forensic evidence. Reasonable jurists could debate whether the Government's failure to disclose this information violated *Brady* and that the violation was material, given Brown's central role in the Government's case. A COA should issue on this claim.[3]

---

[3] Solely to preserve the issue for further review, Bernard also requests a COA on one claim foreclosed by Fifth Circuit precedent: a challenge to the indictment for failing to include the statutory intent factors and aggravating factors necessary to charge a capital offense under Federal law.

## VII. Argument

### A. A COA should issue regarding the district court's denial of a hearing.

Bernard's pleadings below were factually detailed and supported by affidavits and other evidentiary documents. These included detailed and specific expert evidence demonstrating that many of trial counsels' actions were professionally deficient, as well as evidence to show the prejudice that resulted from those errors and omissions. *See generally* USCA5 4:869-5:950, 5:964-1033.

The Government did not submit a single piece of evidence in response. In particular, there was no evidence whatsoever before the district court that identified trial counsels' strategy, if any, in Bernard's case or how any strategy shaped decisions to pursue – or not – particular evidence or issues. Despite this yawning gap in the record, the district court denied Bernard's IAC claims, in part based on speculation that all of trial counsels' (unexplained) actions were "strategic." USCA5 8:157.

Section 2255 requires that the district court "grant a prompt hearing" on a federal prisoner's motion unless the motion itself and the files and records of the case *conclusively* disentitle the movant from relief. *United States v. Martinez*, 181 F.3d 627, 628 (5th Cir. 1999); *Rivas-Lopez*, 678 F.3d at 358 ("A district court must hold an evidentiary hearing '[u]nless the motion and the files and records of the

case conclusively show that the prisoner is entitled to no relief.'") Conclusive negation is a high bar. *United States v. Auten*, 632 F.2d 478, 482 (5th Cir. 1980) (documents that suggested, but did not prove, that Government had failed to disclose all impeachment information about its witness were sufficient to trigger a hearing). If the movant's "specific and detailed factual assertions … cannot be said to be incredible," and, if true, would entitle him to relief, the function of 28 U.S.C. §2255 can be served only by affording a hearing. *See Machibroda v. United States*, 368 U.S. 487, 495-496 (1962).

Section 2255 thus creates a robust presumption that a movant will have an opportunity to prove his extra-record allegations in a hearing. *United States v. Briggs*, 939 F.2d 222, 228 (5th Cir. 1991) ("Where . . . the allegations in the §2255 motion are not negated by the record, the district court must hold an evidentiary hearing").

An evidentiary hearing is mandatory here because almost all of Bernard's claims concern events which took place outside the district court's presence and which do not appear on the trial record. In such circumstances, only an evidentiary hearing can ensure the fair and reliable determination of the underlying facts. *Machibroda,* 368 U.S. at 494-95 (hearing necessary where movant's allegations primarily concern "occurrences outside the courtroom and upon which the record [can], therefore, cast no real light"); *White v. United States*, 366 F.3d 291, 302 (4th

Cir. 2004) (same); *Armienti v. United States*, 234 F.3d 820, 825 (2nd Cir. 2000) (a hearing is ordinarily required where the movant's claims depend on "actions taken by counsel outside the [trial judge's] presence"). Because IAC claims "involve[] off-the-record interactions [between the movant and] his trial counsel," they typically "cannot be determined by examining the motion, files, and records" alone. *Chang v. United States*, 250 F.3d 79, 85 (2nd Cir. 2001) (citation omitted). This is particularly true where, as here, the Government alleges that defense counsel acted according to a "strategy." *See United States v. Hayes*, 532 F.3d 349, 355 (5th Cir. 2008) (absent a hearing, there is "no way to analyze [counsel's] potential strategy"); *United States v. Culverhouse*, 507 F.3d 888, 898 (5th Cir. 2007) (remanding for a hearing, because without a hearing, court could only make "hindsight guesses" regarding counsel's strategy).

The district court pleadings raised material factual disputes which cannot be resolved without taking evidence. Some of them are implicit, since the Government offered no evidence to support its characterizations of various relevant events, actions, motivations, etc. For example, the Government repeatedly denied – without submitting any evidence – that Bernard's trial counsel performed deficiently. In contrast, Bernard submitted the sworn declaration of an expert, describing the prevailing standard of practice for defending federal capital cases in 1999-2000 and identifying specific ways in which counsels' performance fell

14

below it. Reasonable jurists could conclude that the conflict between Bernard's detailed allegations, supported by sworn evidence, and the Government's unsupported denials cannot be resolved against Bernard without a hearing. *See Peavy v. United States,* 31 F.3d 1341, 1346 (6th Cir. 1994) (where an affidavit supported the movant's claims, and the Government offered no "evidence in support of its position," the Government's "unverified responses ... were plainly inadequate" to justify denying relief without a hearing).

The disputes of material fact that exist with respect to Mr. Bernard's claims for relief include, *inter alia*:

- What steps trial counsel took to investigate in preparation for the guilt phase of trial, and when they did so;

- What reasons, if any, trial counsel had for not conducting particular investigation;

- Why trial counsel did not consult any forensic experts, including specifically an arson expert and a pathologist;

- Whether trial counsel obtained and examined the report prepared by the Government's arson expert;

- Whether and to what extent trial counsel relied on investigation and/or other preparation for trial by Vialva's counsel, rather than conducting their own investigation;

- Trial counsels' strategy in attempting to avert authorization of this case as a death penalty prosecution by the Attorney General;

- What efforts, if any, trial counsel made to interview any witnesses, including but not limited to Brown and Lewis;

15

- What documents, information, and/or materials the Government made available to trial counsel through its alleged "open file" discovery policy, and whether the Government provided any other information to the defense;

- The nature and extent of codefendant Brown's mental illness, at the time of the events underlying the indictment, during the period prior to trial, and during trial;

- The nature of any treatment provided to Brown for his mental illness, including but not limited to: the nature of all medications Brown was taking, including their dosages, and their impact on his perceptions and behavior;

- What the Government knew about Brown's mental illness and/or any treatment or medication he was receiving for that condition;

- What impeaching information the Government possessed about Brown but did not disclose to trial counsel, including but not limited to: Brown's involvement in other violent crimes (such as the ones his attorney's notes reflect that Brown admitted during a proffer session with Government agents); Brown's mental illness and treatment (including the treatment documented by the jail records Bernard submitted as exhibits in support of his §2255 motion); Brown's use of illegal or non-prescription drugs; Brown's expectation that he would benefit in return for cooperating with the prosecution, and any other impeaching information;

- Whether the Government agents present at the proffers with Brown and Lewis took any notes during any of those proffers or memorialized the proffers afterward in any written form;

- If the Government agents present at any of the proffers with Brown and Lewis took no notes, why they did not;

- What steps, if any, trial counsel took to investigate potential mitigating evidence;

16

- What mitigating evidence a reasonable and timely investigation would have uncovered;

- What strategy trial counsel was pursuing at the guilt phase;

- What strategy trial counsel was pursuing at the penalty phase;

- Why trial counsel chose not to make an opening statement at the penalty phase;

- Whether the steps trial counsel claim they took to investigate potential mitigating circumstances were consistent with the prevailing standard of practice for defending capital cases in 1999-2000;

- Who decided which witnesses would be called at the penalty phase, and on what basis that decision was made;

- What steps, if any, trial counsel took to prepare the witnesses actually called to testify during the defense case at the penalty phase;

This list is representative, not exhaustive. Bernard's point is simply that reasonable jurists could agree that the district court erred in resolving these myriad contested issues without hearing evidence. *Montgomery v. United States*, 469 F.2d 148, 150 (5th Cir. 1972) ("contested fact issues" that are "bona fide" can only be resolved by an evidentiary hearing).

Bernard was not required to demonstrate conclusively that he would be entitled to relief in order to obtain a hearing. *See Smith v. United States*, 348 F.3d 545, 551 (6th Cir. 2003) (under §2255, the movant's "burden for establishing [his]

17

entitlement to an evidentiary hearing is relatively light") (citation omitted); *United States v. Rodrigues*, 347 F.3d 818, 824 (9th Cir. 2003) (burden is "fairly lenient"). Bernard's burden in the court below was to allege facts which, if true, would entitle him to relief. He did so and supported those allegations with evidentiary documents and numerous sworn declarations. The Government offered no contrary evidence. At a minimum, reasonable jurists could conclude that such circumstances compel a hearing. This issue deserves a COA.

**B.    Bernard's IAC claims warrant a COA.**

**1.  The law governing IAC claims**

The next two sections identify COA-worthy errors and omissions by Bernard's trial counsel, from their appointment to the final verdict, that undermine confidence in the outcome of the proceedings. This section summarizes the legal principles that govern review of such IAC claims.

An IAC claim has two elements: deficient performance and actual prejudice. *Strickland v. Washington*, 466 U.S. 668, 694 (1984).

Counsel performs deficiently by engaging in conduct that falls below an objective standard of reasonableness under prevailing professional norms. *Wiggins v. Smith*, 539 U.S. 510, 521 (2003). Formal standards of professional practice can be "important guides" in determining whether counsel performed deficiently.

*Missouri v. Frye*, 132 S. Ct. 1399, 1408 (2012) (referring to ABA standards). A reviewing court may consider expert testimony in determining whether trial counsel's performance reflected relevant professional norms. *See, e.g., State* v. *DiFrisco,* 804 A.2d 507, 533 (Pa. 2002) (trial court erred in refusing to consider opinion of capital defense expert, relevant because of the "constantly evolving [and] specialized" character of capital litigation) (citing *Bailey* v. *State,* 424 S.E.2d 503, 507 (S.C. 1993) (quoting capital defense expert on specialized demands of capital litigation)); *Haliym v. Mitchell*, 492 F.3d 680, 717 (6th Cir. 2007) (reflecting use of expert on accepted standard of practice); *In re Avena,* 909 P.2d 1017, 1032 (Cal. 1996) ("reliance on attorney experts is commonplace" in post-conviction) (citing cases).

Prejudice is shown when, "but for counsel's unprofessional errors," there is a "reasonable probability [that] the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694. The reasonable probability standard requires only "a probability sufficient to undermine confidence in the outcome." *Id*. It does not require a showing that counsel's deficient conduct "more likely than not" altered the verdict. *Id*. This is because "[t]he result of a proceeding can be rendered unreliable, and hence the proceeding itself unfair, *even if* the errors of counsel cannot be shown by a preponderance of the evidence to have determined the outcome." *Id*. at 694 (emphasis supplied). For example, the standard can be

19

satisfied if, had counsel performed effectively, it is reasonably probable that a single juror might have "struck a different balance" as to the weight of the evidence. *Wiggins*, 539 U.S. at 537; *Loyd v. Smith*, 899 F.2d 1416, 1426 (5th Cir. l990) (before concluding "no prejudice" under *Strickland*, reviewing court "must be confident that at least *one juror's* verdict would not have been different had the new evidence been presented") (emphasis added).

As will be argued below, the deficient performance by Bernard's counsel began before trial. The Sixth Amendment right to counsel applies at every critical stage of a criminal prosecution, which includes pretrial events like pleas or negotiations. *Frye*, 132 S. Ct. at 1407-08. And the fact that a given case may have been resolved by trial – even a fair trial – does not immunize the prejudicial effect of counsel's deficient pretrial performance. *Id.* at 1407 (the guarantee of a fair trial is not "a backstop that inoculates any errors in the pretrial process"). When ineffective assistance of counsel is alleged regarding pretrial negotiations, *Strickland* prejudice is shown where, "but for the ineffective advice [of counsel,] there is a reasonable probability that the plea offer would have been presented to the court." *Lafler v. Cooper*, 132 S. Ct. 1376, 1385 (2012).

A reviewing court must also consider the harm that can result at both phases of trial from a deficient pretrial investigation. Errors made in the guilt phase (including those which have their genesis in an inadequate pretrial investigation)

must be evaluated for both their effect on the jury's decision to convict and any potential impact on the sentencing phase that followed. *See Moore v. Johnson*, 194 F.3d 586, 619 (5th Cir. 1999) ("reject[ing the] notion" that guilt-phase ineffectiveness "may not be deemed to prejudice a capital defendant during the punishment phase"); *Cargle v. Mullin*, 317 F.3d 1196, 1208 (10th Cir. 2003) (noting the "commonsense notion that sentencing proceedings may be affected by errors in the preceding guilt phase"); *Smith v. Wainwright*, 741 F.2d 1248, 1255 (11th Cir. 1984) (counsel's failure to impeach witness at guilt "may not only have affected the outcome of the guilt/innocence phase [but] may have changed the outcome of the penalty trial").

When evaluating the prejudicial effect of numerous errors made throughout counsel's representation, a reviewing court should not treat each error in isolation. Instead, the question is whether the cumulative effect of all of counsel's errors, omissions and oversights undermines confidence in the result. *Williams*, 529 U.S. at 397-398 (a reviewing court applying *Strickland* must assess "prejudice" by considering mitigating evidence cumulatively, rather than piece-by-piece); *see also Wiggins*, 539 U.S. at 534 ("In assessing prejudice, we reweigh the evidence in aggravation against the totality of the available mitigating evidence").

**2.    A COA should issue regarding Bernard's claim that trial counsel mailed to provide effective assistance prior to and during the guilt phase.**

**a.    Deficient performance**

Reasonable jurists could disagree with the district court's endorsement of trial counsels' performance at, and leading up to, the guilt phase. Bernard presented expert testimony demonstrating that, in several respects, counsels' performance failed to comply with prevailing professional norms. Given the absence of any countervailing evidence from the Government, and given the substantial evidence supporting Bernard's expert's opinions, reasonable jurists could surely debate whether counsels' performance was deficient under *Strickland*.

Counsel's deficient performance began even before trial, when reasonable counsel would have pursued early and thorough investigation aimed at developing information to persuade the Government not to seek Bernard's execution. USCA5 4:878-881. Counsel failed to do so. As a result, the two-page letter that counsel sent the Government on August 31, 1999, asking it not to seek Bernard's execution, was almost completely silent about Bernard's diminished culpability or why a death sentence was inappropriate.

The factual context of Bernard's case is essential to appreciating the deficiencies in counsels' performance in preparing and trying the case. USCA5 5:883. No physical or forensic evidence established the respective roles played by,

or the acts committed by, the various defendants. *Id*. As a result, the Government's case at guilt rested almost entirely on the credibility of cooperating codefendants Brown and Lewis, who had participated in the key events of the carjacking and murder; reasonably effective counsel would have known that their testimony would form the linchpin of the Government's case. *Id*.

Thus, reasonably effective counsel would have attacked Brown and Lewis on every front, "rais[ing] any … fact or circumstance that would undermine their credibility with the jury," USCA5 5:887, including specifically the fact that both had made numerous statements regarding the events surrounding the crime, with each statement containing inconsistencies and contradictions when compared to that individual's own prior statements and to the other's statements. USCA5 5:883-84. Given this context, counsel were ineffective for, *inter alia*, (1) not making an opening statement to alert the jury to the known problems with Brown and Lewis' credibility, USCA5 5:884; (2) not cross-examining Brown or Lewis effectively concerning their prior statements, *id*. 5:887-898,[4] their motivation for seeking reduced sentences, *id*. at 5:898, or Brown's drug use, *id*. at USCA5 5:887-88.

---

[4] These statements included Brown's and Lewis' numerous statements to law enforcement and the factual proffers that Brown, Lewis, and codefendant Sparks confirmed under oath in pleading guilty. *See generally* USCA5 5:887-898.

Counsel also performed deficiently in failing to consult independent experts regarding two areas of forensic evidence central to the Government's case: how and where the fire that consumed the Bagley's car was started, and the nature and extent of the Bagleys' injuries and how they died. *See*, *e.g.*, USCA5 4:877 ("Reasonably effective counsel … would have sought the assistance of an independent arson expert or fire investigator to examine the evidence relating to the fire"). Those issues were plainly going to be pivotal at both phases of trial, and counsels' complete failure to investigate them was objectively unreasonable. *See*, *e.g.*, *Draughon v. Dretke*, 427 F.3d 286, 294-96 (5th Cir. 2005) (where bullet's flight path was key to whether killing was intentional, defense counsel performed deficiently in failing to pursue independent ballistic analysis).

### b. A COA cannot be avoided by characterizing counsels' errors and omissions at either phase as the product of reasoned strategic choice.

The Government may contend here, as it did below, that counsels' behavior – which abridged numerous well-established professional norms, *see generally* USCA5 4:869-5:950 – should be excused as some sort of strategic decision. There are two fundamental problems with that contention. First, there is no evidence in the record from Bernard's trial counsel about what strategy, if any, they were trying to pursue, and courts may not use hindsight to supply a strategy for counsel. *Kimmelman v. Morrison*, 477 U.S. 365, 386-87 (1986). Second, the record is clear

that trial counsel failed to undertake the type of thorough investigation that the Supreme Court has made a prerequisite to immunizing counsel's judgments as "strategic" under *Strickland*.

Thus, the actions of Bernard's counsel cannot be excused as "strategy." "[A] decision [not to adduce certain facts in mitigation] cannot be credited as calculated tactics or strategy unless it is grounded in sufficient facts, resulting in turn from an investigation that is at least adequate for that purpose." *Lewis v. Dretke*, 355 F.3d 364, 368 (5th Cir. 2003). Unless counsel have conducted a sufficiently thorough investigation into a potential area of mitigation, they are in no position to make a strategic decision not to use that evidence. *Id.* A decision by counsel not to present mitigating evidence can only be made "after having investigated the defendant's background," and even then such a choice must have been "reasonable under the circumstances." *Hardwick*, 320 F.3d at 1186 (citations omitted); *see also, e.g., Moore*, 194 F.3d at 615 ("*Strickland* does not ... require deference to decisions that are not informed by an adequate investigation into the controlling facts and law"); *Soffar v. Dretke*, 368 F.3d 441, 474 (5th Cir. 2004), *amended on denial of rehearing*, 391 F.3d 703 ("[A]n actual failure to investigate cannot be excused by a hypothetical decision not to use its unknown results.").

### c. Prejudice

Because reasonable jurists could certainly conclude from the evidence Bernard presented in the court below that he has shown prejudice under *Strickland*, a COA should issue.

First, this court must consider the cumulative effect of all errors and omissions by counsel, including those which began immediately after counsels' appointment and continued until trial actually started. As noted, *see* Sec. VII(B)(2)(a) *supra*, during the pretrial period counsel did almost nothing. A prompt and reasonable investigation of the case and Bernard's background would have produced a wealth of mitigating information, *see* Section VII.B.3.b.i *infra*, armed with which counsel might well have persuaded the Government not to seek Bernard's execution. USCA5 4:878-881.

Moreover, had counsel properly investigated the case, he could have shown the Government that a main aspect of the theory upon which the Government would ultimately urge a death sentence for Bernard – that the fire contributed to Ms. Bagley's death – was dubious. Had the Government been so advised, it is reasonably probable that it would have seen Bernard's culpability as more like Brown and Lewis's than like Vialva's, and would not have insisted on seeking Bernard's execution in the first place. Bernard should be granted discovery and an

evidentiary hearing so that he can develop the record to show that this reasonable probability existed.

When trial arrived, counsels' failure to investigate, and their resulting lack of familiarity with the case, left them unprepared to adequately impeach the Government's key witnesses, codefendants Brown and Lewis – the only two witnesses who could describe the events of the crime and the actions that the Government sought to attribute to Bernard. As a consequence, the very foundations of the guilty verdicts against Bernard went unchallenged. As detailed throughout this brief, there was no comprehensive assault on the credibility of Brown and Lewis, no dispute over who set fire to the Bagleys' car, no attack on how the fire was set, and no critical examination of whether the fire in fact contributed to Ms. Bagley's death.

Had counsel not performed deficiently on all these matters, it is reasonably probable that at least one juror would have viewed the case differently and returned a different verdict. Indeed, the wealth of missed impeachment relating to Brown and Lewis, by itself, points strongly to that outcome. See *Napue v. Illinois*, 360 U.S. 264, 269 (1959) ("The jury's estimate of the truthfulness and reliability of a given witness may well be determinative of guilt or innocence, and it is upon such subtle factors … that a defendant's life or liberty may depend").

Counsels' complete failure to challenge the forensic evidence regarding where the fire originated inside the Bagleys' car, and whether the fire had any role in Ms. Bagley's death, also rendered the resulting verdicts fundamentally unreliable. In closing argument at the guilt phase, the Government relied heavily on its theory that Bernard was guilty of first-degree murder because he set the fire and the fire contributed to Ms. Bagley's death. USCA5 23:2610-11. The resulting guilt verdicts are therefore inextricably intertwined with this theory and rest on this aspect of the Government's proof.

To support its claim that the fire likely originated in the car's passenger compartment, the Government used the testimony of an arson investigator. USCA5 20:2084, 2093-94. From that testimony, the Government argued that the car's fire pattern confirmed Brown's testimony that only Bernard was in position to have set the fire. USCA5 19:1928-30; 23:2610.[5]

Having identified Bernard as the only person who could have started the fire, the Government then suggested through a medical examiner that Ms. Bagley suffered and died as a direct result of that action. The medical examiner contended

_____

[5] In fact, the prosecution expert's own report identified three other possible points of origin, including where Vialva was standing as he shot the Bagleys. USCA5 4:731 and USCA5 20:2086. This point was not highlighted for the jury by Bernard's counsel, who asked this witness no questions.

that, although Ms. Bagley would most likely have been unconscious after being shot, USCA5 20:2061, 2067, she could have been alive for a few minutes even after sustaining that wound; he opined that smoke inhalation contributed to her death. USCA5 20:2062. He also stated that Ms. Bagley could have suffered some of her burns while still alive. USCA5 20:2063.

Bernard's counsel limited his cross-examination of the medical examiner to five questions, essentially restating the Government's points from direct. USCA5 20:2067-68. Vialva's counsel later called his own forensic pathologist; he testified that Ms. Bagley could have lived for up to two hours after sustaining her gunshot wound, USCA5 22:2558, was "obviously alive at the time of the fire," USCA5 22: 2574, and could have been inhaling smoke for thirty minutes after being shot. USCA5 22:2569-70. Bernard's counsel did not cross-examine Vialva's expert and never asked either pathologist whether Ms. Bagley would have experienced any pain after being shot, since she was rendered immediately unconscious. USCA5 22:2568, 20:2061, 2067.

At closing, based on this testimony, the Government suggested that Ms. Bagley's death amounted to "torture" and that this torture justified a death sentence for Bernard. USCA5 26:3204-05; *compare* USCA5 26:3264 (acknowledging that Bernard did not intentionally kill Todd Bagley by lighting the fire, because he was

already dead when it was lit) *with* USCA5 26:3269 (arguing that Bernard intentionally killed Stacie Bagley by lighting the fire).

Readily available evidence, which reasonably effective counsel would have pursued and obtained, could have rebutted these key Government's claims.

With regard to where the fire originated, a qualified fire scientist has reviewed the evidence and concluded that the extreme damage and destruction associated with post-flashover burning rendered it "impossible to draw any reliable inference about where the fire started . . . " and that "the physical evidence is just as consistent with the inference that the fire started in the trunk [*i.e.*, closest to where other evidence indicated Vialva was standing] as it is with the inference that it started in the passenger compartment [into which Bernard could have thrown a match, according to the Government's theory]." USCA5 9: 339, 344. This same opinion could have been obtained from any appropriately qualified fire scientist at the time of trial. *Id.*

With regard to the nature of Ms. Bagley's death, a qualified medical examiner has stated that physiological processes inevitably occurring after Ms. Bagley's medical death from the gunshot wound – namely, agonal respiratory effort and circulation – would explain the presence of soot in Ms. Bagley's airways and carbon monoxide in her blood. He concluded that these processes provided an equally plausible and, indeed, even more likely explanation than the Government's

theory – *i.e.*, that the soot in Ms. Bagley's lungs meant she was meaningfully alive and breathing while the car was burning. USCA5 9:349; *see also* 23:2610 (Government's theory stated in closing argument in guilt phase); 26:3202-03 (Government's theory stated in closing argument in penalty phase). This evidence would have been readily available from any qualified medical examiner at the time of trial.

Moreover, with respect to the Government's claim that only Bernard could have set the fire, defense counsel also unreasonably failed to alert the jurors to several pieces of evidence that collectively would have strongly suggested that Bernard did not set the fire.[6]

For example, cooperating witness Lewis drew a diagram showing that Bernard could not have set the fire, because Bernard was already down the hill next to his own car when the Bagleys' car went up in flames. USCA5 3:594. But Bernard's counsel never directed the jury's attention to Lewis' exculpatory diagram – nor did anyone else.

The Government's other cooperating witness, Brown, was the sole witness asserting that only Bernard could have lit the fire. USCA5 19:1930. But Brown had *previously* told the Government that Bernard was – consistent with Lewis's

---

[6] Other information – in the Government's possession – would have undermined its theory that Bernard lit the fire; that evidence appears not to have been disclosed to Bernard's counsel. *See* Section F.4 *infra*.

diagram – already waiting at his own car when the shots were fired (*i.e.*, before the blaze was set); thus, Bernard could not have set the fire. USCA5 3:594. While Vialva's attorney made a passing reference to this fact, USCA5 19:1944, neither of Bernard's attorneys mentioned it at closing.

Further, an investigating agent had determined – apparently based on interviews with Brown and Lewis – that Bernard did not set the fire and that either Vialva or cooperating witness Lewis did. USCA5 4:673. Also supporting the conclusion that either Vialva or Lewis had set the fire was evidence that a tracking dog had found their scents most strongly in the immediate area of the burned car (where it was unable to get a complete scent of Bernard). USCA5 4:673. Bernard's counsel failed to bring any of these important facts to the jurors' attention.

Thus, with appropriately qualified experts, reasonably effective counsel could have demonstrated for the jury that the Government's theories about the fire's origins and effect were highly suspect. And counsel could have strengthened this argument even further with other evidence that was readily at hand. Had counsel not performed deficiently, it is reasonably probable that at least one juror would have been left with reasonable doubt about whether the Government had proved its case.

Moreover, the Government later relied on the same theories – that Bernard set the fire, and that the fire directly caused Ms. Bagley's death – in urging the jury to return a death sentence for Bernard. USCA5 26:3203, 3269-70, 3272. The record suggests that the argument hit the mark. In making their special sentencing findings with respect to Bernard, the jury found identical intent and aggravating factors for all three death-eligible counts and found no mitigating factors for any of those counts. USCA5 2:348-378. Nevertheless, jurors recommended life sentences for Bernard on the first two counts – the carjacking and Todd Bagley's murder – while recommending a death sentence only for Stacie Bagley's murder. In addition, jurors sent out a note during their deliberations asking to be provided the report of Ms. Bagley's autopsy. USCA5 5:1039.[7]

Given the jurors' identical findings on each count regarding the aggravating and mitigating factors, their specific request to review the report of Ms. Bagley's autopsy, and the different sentence they imposed on that count (death, as opposed to life imprisonment), the only logical inference is that jurors concluded that Bernard set fire to the car, that the fire contributed to Ms. Bagley's death, and that a death sentence for Bernard was justified on that basis. Therefore, the prejudice

---

[7] The trial court responded that "[t]he autopsy report was not offered into evidence." *Id*.

that flowed from this particular aspect of counsels' deficient performance at the guilt phase became part of the prejudice that flooded the penalty phase.

> **3.     A COA should issue regarding Bernard's penalty-phase IAC claim.**

> **a.  Deficient performance**

Reasonable jurists could debate the district court's conclusion that trial counsels' performance respecting the penalty phase was consistent with prevailing professional norms.  Contrary to those norms, counsel delegated responsibility for the preparation of the mitigation case, did not develop evidence to rebut the Government's case in aggravation, failed to make appropriate use of experts, and presented only a handful of witnesses.  These witnesses, who do not appear to have been meaningfully prepared, offered no explanation regarding how Bernard's life experiences contributed to his becoming involved in the crime and described none of his recent efforts to turn his life around and go straight.  Nor did counsel call any of the three pastors who could have testified, *inter alia*, to Bernard's enduring expressions of remorse.

**i.** **Counsel delegated the mitigation investigation to persons who did not conduct a thorough inquiry, failed to uncover much meaningful information about Bernard, and missed the significance of important facts that sources disclosed.**

Bernard's counsel did little to develop mitigation evidence. They hired private investigators (Criterion Investigations) who had no apparent experience in doing so, and gave them only a list of names provided by Bernard's mother. *See* USCA5 3:610-4:634-641. This technique – relying on the defendant's mother to identify investigative leads for the case in mitigation – was explicitly condemned as professionally unreasonable by the United States Supreme Court in *Sears v. Upton*, 130 S. Ct. 3259, 3261-64 (2010). *See also, e.g., Foust v. Houk*, 655 F.3d 524, 537 (6th Cir. 2011) (counsel in 2001 trial performed deficiently by effectively delegating decision-making responsibility about the mitigation case to their psychological expert); *Williams v. Allen*, 542 F.3d 1326, 1340 (11th Cir. 2008) (despite availability of other family members, defense counsel in 1990 trial "sought mitigating evidence from only one person with firsthand knowledge of [the defendant's] background: his mother," and doing so left counsel with an "incomplete and misleading" understanding of his client's life history). Some of the contact information Ms. Bernard provided was incorrect and those persons were never found. USCA5 4:635-641. Of those actually contacted, more than a third reported little or no personal knowledge of Bernard. Others could only recall

35

vaguely that Bernard had been a "good boy" and "respectful" when he was younger. *Id.*

Criterion Investigations also lacked the specialized knowledge necessary to locate and develop mitigating evidence in a capital case – they did not know what they were looking for or how to get it from people who might have it. *See, e.g., Foust*, 655 F.3d at 537-38 (2001 trial; counsel's "suspect" hiring of an individual "who [was] not a trained mitigation specialist" was deficient performance; there was "simply no strategic reason" for counsels' "not interviewing family members, not obtaining records, not consulting with [defense psychologist], and not hiring a mitigation specialist"); *Jells v. Mitchell*, 538 F.3d 478, 494 (6th Cir. 2008) (counsel in 1987 trial was ineffective in not using a mitigation specialist to gather "information about Jells's educational, medical, psychological, and social background [that was] necessary to prepare a proper mitigation defense"). Counsel – who were ultimately responsible for ensuring that the mitigation investigation was done properly – provided Criterion with no guidance. *See Johnson v. Bagley*, 544 F.3d 592, 601 (6th Cir. 2008) ("investigative blunders" in 1998 trial were counsel's responsibility because no one on defense team "made *any* deliberate decisions about the scope of the investigation"; counsel provided his alleged mitigation specialists no significant guidance beyond giving them "an initial set of names").

In their contacts with the potential witnesses identified by Bernard's mother, Criterion Investigations failed to recognize leads to significant mitigating information, leads that clearly called for further inquiry and development. *Inter alia*, several people remarked on how the turbulent breakdown of his parents' marriage when he was in his early teens caused Bernard great emotional pain, triggered negative behavior, and left him depressed, withdrawn and socially isolated; others talked about the damaging influence exerted on Bernard by his cousin Melsimeon Pollock. *See generally* USCA5 3:610-4:634.

Sources also noted positive aspects of Bernard's personality that were essential for counsel to pursue and develop. These included his trustworthiness as a caretaker for young children (in addition to sharing the work of caring for his own siblings, Bernard had reliably helped take care of his aunt's infant granddaughter and the young children of a family friend), his determination to educate himself (*e.g.*, as a "model student" in his GED program), and his desire to make amends for his involvement in the crime. USCA5 3:627. Neither counsel nor Criterion Investigations conducted any follow-up investigation. USCA5 5:916. Criterion Investigations interviewed Bernard exactly once, *see* USCA5 5:1046 (visit by Carolyn Hoppe), and counsel themselves visited Bernard in person only eleven times between his arrest and the beginning of trial. *See* USCA5 5:1043-1047.

Neither counsel nor Criterion Investigations interviewed Bernard's father or his siblings – or, indeed, a single immediate family member other than Bernard's mother – and no one sought out other family members, neighbors, teachers, clergy, correctional officers (including probation or parole officers or supervisors), or other potential sources of information. *See* USCA5 5:916. *See Jells*, 538 F.3d at 493 (counsel ineffective where counsel spoke with only three family members, "neglecting to speak with many other family members who had lived with [defendant] and were available" and "[w]hen speaking with the family members they did contact," made an inquiry that was "brief and … failed to ask sufficiently probing questions"); *Mason v. Mitchell*, 543 F.3d 766, 776 (6th Cir. 2008) (counsel ineffective in 1993 trial where he "inexplicably failed to conduct his own independent investigation and interview members of [defendant's] family regarding the circumstances of his childhood and background").

Neither counsel nor Criterion Investigations took any steps to obtain available documentary records concerning Bernard's education, work history, medical history, family history, or contact with the criminal justice system. *See* USCA5 5:915. *See e.g., Anderson v. Sirmons*, 476 F.3d 1131, 1145 (10th Cir. 2007) (reflecting that "no educational records, medical records, or psychological evaluations were gathered in preparation for trial" by ineffective counsel).

### ii. Counsel performed deficiently in securing mental health expertise.

Counsel waited until May 22, 2000 - two days before testimony began in the guilt-innocence phase - to have Bernard evaluated by psychologist Dr. James Shinder. Counsels' actions in this regard fell below the prevailing standard of practice, which required counsel first to complete the comprehensive social history investigation that was necessary for an informed judgment about what type of evaluation was called for. USCA5 5:919-20.[8] Simply retaining a mental health expert is not a substitute for conducting a comprehensive social history investigation. *See e.g., Wiggins*, 539 U.S. at 532-33 (finding counsel ineffective for not conducting such an investigation even though they consulted a psychologist); *In re Lucas*, 94 P.3d 477, 493 (Cal. 2004) (minimum standards in 1995 required counsel to prepare well in advance of the penalty phase and investigate "every aspect" of the client's life); *Williams*, 542 F.3d at 1339 (1990 trial; concluding that "trial counsel's failure to broaden the scope of their investigation beyond these sources [psychologist, PSI, and defendant's mother] was unreasonable under prevailing professional norms"; counsel needed "to formulate an accurate life profile of [the] defendant") (citations omitted).

---

[8] *See also generally* Dudley & Leonard, *Getting it Right: Life History Investigation as the Foundation for a Reliable Mental Health Assessment*, 36 HOFSTRA L. REV. 963 (Spring 2008) (thorough social history is prerequisite for reliable mental health evaluation); Liebert & Foster, *The Mental Health Evaluation in Capital Cases: Standards of Practice*, 15 AM. J. FORENSIC PSYCHIATRY 4:43 (1994) (same).

Had counsel complied with the prevailing standard of practice in this regard, they would have chosen an expert with a completely different specialization. Bernard's background would have indicated to reasonably effective counsel that a neuropsychological evaluation of Bernard was called for. That background included the fact that he had experienced several head traumas, including two that left him unconscious (one in the spring of 1999, just weeks before the crime), and that he had regularly smoked marijuana dipped in formaldehyde or embalming fluid. USCA5 5:921-22, 1050, 1054. *See, e.g.*, *Collier v. Turpin*, 177 F.3d 1184, 1196 (11th Cir. 1999) (counsel ineffective at sentencing for, *inter alia*, failing to present expert testimony regarding petitioner's "diffuse organic brain damage."); *People v. Ruiz*, 686 N.E.2d 574, 580 (Ill. 1997) (counsel ineffective in failing, *inter alia*, to present evidence that defendant had cognitive dysfunction and diffuse brain impairment); *Littlejohn v. Trammell*, 704 F.3d 817, 860, 864-65 (10th Cir. 2013) (1994 trial; remanding for evidentiary hearing; "[e]vidence of organic mental deficits ranks among the most powerful types of mitigation evidence available" because their "attendant effects on behavior" tend to "diminish moral culpability") (citations omitted).

Such a neuropsychological evaluation would have produced significant mitigating evidence. *See infra* Section VII.B.3.b.ii.

### iii. Counsel failed to prepare to challenge the Government's aggravating evidence, and performed deficiently in meeting that evidence when it was presented in court.

Bernard's attorneys also performed deficiently with respect to rebutting and explaining the Government's aggravating evidence. USCA5 5:930-938. They had a duty to conduct a reasonable investigation into the facts and circumstances they had actual notice the Government might introduce – as well as those which reasonable counsel would have anticipated the Government would attempt to introduce – and take steps to challenge them.[9] Counsels' errors and omissions in this regard covered a wide range of key issues.

For example, counsel performed deficiently in failing to take any steps to challenge or rebut the Government's pervasive characterization of Bernard as especially dangerous – particularly in federal prison, if not put to death – due to his purported membership in the infamous "Bloods" street gang. Counsels' failures in this regard likely explain why the jury endorsed the Government's allegation that Bernard – who had no history of serious violence – was "likely to commit criminal

---

[9] *See, e.g,,* American Bar Association, GUIDELINES FOR THE APPOINTMENT AND PERFORMANCE OF DEFENSE COUNSEL IN DEATH PENALTY CASES, Guideline 10.11(A) (counsel must seek information to rebut the prosecution's case in aggravation); Guideline 10.11(H) (as early as possible, counsel must determine "what aggravating factors the prosecution will rely upon … and what [aggravating] evidence will be offered"): Guideline 10.11(I) (counsel must consider available legal challenges to any of the government's aggravating evidence).

acts of violence in the future which would be a continuing and serious threat to the lives and safety of others."  USCA5 2:350, 363, 376.

Reasonably effective counsel, anticipating that the origin, quality and extent of Bernard's "gang" involvement (and indeed the character of the purported "Bloods" group in Killeen itself) would be important issues, would have explored those matters in depth.  USCA5 5:902-905, 930-931, 934, 944.  Counsel would also have appreciated the importance of developing evidence to show the weakness of Bernard's actual and symbolic ties to this "gang," such as proof that he voluntarily stopped wearing gang insignia.

Counsel also performed deficiently with respect to another feature of the Government's "gang" evidence.  Counsel sought no limiting instruction regarding the testimony of Government psychiatric witness Dr. Richard Coons, who purportedly was called to rebut earlier testimony about *Vialva*, but testified broadly about how "free world" gang members always became gang members in prison.[10]

---

[10] Many meritorious IAC claims have involved similar failures.  *See e.g., White v. McAninch*, 235 F.3d 988, 997 (6th Cir. 2000) (counsel was "incompetent" for not seeking a limiting instruction in 1988 trial); *Mackey v. Russell*, 148 Fed. Appx. 355, 366-67 (6th Cir. 2005) (counsel ineffective for not requesting limiting instruction in 1999 trial; "any professionally competent lawyer would have done what he could to limit the admission and then [limit the] use of such testimony"); *Baldwin v. Adams*, 899 F. Supp. 2d 889, 914 (N.D. Cal. 2012) (defense counsel performed deficiently in not requesting limiting instruction in 2004 trial); *Musladin v. Lamarque*, 555 F.3d 830, 846-47 (9th Cir. 2009) (counsel performed deficiently in failing to seek a limiting instruction in 1995 trial after prosecutor

Counsel also did not cross-examine Bureau of Prisons officer Anthony Davis, who complemented Dr. Coons' testimony by confirming that gangs are a problem in federal prison and that prison gang members "do the same thing [as in the free world], burglary, robbery, they prey on the weak, they like to be in the limelight [and] commit big crimes." USCA5 25:3166-67. Nor did counsel object when the Government then argued the testimony of Dr. Coons and Davis against Bernard. USCA5 5:943-944. *See* Section VII.B.3.b.iv *infra*. In failing to take steps to segregate the effect of this evidence, counsel showed "a complete lack of appreciation of the dangers of a joint penalty phase." USCA5 5:945.

Where, as here, the prosecution has served notice that it will rely on "future dangerousness" in seeking death, reasonably competent counsel would also have recognized the importance of showing jurors that Bernard had lived peacefully and productively in a structured environment. *See, e.g.*, *Skipper v. South Carolina*, 476 U.S. 1, 4-6 (1986) (evidence of a defendant's successful adjustment to confinement can rebut a prosecutorial claim of future dangerousness); *Williams*, 529 U.S. at 396 (counsel ineffective in 1986 trial for, *inter alia,* failing to present favorable prison records, testimony from prison officials that Williams was unlikely to act "violently, dangerously, or provocatively" and testimony from a volunteer in a prison ministry program that Williams "seemed to thrive in a more regimented and

"invited [jury] to draw the precise inference … that a limiting instruction would have prohibited") (citation omitted).

43

structured environment"); *Moore*, 194 F.3d at 614 (counsel ineffective in 1980 trial for not presenting evidence to help jurors interpret and understand defendant's penitentiary records), *id.* at 618 (counsel ineffective for failing to argue Moore's early release from prison (on an earlier sentence) as mitigating against a future dangerousness finding).[11]  Despite this notice, counsel failed to develop readily available "*Skipper*" evidence.  *See infra*, Section VII.B.3.b.iv.

Counsel also performed deficiently in failing to take steps to minimize the harm to Bernard from the Government's "victim impact" evidence.  USCA5 5:938-942.  Counsel failed to seek by motion – like the ones that had succeeded in other federal capital trials, USCA5 5:938 – to limit the nature and extent of that evidence, despite having been provided written statements by likely "victim impact" witnesses that should have alerted counsel to objectionable content.  *Id.* This Court has already found that some of the Government's "victim impact" testimony exceeded the scope permissible under *Payne v. Tennessee*, 501 U.S. 808 (1991).  *See Bernard*, 299 F.3d at 480-81 (parts of Donna McClure's testimony

---

[11] *See also Ex parte Land*, 775 So. 2d 847, 854 (Ala. 2000) ("counsel may be found ineffective for failing to present evidence of adjustment to incarceration") *overruled on other grounds  State v. Martin*, 69 So. 3d 94, 97 (Ala. 2011); *Davis v. State*, 87 So.3d 465, 472 (Miss. 2012) (testimony from disinterested witnesses about an inmate's good conduct in custody is "highly probative" mitigation, and counsel in 1992 trial was ineffective for not seeking such evidence).  As these cases suggest, jurors regard the defendant's possible future dangerousness as a vital sentencing consideration.  *See, e.g.*, Blume, *et al.*, *Future Dangerousness in Capital Cases: Always "At Issue,"* 86 CORNELL L. REV. 397, 398-99 (2001).

were irrelevant and inflammatory, and would have been excluded upon a timely objection; other "victim impact" testimony improperly characterized the defendants and their offense). At a minimum, reasonable counsel would have objected to those portions of the "victim impact" witnesses' testimony.

Counsels' failure to prepare also allowed other prejudicial misstatements of fact to go uncorrected. *See* Section VII.B.3.b.vii *infra*.

As Bernard shows in detail below, had counsel prepared effectively, they could have successfully moved to exclude some of the Government's case in aggravation, or blunted its impact by providing essential context and rebuttal.

### iv. Counsel performed deficiently in the conduct of the sentencing hearing.

As they had in the guilt phase, counsel waived any opening statement, forfeiting a vital opportunity to explain why death was not the appropriate punishment for Bernard, and suggesting – since Vialva's attorneys *did* made an opening statement – that there was nothing to be said for Bernard. USCA5 5:922-924.[12] *See, e.g., Mayfield v. Woodford*, 270 F.3d 915, 928 (9th Cir. 2001) (one aspect of counsel's deficient performance in 1993 trial was counsel's wavier of opening statement, "his first opportunity to 'explain the significance' of the

---

[12] Counsels' failure to make an opening statement also constitutes additional proof of deficient investigation – no opening statement was possible because counsel had no idea what their witnesses were going to say.

mitigating evidence to the jury"). Counsel did not subpoena a single witness to the sentencing hearing and hardly spoke with the witnesses they called to testify, who had been rounded up by Bernard's mother. USCA5 6:1382, 1385. The record does not suggest that Bernard's counsel prepared their mitigation witnesses by explaining what they would be asked on direct or cross-examination. At least two of the eight defense witnesses attest that they were not contacted by Bernard's counsel before being called to testify. USCA5 5:1385, 6:1385-1389. Nothing in the remaining witnesses' testimony suggests that Bernard's counsel had any substantial conversations with those witnesses before they testified.

The prevailing standard of practice required counsel to interview potential witnesses and identify the relevant information they possessed, and then to structure examinations to elicit that information. USCA5 5:924-26. [13] The transcript of the sentencing hearing strongly suggests that none of this occurred. To some extent, one can only appreciate the poverty of counsels' presentation by reading it. But the salient points regarding trial counsels' mitigation case can be summarized briefly.

---

[13] *See Foust*, 655 F.3d at 534 (ineffective counsel in 2001 trial interviewed few mitigation witnesses prior to testimony and did not discuss specifics of testimony with other witnesses); *Bond v. Beard*, 539 F.3d 256, 285 (3d Cir. 2008) (ineffective counsel in 1995 trial had given little thought to the specific questions he would ask each witness, and witnesses "were frequently … caught off guard by [his] questions").

Bernard's trial counsel called only eight witnesses, whose testimony collectively covers just over 50 transcript pages. USCA5 24:2873-2885; 25:3116-3154. Counsel asked each witness a formulaic open-ended question along these lines: "What can you tell the jury to save Mr. Bernard's life?"

Some of the eight witnesses had never had more than minimal contact with Bernard, especially within recent years. For example, Jimmy Duran-Olarte had had "[v]ery little contact" with Bernard at all, beyond greeting him at church. USCA5 25:3131. Neighbor Oliver Cole's son grew up with Bernard and if Cole saw Bernard outside his house, Cole would say "hi." That was effectively the extent of his knowledge of Bernard. USCA5 25:3135-36.[14]

Three other witnesses had once had somewhat closer contact with Bernard, but not in recent years. For example, Matthew Mitchell had spent little time with Bernard since eighth grade. Billy Spiller had lost contact with Bernard about two years before the trial. Milton Rios had had little contact with Bernard in the previous four years; since then, he had only encountered Bernard occasionally at church, where he would simply say "hello." USCA5 25:3145.

As noted, counsel did not speak with two of the eight mitigation witnesses prior to their testimony (Duran-Olarte and Rios), and the record demonstrates that counsel talked to a third only briefly (Matthew Mitchell, whom counsel called

---

[14] The report prepared for trial counsel by Criterion Investigations had made clear that Cole hardly knew Bernard. USCA5 3:628.

"Anthony Mitchell"). USCA 24:2873, USCA5 5:1385, 6:1385-1389. All eight witnesses' testimony reflected little preparation and suggested that counsel did not know what they would say. For example, asked whether he believed that Bernard had had a change of heart since the offense, Duran-Olarte responded that he had no opinion, because "I haven't talked to him[.]" USCA5 25:3131.

For Spiller and Rorie-Cody, the problem was not just their lack of knowledge about, or recent contact with, Bernard. Through fairly extensive cross-examination (twice the length of direct as to Spiller, nearly twice as to Rorie-Cody), the Government elicited that each had a son who was in a gang with Bernard, showing them photographs in which their sons appeared with Bernard, wearing gang colors and making gang signs.[15]

Three witnesses had just enough contact with Bernard to have a little to say. Spiller described him as very respectful, hardworking, and a good basketball player. USCA5 25:3118. Rosie-Cody considered him kind and respectful.

---

[15] By calling witnesses who were subjected to devastating cross-examination, when a reasonable investigation would have alerted counsel to that risk, counsel performed deficiently. *Moore*, 194 F.3d at 611-12 (counsel ineffective for, *inter alia*, eliciting damaging evidence from a prosecution witness); *Hooper v. Mullin*, 314 F.3d 1162, 1171 (10th Cir. 2002) (counsel ineffective for opening the door to a damaging report by presenting expert testimony in an "unprepared, uninformed and, thus, disastrous" manner); *Berryman v. Morton*, 100 F.3d 1089, 1109-10 (3rd Cir. 1996) (counsel ineffective for, *inter alia*, opening the door to irrelevant and damaging evidence); *Sager v. Maass*, 84 F.3d 1212 (9th Cir. 1996) (counsel ineffective for introducing the complaining witness' entire victim impact statement into evidence).

USCA5 25:3125. Rios stated that Bernard had been a "good kid" years earlier. USCA5 25:3145.

As to the three witnesses who had significant knowledge of Bernard (Mitchell, Sherise Scott, and Bernard's mother, Thelma), Mitchell testified that Bernard was once gentle and funny, but then started wearing gang colors and seemed to have "lost some of his compassion." USCA5 24:2875-76. He also related that Bernard had "express[ed] some form of remorse[.]" USCA5 24:2879. Scott, the mother of Bernard's child, found him kind and helpful.[16] USCA5 25:3140, 3141. Cross-examining her, the Government highlighted the fact that on the day of the murders, Scott had watched Bernard drive away, leading the maroon car in which, unbeknownst to her, the Bagleys were imprisoned. USCA5 25:3143-44. There was no redirect.

The eighth and final witness was Bernard's mother Thelma. Ms. Bernard began by stating that she had thought about talking about her son, but "want[ed] to kind of switch it a bit and talk about the victims." USCA5 25:3148. She expressed "outrage[] about what happened" and called the Bagleys' murder "a horrible crime against humanity." USCA5 25:3148. She described reading the

---

[16] Here, too, counsel's questions suggested that they did not know Scott's likely answers. Asked whether Brandon was a leader or follower, Scott would commit to neither label, responding instead that Bernard was "himself." Defense counsel next asked whether Bernard was "funny, or not funny," USCA5 25:3140, an entirely inane question absent some (wholly missing) context.

newspaper coverage and seeing photos of the Bagleys "with smiles on the[ir] faces"; she commented that "they looked like good Christian people." USCA5 25:3149. She then expressed worry that she might have "failed to instill those Christian principles" in Bernard, and if so, "he must pay for his crime [but] [t]he penalty must not be death." USCA5 25:3149.

Ms. Bernard then continued talking about God and the nature of God's love and sin; her narrative reached three transcript pages before Bernard's counsel finally broke in, when Ms. Bernard began to talk of "the woman in the story of the lost coin." Without offering other guidance, counsel asked Ms. Bernard to discuss something specifically relating to her son. USCA5 25:3150. She then talked briefly about Bernard's childhood in Alaska, how he started to become truant, and how he was a follower as opposed to a leader. She denied knowing about Bernard's gang involvement, saying she had inadvertently bought him "a lot of red things . . . not knowing it was gang stuff," because she liked the color. USCA5 25:3153. Concluding, she said that she loved Bernard and asked the jury not to perpetuate the "madness that has … gone on already." USCA5 25:3153.

In abandoning the mitigation investigation to unqualified persons, failing to ensure that a proper investigation was completed, and presenting without meaningful preparation only the handful of witnesses whose attendance in court Bernard's mother had secured, counsel performed deficiently. *See* USCA5 5:916.

### b. Prejudice

Reasonable jurists could dispute the district court's view that none of the mitigation proffered by Bernard in the §2255 proceeding was reasonably likely to have persuaded a single juror to spare his life. With the readily available evidence that a professionally reasonable investigation would have uncovered, counsel could have painted a rich portrait of a young man shaped by a painful background, whose criminal actions could be understood, though certainly not excused, and whose life had value to many people. Reasonable jurists could also conclude, as set out below, that if counsel had complied with prevailing professional norms by anticipating and responding to the Government's evidence in aggravation, doing so (particularly in conjunction with developing and presenting a meaningful case in mitigation) was reasonably likely to have led to a different verdict.

The contrast between the sketchy, vague portrait of Bernard that emerges from the case that counsel presented,[17] and the detailed and compelling story that

---

[17] In arguing for death, the Government highlighted the paucity of the mitigation presented by Bernard's counsel, noting, for example, that "nothing" in Thelma Bernard's testimony "would be helpful for you in making a decision as to Brandon Bernard." USCA5 26:3274. Noting that only witness Mitchell had even suggested that Bernard had displayed any sort of remorse, the Government attributed it to regret over getting caught. USCA5 26:3273.

could have been told – had counsel undertaken an investigation that complied with prevailing professional norms – is striking.[18]

### i. Bernard endured a turbulent and deprived childhood marked by family violence, which shaped his path into depression, drugs, and crime; yet, he retained hopes of a normal law-abiding life and showed positive character traits.

The gravest deficiency of the mitigation case presented by Bernard's trial counsel was that it made no attempt to help the jury understand how the respectful, polite child vaguely recalled by defense witnesses could possibly have ended up involved in Vialva's carjacking plot; this was primarily because the presentation omitted any mention of the many hurdles and challenges that life had placed in Bernard's path. By contrast, a properly conducted investigation would have led to a mitigation presentation that provided just such a route to understanding, helping explain Bernard's criminal conduct while confirming that evidence of underlying good character made his life worth sparing.

Part of that explanation lies in the turbulence and deprivation that marked Bernard's childhood and adolescence – which the jury heard absolutely nothing about. As a child, Bernard witnessed frequent and angry arguments between his

---

[18] Counsel's errors and omissions respecting the penalty phase cannot be excused as "strategic," for the same reasons set out above in section VII.B.2.b respecting the guilt phase.

parents, and his father once hit his mother squarely in the face.  USCA5 5:977.
Bernard, too, was a target of violence from his volatile father, who "took his anger
out with a belt," whipping Bernard loudly enough for it to be heard outside the
house and raining down verbal abuse on his child.  *Id*. at 5:974.

When Bernard was about twelve, his mother had open-heart surgery.
USCA5 5:978.  Shortly after her return home, Bernard's father struck her in the
chest during an escalating dispute; she tried to protect herself with a can of mace,
but her husband wrested it away and sprayed her.  *Id*. at 5:978-79.  Bernard heard
the struggle from the next room and rushed in to find his mother on the floor.  *Id*.
Bernard's mother secured a protective order against his father, who moved out of
the house and was homeless for several months.  USCA5 5:981.  At one point,
Bernard's father broke into the family home and stole a number of items; he was
arrested for violating the protective order.  *Id*. at 5:980.

Ultimately, these events led Bernard's parents to divorce.  Bernard and his
father did not speak for two years thereafter, USCA5 5:982, and on one occasion
they came to blows in the parking lot of their family church in front of a crowd of
witnesses.  *Id*. at 5:990.  Numerous people observed that Bernard blamed himself
for the breakdown of his parents' marriage, and that by his mid-teens he was beset
by emotional isolation and depression.  Family friend Bonnie Wainwright recalls
that when she saw Bernard during this period, she always tried to hug him; he was

a "lost person … his spirit was down … there was a sadness, a weight."  USCA5 5:984.

In this state, Bernard came under the influence of Pollock, his cousin, who came to live with the Bernards after Bernard's mother kicked his father out of the home.  *Id.* at 982-83.  It was obvious to many that Pollock led Bernard into delinquency; Wainwright implored Bernard's mother Thelma to intervene, but Thelma was apparently too busy to give Brandon the supervision he needed.  *Id.* at 984.[19]  Pollock himself admits that he was the instigator in the burglaries he and Bernard committed as juveniles, and others recall how Pollock introduced Bernard to alcohol and marijuana.  *Id.* at 5:983-84.

In his later teen years, Bernard's depression made him vulnerable to accelerating drug use and alcohol abuse, which contributed to his deteriorating emotional state and susceptibility to criminal conduct, especially in the company of other teenagers.  USCA5 5:995, 1000-01.  Adrift from his broken family, Bernard looked to the streets for companionship and support, and began spending more and more time with the other teens who styled themselves the "212 PIRU Bloods."  *Id.* That, in turn, led to more substance abuse and a slide into criminality.

---

[19] Mitchell – whom trial counsel called as a witness without knowing what relevant information he might possess – could also have explained how Bernard, always passive, fell under Pollock's destructive influence.  USCA5 5:975, 977, 982.

54

Yet focusing on the suffering and sadness Bernard experienced as a result of his turbulent family background paints an incomplete picture. Throughout his life, Bernard has shown positive character traits, like trustworthiness and acts of kindness – and these, too, were mostly absent from the mitigation case presented at sentencing. For example, at fourteen Bernard was often personally responsible for caring for his two younger siblings while their mother worked. *Id*. at 5:981. Psychological testing the following year indicated that Bernard was responsive to the needs and concerns of others, compassionate and empathetic in relationships, and had no anti-social tendencies. *Id*. at 5:985-86. Even in his late teens (1998), Bernard was taking care of his siblings after school every day. *Id*. at 5:993-94.

In 1997-99, Bernard repeatedly tried to straighten out his life. In the spring of 1997, he got a job at Burger King, working there for three months. *Id*. at 5:990. That summer, he enrolled in a program and obtained his G.E.D. *Id*. at 5:991-92. A year later, Bernard tried to enlist in the military but was turned down because of his juvenile record. *Id*. at 5:996. In the fall of 1998, he moved to live with relatives in Michigan and got a job stocking shelves at a retail store, which he held for two months. *Id*.

Of course, these events were intertwined with other, negative ones – *e.g.*, Bernard was arrested in the summer of 1998 with friends who were driving a stolen car, *id*. at 5:995, and his employment in Michigan ended when he learned

that his girlfriend Shay Grimstead (then in New York) was pregnant with his child. *Id*. at 5:996-97. Bernard returned briefly to Killeen, intending to join Grimstead in New York, but events (including the death of his maternal grandmother, to whom he was very close) overtook him, making it impossible to leave. *Id*. at 5:997. He worked sporadically, sending money to Grimstead, but continued to spend time with his friends in the "gang." *Id*. at 5:997-98.

Bernard's daughter by Grimstead, Kiara, was born in late March 1999. *Id*. at 5:998. Bernard intensely felt the pressures of parenthood at such a young age, having little ability – financially or emotionally – to shoulder such responsibility. *Id*. at 5:1010. Later that spring, Bernard learned that another woman was carrying his second child. *Id*. at 5:999. Bernard's drug and alcohol use increased dramatically around the same time, as did his contact with the "212 PIRU." *Id*. By June 1999, he was in jail on the charges that brought him to Death Row.

A complete description of Bernard's background leading up to the crime – one the jury never heard – tells a distinctly *human*, three-dimensional story: a depressed teenager from a broken home, blaming himself for the end of his parents' relationship, is drawn into crime and drugs by an older cousin – but even up until the weeks just before his involvement in this terrible crime, he still hopes to unite with his girlfriend and their new child, and to become a responsible and loving parent. Counsels' errors kept from the jury this information about who

Bernard really was, and how his life had come to this. Had jurors heard this evidence, it is reasonably probable that at least one of them – even recognizing that Bernard's role in the crime called for severe punishment – would have decided that life imprisonment without any possibility of release was punishment enough.

### ii. Evidence of Bernard's neurocognitive dysfunction would have helped persuade jurors that a life sentence was appropriate.

As noted above, counsel performed deficiently in not having Bernard evaluated by a qualified neuropsychologist. An appropriate evaluation would have shown that Bernard suffers from mild neurocognitive dysfunction, which was likely to have affected his behavior and judgment during the crime. USCA5 5:1051. Even though Bernard's impairment is in the mild range, the test results strongly suggest an impairment that impacts Bernard's functioning in the world. *Id.* Specifically, Bernard's impairment reduces his "ability to confront and solve complex problems, especially when under time constraints or in emotionally charged situations." *Id.*

The "complex problem" that confronted the teenage carjackers was how to extricate themselves from a situation that had gotten out of their control. But because Bernard was not "operating with an undamaged brain whose structures had assumed their fully mature form" (a situation compounded by the influence of alcohol and drugs), he could not "respond sensibly to the perceived crisis

surrounding how to resolve the carjacking-kidnapping." *Id.* The situation presented itself to Bernard as "a complex and emotionally charged problem demanding immediate resolution," and Bernard's impairment likely contributed to his inability to "reason his way to an appropriate decision," and influenced his decision to "defer to others who take command of the situation." *Id.*

There is a reasonable probability that the jury would have found that Bernard's neuropsychological impairments, in combination with the other facts and circumstances of Bernard's life history, made a life sentence appropriate. A defendant's mental impairment need not rise to some extraordinary level to warrant the jury's attention. *See Hardwick v. Crosby*, 320 F.3d 1127, 1163 (11th Cir. 2003) ("One can be competent to stand trial and yet suffer from mental health problems that the sentencing jury . . . should have had an opportunity to consider") (quotation marks and citation omitted); *see also* USCA5 5:948-49.

### iii. Counsel could have protected Bernard from unreliable "scientific" predictions of his future dangerousness in prison.

As noted, the Government's "future dangerousness" evidence included the testimony of Dr. Coons, purportedly called to rebut favorable testimony given earlier on Vialva's behalf. USCA5 25:2960-3115. Dr. Coons broadly declared that *anyone* involved in planning a violent crime would be "highly dangerous," would "not have a conscience," and would continue "injuring other people,

threatening other people, manipulating other people, and killing other people just to get away." USCA5 25:3162. He added that *anyone* who belonged to a gang in the free world – which, according to the Government's evidence, would of course include Bernard – "[will] be a member of the gang inside", and would be "asked to participate in criminal [and] violent acts." USCA5 25:3162-63. He punctuated this last point: "I mean, that's just the facts." *Id.*

Because Bernard's counsel did not point out that Dr. Coons' "methodology" (his subjective evaluation of six overlapping factors) had never been subjected to peer review, or his predictions tested for accuracy or evaluated for error rates, the jury likely regarded Dr. Coons' "future dangerousness" predictions as scientific. USCA5 25:3157-58. In fact, they were not.[20] Pointed questions to Dr. Coons,[21]

---

[20] The Texas Court of Criminal Appeals has since concluded that Dr. Coons' subjective approach to predicting future dangerousness is inadmissible as expert opinion because it fails ER 702's reliability requirements. *See Coble v. State*, 330 S.W.3d 253, 280 (Tex. Crim. App. 2010). The subjective, overlapping, and illegitimate factors Dr. Coons applied in *Coble* were identical to the ones he cited here. *Compare Coble*, 330 S.W.3d at 271 with USCA5 25:3157-58.

[21] There is an ever-growing body of evidence that predictions of future dangerousness are utter guesswork. *See*, *e.g*., Cunningham, M.D., Sorensen, J.R. & Reidy, T.J., *Capital Jury Decision-Making: The Limitations of Predictions of Future Violence*, 15 PSYCHOLOGY, PUBLIC POLICY & LAW 223, 227-228, 246 (2009) (no data exist from which anyone can reliably predict which few offenders will prove violent in prison); *id*. at 239-40, 243 & Table 4 (more than 90 percent of death-sentenced defendants whom jurors had judged dangerous had, in fact, not engaged in any serious violence in prison after being sentenced; even among defendants found to be a future danger but sentenced to life, jurors' positive predictions of dangerousness proved wrong more than two-thirds of the time).

plus a request for limiting instructions, would have prevented jurors from considering his testimony against Bernard. Bernard was harmed when, relying on Dr. Coons' testimony, the Government then argued that both Vialva and Bernard were beyond redemption and would always present a danger to others, even (and particularly) in prison. USCA5 26:3251, 3260-61.[22]

Timely objections by defense counsel would also have prevented jurors from considering the testimony of Dr. Coons and BOP officer Davis against Bernard, after the Government made misleading and prejudicial arguments that blurred the line between the defendants. *See, e.g.*, USCA5 26:3251 ("*[t]hey* don't have a conscience"); 26:3260-61 (citing "a steady escalation in the types of crimes committed by both Brandon Bernard and Christopher Vialva," Government claims both defendants are becoming "more violent," "more risky," and "continue to be a danger"); 26:3261 (Government cites Davis and Dr. Coons by name in arguing that both defendants will be dangerous even "if *they* are in prison"); *id*. ("[P]eople can commit violence in the prison system …. *They*'re not foreclosed. *They* still go on"). Appropriate steps would have ensured that Bernard would not be sentenced

---

[22] Even though Dr. Coons' testimony nominally was not offered against Bernard, it was invoked on direct appeal as a basis for affirming Bernard's death sentence. *See Bernard*, 299 F.3d at 482 n. 11 and accompanying text. The fact that even this Court read Dr. Coons' testimony as applying to Bernard confirms that, absent a limiting instruction, jurors likely drew the same conclusion.

based on evidence about Vialva that was both irrelevant to Bernard's culpability and highly inflammatory and prejudicial. USCA5 3:524; 5:942-945.

> **iv.** **Evidence of Bernard's successful adjustment to confinement awaiting trial, and his positive response to structure and supervision in the past, would have rebutted the Government's "future dangerousness" claims as well as shown that Bernard's life would have positive value in prison if he were not condemned.**

As noted *supra*, Section VII.B.3.a.iii, Bernard's counsel did not seek evidence that Bernard had made a successful adjustment to confinement while awaiting trial, or that he had positively responded to structure and supervision in the past. Such evidence was readily available. Jail records demonstrated that in the approximately one year that Bernard spent in custody awaiting trial, he was disciplined for misbehavior on only two occasions. USCA5 5:1066, 1068. Neither incident involved violence against another inmate or against correctional staff, possession of any sort of contraband or weapons, or any gang-related activity whatsoever. *Id*. These records constituted concrete evidence that would have rebutted the Government's primary speculation about Bernard's "future dangerousness" – that Bernard would be dangerous in prison because, as a former "free world" gang member, he would likely be drawn into gang-related violence in prison. Beyond this documentary evidence, there were witnesses who were available to testify that Bernard had been using his time in jail constructively (*e.g.*,

renewing his faith by taking part in the jail's Bible study group) and that his presence exerted a positive influence on the behavior of other inmates. *See* Section VII.B.3.b.ix *infra*; *see also Horton v. Zant*, 941 F.2d 1449, 1463 (11th Cir. 1991) (finding *Strickland* prejudice where counsel failed to present evidence that defendant had, *inter alia*, "successfully adjusted to previous stays in prison").

In addition, probation officers, teachers, and counselors were available to testify that Bernard in earlier years had responded well to structured settings, like the one in which he would live if the jury spared his life. USCA5 5:1002, 5:987-88.

For example, juvenile probation officer Novotny Baez, who had supervised Bernard about two years before the Bagley murders, found that he responded very positively to supervision. Ms. Baez would have testified, *inter alia*, that Brandon, who was on "intensive supervision," duly reported to her 2-3 times per week and was always at home when she made her unannounced visits to the family home once each week; that nothing about his character suggested a capacity for violence; that she felt extremely safe around Brandon and would have gone with him anywhere unaccompanied; that he was quiet, respectful, and well-mannered; that he had a calming presence; that she never thought twice about making her visits to the family home late at night, because she was completely confident that Brandon posed no threat to her; and that during this period of intensive supervision Brandon

kept curfew, went to school as required, and worked regularly and successfully at a local Burger King restaurant. *See* USCA5 5:988. Ms. Baez could also have testified that, although the juvenile court originally ordered that Mr. Bernard reside in the "Catch-22" residential facility in Brownwood for a full year, he was released after only six months despite the fact that he still had treatment needs. USCA5 5:987-88.

> **v.** **Available evidence would have shown that Bernard's "gang" membership was highly unlikely to exert long-term influence over his behavior.**

One important theme in the Government's case for death against Bernard rested on two premises: (1) once a gang member, always a gang member; and (2) gangs are responsible for extensive criminal violence inside federal prison. Dr. Coons' testimony was advanced to support the first, and BOP officer Davis' testimony to support the second. The Government hoped thus to persuade the jury that having been a "Blood" in the free world, Bernard would be a "Blood" in federal prison if not put to death, and would join other "Bloods" there in committing "big crimes" like "burglary, robbery, [and] prey[ing] on the weak." USCA5 25:3166-67. As noted in Section VII.B.3.b.iii *supra*, trial counsel failed to investigate and prepare to challenge the significance of these allegations about Bernard's involvement in gang activity. This was prejudicial for several reasons.

First, with proper investigation and preparation counsel could have made the jury aware of research showing why someone from a law-abiding family, like Bernard, would become involved in a gang in the first place – like the desire for a sense of family, belonging or acceptance; for protection; for material subsistence; for respect; and as a response to strong peer pressure. Counsel could have educated the jurors about the close relationship between typical adolescent behaviors/experiences and involvement in youth gangs – thereby helping jurors understand that such involvement is consistent with, and likely reflects, such characteristic traits of adolescence as risk-taking, impulsivity, vulnerability to peer pressure, problems with judgment and problem-solving, and a need for a sense of group identity. USCA5 5:1008. This information would have left the jury highly skeptical about accepting the Government's portrayal of eighteen-year-old Bernard, product of a broken home, as a hardened "gangster."

Other available evidence – research from the Department of Justice, through its Office of Juvenile Justice and Delinquency Prevention (DOJ - OJJDP) – could have explained for the jury that by the time gang activity had spread to smaller cities like Killeen – manifesting itself in loose-knit groups like the "212 PIRU" to which Bernard allegedly belonged – it bore only a superficial resemblance to the highly organized, large-scale gang activity in large U.S. cities. Such research would have shown the jurors that gangs like the "212 PIRU" typically pose a far

less serious threat than do formally organized gangs in urban areas.[23] This scientific data could have been deployed to combat the popularly held misconceptions about youth gangs which likely influenced the jury. USCA5 5:1008-1010.

Perhaps more important, the DOJ research, showing that other teens like Bernard in small cities around the country affected a similar "Blood" identification while lacking any link to the national "Bloods" gang, would have helped rebut the inference – vital to the Government's case for Bernard's "future dangerousness" – that Bernard would likely join the established "Bloods" in any federal prison where he might be sent. USCA5 25:3162, 3166-70. Simply put, according to the DOJ, the "Bloods" to which Mr. Bernard claimed to belong and the "Bloods" that pose a genuine security threat in certain federal prisons are wholly different types of gangs. Thus, the fact that Mr. Bernard once claimed identification with the former would not dictate that he would join the latter. *See* USCA5 5:1008-09 ("gangs" that are little more than groupings of neighborhood kids of both sexes, lacking any formal hierarchical structure or ties to national organizations, are the type that "most adolescents do not remain in … for long periods of time").

---

[23] Making sure the jury understood that the group to which Bernard belonged was informally organized, non-hierarchical, and open to both sexes would have helped make this point. In each of those respects, jurors could have been informed, Bernard's youth gang – whatever they called themselves – bore no resemblance to the formally organized "Bloods" gangs operating in urban areas like Los Angeles, and indeed would not even have been recognized as "Bloods" by the latter.

Available evidence on this point included not only the DOJ studies but the testimony of Bernard's former teachers Rick Marasco and Brad Hobbs, who recognized these purported "gangs" for what they were – informal and amorphous neighborhood-based groups of adolescents unaffiliated with any larger organization. USCA5 5:992. As Juvenile Probation Officer Novotny Baez would have told the jury, the kids in such "gangs" were just "wannabes." *Id.*

This evidence would also have helped undermine the testimony of Government witness John Bowman, who testified about the purported likelihood that youth gang members would affiliate with particular gangs in prison.

Investigating the incidents related to Bernard's gold teeth – which at one time bore the letters "C.K." (for "Crip Killer," *i.e.*, a "Blood") – would have enabled Bernard's counsel to defuse those allegations as evidence of any strong gang affiliation. For example, Bowman described how Bernard had been cited for provoking another student by baring those gold teeth. But available evidence would have shown the jury that immediately *after* that incident in March 1999, Bernard – on his own initiative – had his family dentist replace the "C.K." caps with plain ones. *See* USCA5 5:1072; *see also* USCA5 3:527. That same evidence, which strongly suggested that Bernard was no "die-hard" gangster, would have rebutted Texas Ranger Aycock's claim that when arrested in June 1999, Bernard's front teeth still bore the gold letters "C.K." USCA5 5:935-936.

66

### vi. Properly prepared, counsel could have impeached Government witnesses on other important points.

Defense counsels' deficient investigation also robbed Bernard of opportunities to impeach Government witnesses. For example, Brown testified at the penalty phase that he, Vialva and Bernard had committed numerous residential burglaries together. This claim could have been impeached with Brown's own sworn statement from Brown's guilty plea hearing, which did not name Bernard as one of the burglars. USCA5 5:931. Similarly, a reasonable investigation would have empowered counsel to rebut testimony by FBI Agent Chadwick that Bernard had been "detained" (and subsequently released) following a fight at a party on Ft. Hood – because readily available evidence showed that Bernard was never detained; he had left that party unconscious in an ambulance and, after receiving emergency-room care, went home with his mother. USCA5 5:998. These are just two examples of the more effective witness examinations that properly prepared counsel could have accomplished.

### vii. Improper and excessive victim impact evidence could have been excluded.

Trial counsels' unreasonable failure to object to impermissible "victim impact" testimony, *see supra* Section VII.B.3.b.iii, was prejudicial because it enabled the Government to put before the jury inflammatory statements whose only effect was to unfairly rouse the jurors' passions against Bernard and increase

the risk of an arbitrary verdict. Whether or not the improperly admitted "victim impact" evidence was harmless when considered in isolation and under the demanding "plain error" standard, it remains relevant to Bernard's penalty-phase IAC claim. That is because the "adverse effect" of improperly admitted "victim impact" evidence is compounded when defense counsel presents only a "meager amount of mitigating evidence" and proper preparation would have led to the discovery and presentation of "a substantial amount of additional mitigating evidence." *Cargle*, 317 F.3d at 1224 (internal quotation marks omitted). That is the case here.

### viii. The jury could have heard detailed descriptions of Bernard's deep remorse for his actions.

Trial counsels' deficient investigation also failed to seek or develop readily available evidence of Bernard's remorse.[24] For example, Archbishop Jack Hetzel – a practicing minister for over fifty years who met regularly with Bernard in jail as

---

[24] Evidence of remorse rebuts the inference of future dangerousness. *See* USCA5 5:928. Moreover, jurors take evidence of genuine remorse as proof that the defendant is not fundamentally antisocial or irretrievably lost as a human being. *See*, *e.g.*, Sundby, *The Capital Jury and Absolution: The Intersection of Trial Strategy, Remorse, and the Death Penalty*, 83 CORNELL L. REV. 1557, 1584 (1998) (evidence of remorse was frequently cited by jurors who voted for life); Eisenberg, Garvey, and Wells, *But Was He Sorry? The Role of Remorse in Capital Sentencing*, 83 CORNELL L. REV. 1599 (1998) (if jurors believe the defendant is remorseful, his chances of receiving a life sentence improve).

he awaited trial – was available to testify that Bernard "was full of grief about what he had done and asked God for forgiveness every time I saw him."  USCA5 6:1382.[25]  Likewise, Bernard's pastor, Terry Johnson, could have testified about Bernard's remorse and shame, citing the powerful letter of apology that Brandon had written to his church community.  USCA5 4:632-33.

Pastor Michael Cherry – then an inmate, now ordained and conducting a prison ministry – could have testified, *inter alia*, to the remorse that Bernard felt for the victims and their families; that Bernard was an active and enthusiastic participant in the jail Bible study group; that Bernard exerted a positive influence on the behavior of other inmates; that Bernard constantly expressed concern about his family, especially his younger brother Max, and how his actions had hurt them; that Bernard was haunted by the photographs of the victims that he saw during trial; and that Bernard was distraught that his involvement in the crime was going to result in his being separated forever from his own children.  USCA5 5:1002, 1004.

---

[25] Such evidence would have strongly rebutted the prosecutors' claim that Bernard lacked any genuine regret for his crime.  *See* USCA5 26:3273.

**ix.** **A COA should issue because the mitigation case presented by trial counsel was grossly inaccurate and pitifully inadequate as a portrait of Bernard's human qualities, life experiences, and moral culpability; had the jury been introduced to the real Brandon Bernard, there is every reason to believe that at least one juror would have voted to spare his life.**

The carjacking and murder of Todd and Stacie Bagley was outrageous, horrific and cruel. But "[a]lmost without exception," death penalty cases "arise from extremely egregious, heinous, and shocking facts"; if such facts alone were always enough to render constitutional error non-prejudicial, "habeas relief based on [error] in the punishment phase would virtually never be available," making this Court's review "a hollow judicial act." *Gardner v. Johnson*, 247 F.3d 551, 563 (5th Cir. 2001); *see also Foust*, 655 F.3d at 546 ("[p]owerful aggravating circumstances … do not preclude a finding of prejudice, even when our review is constricted to assessing [how] the state court weighed … mitigating and aggravating factors"). In short, the fact that the crime was terrible does not mean that the jury, had it heard all available mitigating evidence, would not have chosen to spare Bernard's life – indeed, jurors *withheld* the maximum punishment when sentencing Bernard for *both* the carjacking and Todd Bagley's murder, imposing death only for what they believed to be his role in killing Stacie Bagley.

Nor is *Strickland* prejudice foreclosed because Bernard's counsel presented some meager mitigating evidence. The Supreme Court emphatically has "never

limited the [*Strickland*] prejudice inquiry … to cases [where] little or no mitigation evidence [was] presented." *Sears*, 130 S. Ct. at 3266. On the contrary, the Court "ha[s] found deficiency and prejudice [where] counsel presented what could be described as a superficially reasonable mitigation theory during the penalty phase." *Id.*; *see also, e.g., Lewis*, 355 F.3d at 368 (district court erred in upholding trial counsel's performance on the ground that counsel had presented some mitigating evidence, where that "skeletal testimony" was "wholly inadequate to present … a true picture" of the defendant's life); *Cargle*, 317 F.3d at 1210 (testimony of sole mitigation witness was "brief, unprepared, personally remote, and fairly generic"); *Collier*, 177 F.3d at 1201 (counsel ineffective for failing to elicit relevant mitigating facts from the witnesses actually called at trial; counsel's examination of those witnesses was "minimal" and "elicit[ed] very little relevant evidence about Collier's character"); *Jermyn v. Horn*, 266 F.3d 257, 310-11 (3d Cir. 2001) (state court's decision that defendant had not shown *Strickland* prejudice, apparently based on counsel's "ha[ving] put some mitigating evidence before the jury, even though [jurors] did not hear the substance of what was uncovered [in post-conviction]," was objectively unreasonable; that counsel presented "some mitigating evidence of a different nature and quality" is "largely beside the point" if other, significant evidence was omitted).

A court assessing an IAC claim in a capital case must be "conscious of the overwhelming importance of the role mitigation evidence plays in the just imposition of the death penalty." *Mayes v. Gibson*, 210 F.3d 1284, 1288 (10th Cir. 2000). A jury that lacks the "fullest information possible concerning the defendant's life and characteristics" cannot make an individualized choice between life and death. *Williams v. New York*, 337 U.S. 241, 247 (1949); *Lockett v. Ohio*, 438 U.S. 586, 603 (1978) (plurality opinion). The task facing counsel who defends a defendant on trial for his life – like Bernard – is to "explain to the jury why [the] defendant may have acted as he did," to "connect the dots between, on the one hand, [the] defendant's mental problems, life circumstances, and personal history and, on the other, his commission of the crime." *Hooks v. Workman*, 689 F.3d 1148, 1204 (10th Cir. 2012). The mitigation case presented at Bernard's trial accomplished none of these goals, even though the necessary raw material – persuasive, powerful mitigating evidence – was available.

A COA should issue because reasonable jurists could conclude that the enormous gulf between the mitigation case actually presented, and the one that could have been presented if counsel had conducted a proper investigation into Bernard's background, establishes both prongs of *Strickland*.

**C. A COA should issue regarding Bernard's *Brady* claims.**

**1. Factual Background**

The district court, refusing discovery and a hearing, rejected Bernard's *Brady* allegations. To show why reasonable jurists could debate that disposition, Bernard first reviews what happened at trial and in the §2255 proceedings.

**a. The Government decided not to memorialize what Brown and Lewis said during their meetings with Government agents.**

The pretrial discovery provided to Bernard showed that the Government – with the prosecutor's explicit approval in at least one instance – deliberately decided not to fully memorialize debriefing sessions it conducted with Lewis and Brown. With regard to Brown, the documents show that at one point the prosecutor and an investigating agent declared that "no further written statements" should be taken from Brown, because they believed that he was not being "completely truthful." USCA5 3:579-80. The documents similarly show that agents elected not to memorialize what Lewis told them in at least one of his meetings with the Government, though they are silent about why. USCA5 3:580-81.[26]

---

[26] Despite possessing this documentation, Bernard's trial counsel never brought it to the jury's attention that the Government had elected not to write down what its key witnesses said because it believed that at least one of them was lying. Nor does the record reflect any effort by Bernard's trial counsel to learn what exculpatory

### b. How the Government portrayed Brown and Lewis's criminal histories at trial

Before the jury, the Government portrayed Brown as having an extremely minor and non-violent criminal past. USCA5 19:1859-60. It had him confirm that he had only a single juvenile conviction for trespassing, had committed no felonies, and was not under any sort of supervision. *Id*.

Asked about his criminal history, Lewis admitted to a juvenile adjudication for assault with bodily injury. The Government described the incident as merely "like a fight," and Lewis agreed. USCA5 21:2303-04.

### c. Notes from Brown's attorney indicate that the Government knew about Brown's history of serious violent crimes.

Post-trial, Bernard obtained notes taken by Brown's attorney during a proffer session with the Government. In that meeting, Brown disclosed that his prior criminal conduct included beating someone with a sledgehammer, shooting someone during a "drive-by," and threatening a crowd by pumping and pointing a shotgun at them. USCA5 5:1076.

Moreover, these notes indicate that Brown told the Government during that proffer session that Bernard had started the fire by throwing a match into the Bagleys' car through an open window. This is significant because that claim

information had been suppressed as a result. As this brief shows, at least some material impeaching information was indisputably suppressed. Under either theory (IAC or *Brady*), these facts compel a remand for discovery and a hearing.

74

would be difficult – if not impossible – to harmonize with the undisputed forensic evidence presented at trial, which showed that all the car's windows were closed when the fire erupted. *Compare* USCA5 5:1076 with USCA5 20:2094.

### d. Below, the Government did not deny that it possessed the impeachment information recorded in Brown's attorney's notes.

In the court below, the Government did not submit any evidence (*e.g.*, a declaration from an agent or prosecutor) denying that the Government had possessed this impeaching information about Brown's criminal background, that it failed to disclose this information to Bernard's counsel, or that it omitted Brown's serious violent crimes in presenting his criminal history at trial. The Government's only response was that Bernard – who was never afforded the discovery or hearing he requested – had not shown that Brown's attorney's notes of the proffer session were "perfectly accurate" or that "any agent" had noted Brown's statements "either mentally or in writing." USCA5 7:1571.

### e. Brown's serious mental illness, use of psychotropic medication, and diagnosis as someone who tended to minimize and rationalize his own wrongdoing

At the time of trial, the Government knew that Brown suffered from a serious mental illness, both during the crime and when he testified at trial (when he was also being administered psychotropic medications). USCA5 6:1356, 1372. Moreover, the Government was in possession of a mental health evaluation

concluding that Brown tended to minimize his wrongdoing and then rationalize his behaviors. USCA5 3:576 (redacted evaluation); 5:1129-30 (motion to seal); 8:87 (order sealing). None of this impeachment evidence appears in the files of Bernard's trial counsel and none of it was brought to the jury's attention. When Bernard alleged this *Brady* violation, USCA5 3:433-34, the Government offered no response. USCA5 7:1563-1574 (Government's response), USCA5 7:1648 (Bernard's Reply). The district court did not specifically address this claim in denying relief without discovery or a hearing. USCA5 8:119.

### 2. The law governing *Brady* claims

The Government has a duty to disclose materially exculpatory or impeaching evidence to the defense. *Brady*, 373 U.S. at 87. The prosecutor must seek out and disclose any such evidence held by Governmental agencies, including the police, regardless of whether the defense requests it. *Kyles v. Whitley*, 514 U.S. 419, 432-34, 437 (1995).

Failing to discharge that duty, whether through negligence or design, requires a new trial if there is a "reasonable probability" of a different result. *Banks*, 540 U.S. 668, 699 (2004); *Giglio v. United States*, 405 U.S. 150, 154, (1972). The defendant need not show that the suppressed evidence would have rendered the prosecution's case legally insufficient. *See Banks*, 540 U.S. at 698-99 (citation omitted). "The question is not whether the defendant would more likely

than not have received a different verdict with the evidence, but whether in its absence he received a fair trial[.]" *Kyles*, 514 U.S. at 434.

Impeachment information about an important prosecution witness can be material under *Brady* even if the witness was impeached to some extent at trial. *See Banks*, 540 U.S. at 700-01 (undisclosed impeachment evidence about a particular witness could not be deemed "cumulative" to in-trial impeachment, because the prosecution relied on his testimony in urging a death sentence); *United States v. Sipe*, 388 F.3d 471, 478 (5th Cir. 2004) (evidence is material if it "would seriously undermine the testimony of a key witness on an essential issue or there is no strong corroboration") (citation omitted); *see also*, *e.g.*, *Benn v. Lambert*, 283 F.3d 1040, 1056 (9th Cir. 2002) (*Brady* violation is material where jury likely relied on a witness's testimony and "the suppressed impeachment evidence, when considered together with the disclosed impeachment evidence, would have affected the jury's assessment of the witness's credibility").

The Supreme Court has long recognized that a reviewing court should be cautious about declaring any withheld impeachment evidence cumulative, since subtle factors influence jurors' estimation of a witness's truthfulness and reliability. *Napue*, 360 U.S. at 269. Such caution is especially warranted here, because this Court's "duty to search for constitutional error with painstaking care

is never more exacting than it is in a capital case." *Kyles,* 514 U.S. at 422 (citation omitted).

> **3.** **The Government's suppression of evidence about Brown's violent past enabled it to mislead the jury regarding Brown's character.**

A prosecutor may not allow false testimony to go uncorrected, including "testimony [that] goes only to [witness] credibility," or mislead the jury about a material issue. *Napue*, 360 U.S. at 269; *Giglio,* 405 U.S. 150 (false testimony regarding promises by Government); *Tassin v. Cain*, 517 F.3d 770, 781 (5th Cir. 2008) (granting relief under *Brady* where State failed to correct misleading testimony and then took advantage of that testimony at closing argument); *United States v. Barham*, 595 F.2d 231, 241 (5th Cir. 1979) (reversing conviction where witnesses' testimony created false impression). In concealing information about Brown's criminal history and propensity for violence, the Government both misled the jury and kept Bernard's counsel from correcting the false impression this testimony created about Brown's credibility.

Before the jury, the Government portrayed Brown as little more than a truant kid, asking him to confirm that he had only one minor juvenile misdemeanor adjudication, had no felony convictions, and was not under any sort of supervision. USCA5 3:546-47; 19:1859-60. By so doing, the Government not only improperly reassured jurors that Brown deserved their trust concerning the matters about

78

which he testified, but communicated that he was less culpable than Bernard, likely contributing to the jurors' rejection of one submitted mitigating factor – that other equally culpable individuals would not face the death penalty. USCA5 2:352, 365, 378. The Government's presentation of a profoundly misleading depiction of Brown's criminal history warrants a COA and relief as a *Napue* violation.[27]

> **4.  Brown's improbable story about how the fire was set would have directly impeached him on the very theory on which the Government relied to secure Bernard's death sentence.**

In his proffer session that the Government chose not to memorialize, Brown claimed that Bernard had started the fire by throwing a lit match into the Bagleys' car through an open window. USCA5 5:1076. But that window was closed, according to the Government's own forensic evidence. *See* USCA5 20:294. Informing the jury that Brown had made this improbable assertion would have

---

[27] Presumably, the Government would not have tried to misrepresent Brown's prior criminal history before the jury if it had also disclosed to Bernard's counsel the information in Brown's attorney's notes. Had it done so, however, defense counsel could have argued that, by asking Brown to disclose a juvenile adjudication that generally would have been off-limits as impeachment under FRE 609, the Government had put Brown's character into play and "opened the door" for Bernard's counsel to set the record straight. *See United States v. Brumfield*, 686 F.3d 960, 963 (8th Cir. 2012) (doctrine of "opening the door" allows a party to present otherwise-inadmissible evidence to rebut impressions left by opposing party). Alternatively, counsel could have moved for a mistrial. The Government's suppression of evidence it had obtained during proffer sessions with Brown hamstrung counsel from taking any such steps.

dramatically undercut his credibility on the Government's key theory – that Bernard deserved to die for having set the fire. Certainly, reasonable jurists could debate whether suppressing this evidence is reasonably likely to have changed one juror's mind about Bernard's fate.[28] This claim warrants a COA.

### 5. The Government suppressed critical impeachment evidence regarding Brown's mental health.

Bernard has shown that the Government knew that Brown suffered from bipolar disorder, a major mental disorder for which Brown was given powerful psychotropic medications and which was affecting him both during the crime and during Bernard's trial. The Government did not disclose this information to the defense. Yet neither the Government nor the district court meaningfully engaged Bernard's related *Brady* claim

Reasonable jurists could debate the merits of this claim, because cross-examination on issues of mental health is critically important and *Brady* forbids

---

[28] This is especially true given the other evidence to which Bernard's trial counsel failed to direct the jury, which taken together strongly suggested that Bernard did not set the fire. This included Lewis' diagram indicating that Bernard could not have set the fire, USCA5 3:594; Brown's pre-trial statement showing that Bernard did not set the fire, USCA5 3:594; a Government agent's pretrial testimony – apparently influenced by debriefings with Lewis and Brown – that Bernard did not set the fire, USCA5 4:673; and the results of a canine track that found no scent from Bernard close to the Bagleys' car, USCA5 4:673. Reasonable jurists could conclude that the cumulative effect of counsel's errors and the Government's misconduct require a new trial. *See Cargle*, 317 F. 3d at 1207 (considering, in cumulative error analysis, *Brady* and IAC claims that individually were insufficient to require relief).

suppressing material evidence of a witness's mental condition. *See, e.g., East v. Johnson*, 123 F.3d 235 (5th Cir. 1997) (vacating death sentence where prosecution failed to disclose documents that would have led defense counsel to mental health records regarding penalty-phase witness who gave important, uncorroborated testimony); *Browning v. Trammell*, __ F.3d __, 2013 WL 1867412 at *10-14 (10th Cir. May 6, 2013) (mental health records showing that a prosecution witness had "a severe mental disorder" that affected her behavior and perceptions constituted "classic impeachment evidence"; relief was required because this witness was "indispensable" to the prosecution, in that "[the defendant's] fate turned on her credibility"); *United States v. Smith*, 73 F.3d 511, 516 (D.C. Cir. 1996) ("Mental records can be material as impeachment evidence because they can cast doubt on the accuracy of a witness' testimony"); *Freeman v. United States*, 284 F. Supp.2d 217, 226 (D. Mass. 2003) (witness's bipolar disorder was relevant to his credibility, but no *Brady* violation because witness's condition was unknown to prosecution team).

One cannot square this decisional law with the district court's decision to deny Bernard even a hearing on this issue. A COA should be granted.

### 6. The suppressed evidence cannot be considered cumulative.

The suppressed evidence related to Brown and Lewis, the only two witnesses who testified about "who did what" during the murders. Moreover,

Brown was the only witness present at the scene who offered any testimony to support the Government's theory that Bernard set the fire, USCA5 19:1930; the Government relied on this testimony in urging Bernard's execution, USCA5 26:3203, 3269-70, 3272, and the only logical reason for the jury's single death-sentence verdict against Bernard (versus the life sentences it imposed on the other death-eligible counts), *see supra* Section VII.B.2.c., is that the jury believed Brown and concluded that Bernard set the fire.

Given Brown's importance to the Government's case and the jury's evident struggle to decide on Bernard's death sentence, there is at least a "reasonable probability" that at least one juror would have evaluated Brown's credibility differently had the jury known about Brown's serious mental illness and violent criminal past and not it been actively misled by the Government about Brown's trustworthiness. USCA5 2:358, 371, 383. In this way, Bernard's case strongly resembles *Banks* – where the Supreme Court held that if suppressed evidence bears directly on the credibility of a witness upon whom the Government relied heavily in obtaining a death sentence, it cannot be found "cumulative." *See Banks*, 540 U.S. at 701 (contrasting *Strickler*, where the suppressed evidence went to an issue that "was not relied upon by the prosecution … during its closing argument" at penalty phase) (citation omitted).

**D. A COA should issue regarding the district court's blanket denial of discovery.**

Reasonable jurists could debate the correctness of the district court's ruling denying all requested discovery. USCA5 6:1155-1182 (motion), USCA5 8:157 (DCT order). In light of the Government's failure to deny the accuracy of Brown's attorney's notes, those notes alone effectively prove that the Government suppressed favorable impeachment evidence about Brown. That having been shown, reasonable jurists could conclude that "good cause" for discovery exists, to give Bernard a "full opportunity for presentation of the relevant facts." *Harris v. Nelson*, 394 U.S. 286, 298 (1969); *East*, 55 F.3d at 1001; *Murphy v. Johnson*, 205 F.3d 809, 813-814 (5th Cir. 2000) (where "specific allegations" suggest that relief may be warranted once the facts are fully developed, the court has a "duty … to provide the necessary facilities and procedures for an adequate inquiry") (internal quotation marks omitted; citation omitted). Discovery is warranted not only by what is known (the suppression of impeachment evidence about Brown), but because other circumstances raise substantial questions about the Government's compliance otherwise with *Brady* (*e.g.*, the Government's affirmative steps before the jury to minimize the seriousness of Lewis' criminal assault, even though it would not have been admissible to impeach him, and the fact that Lewis' criminal

history category at sentencing, USCA5 5:1082, appears inconsistent with a record limited to a trivial "fighting" incident).[29]

The Court should grant COA and order the district court to grant the discovery Bernard requested below.

### E.  Reasonable jurists could debate whether Bernard's conviction violates the Fifth Amendment.

Bernard argued in his §2255 motion that his conviction and sentence violate the Fifth Amendment, because the indictment – in failing to allege the "culpable mental state" factors and statutory aggravating factors required by statute – did not authorize a conviction for death-eligible first-degree murder. *See* USCA5 3:570; 18 U.S.C. §§3591(a)(2), 3592-93; *Jones v. United States*, 526 U.S. 227, 251-52 (1999); *Ring v. Arizona*, 536 U.S. 584 (2002).  Bernard had previously raised this challenge on direct appeal.  *See Bernard*, 299 F.3d at 488-89.  This Court concluded that even if *Ring* applied, no "plain error" was shown, apparently because it viewed the evidence of the missing factors as "overwhelming."  *Id.* at 489 (citing *United States v. Cotton*, 535 U.S. 625 (2002)).

It is now clear that Bernard's indictment was defective.  *United States v. Robinson*, 367 F.3d 278, 284, 286 (5th Cir. 2004) ("As a result [of *Ring*], the

---

[29] Lewis was placed in criminal history category II.  Thus, he either received at least 60 days' confinement for the assault – a long sentence for a mere "fight" – or had committed other crimes that went unacknowledged in his trial testimony.  *See* U.S.S.G. §4A1.2(d) (11/1/2000).

Government is required to charge, by indictment, the statutory aggravating factors it intends to prove to render a defendant eligible for the death penalty"; failure to do so "is constitutional error"). This Court has adhered, however, to its view that such error may be harmless. *Id*. at 284-288.

Reasonable jurists could dispute the conclusions that such Fifth Amendment error can be waived or forfeited by trial counsel in a capital case, that such error in a capital case is subject to "plain error" review and/or can ever be harmless, and that the evidence in Bernard's case would have compelled any rational grand jury to include the missing findings. *See*, *e.g*., *Stirone v. United States*, 361 U.S. 212, 217 (1960) ("[A] court cannot permit a defendant to be tried on charges that are not made in the indictment against him," and "[d]eprivation of such a basic right is far too serious to be treated as nothing more than a variance and then dismissed as harmless error"). Recognizing that those arguments are foreclosed here by Fifth Circuit precedent, Bernard nevertheless raises them to preserve them for further review by the *en banc* Court or the Supreme Court. *See United States v. Scruggs*, 714 F.3d 258, 264 (5th Cir. 2013) ("[P]arties routinely raise arguments to preserve them for further review despite binding authority to the contrary").

**F.** **Reasonable jurists could debate whether Bernard's conviction and sentence resulted from cumulative error.**

Bernard argued in his §2255 motion that relief should be granted due to cumulative error. USCA5 6:1353. Because Bernard has shown that the proceedings against him were tainted both by IAC and *Brady* error, reasonable jurists could debate whether the combined prejudice from those violations is sufficient to undermine confidence in the verdict and warrant relief. *See Cargle*, 317 F.3d at 1220-21. A COA should issue on this claim.

## VIII. Conclusion

For the foregoing reasons, the Court should grant a COA on each requested issue.

Respectfully submitted,

*/s Robert C. Owen*
Robert C. Owen, Texas Bar No.: 1537195
Capital Punishment Clinic, School of Law
The University of Texas at Austin
727 East Dean Keeton Street
Austin, TX 78705-3224
Phone: (512) 232-9391 / Fax: (512) 232-9171
Email: robowenlaw@gmail.com

*/s John Carpenter*
John Carpenter, WSBA: 23301
Federal Public Defender
1331 Broadway, Suite 400
Tacoma, WA 98402
Phone: (253) 593-6710
Email: John_Carpenter@fd.org

# CERTIFICATE OF COMPLIANCE

Counsel certifies that this draft brief is subject to an unopposed motion for leave to file a supporting brief in excess of the otherwise applicable word limit.

1. Exclusive of the portions exempted by 5th Cir. R. 32.2.7(b)(3), this brief contains 19,714 words printed in a proportionally spaced typeface.

2. This brief is printed in a proportionally spaced, serif typeface using Times New Roman 14 point font in text and footnotes.

3. Upon request, undersigned counsel will provide an electronic version of this brief and/or copy of the word printout to the Court.

4. Undersigned counsel understands that a material misrepresentation in completing this certificate, or circumvention of the type-volume limits in 5th Cir. R. 32.2.7, may result in the Court's striking this brief and imposing sanctions against the person who signed it.

*/s John Carpenter*
John Carpenter, Wash. Bar No.: 23301
Federal Public Defender
Western District of Washington
1331 Broadway, Suite 400
Tacoma, WA  98402
Phone: (253) 593-6710 / Fax: (253) 593-6714
Email: John_Carpenter@fd.org

# CERTIFICATE OF SERVICE

I hereby certify that on July 8, 2013, I electronically filed the foregoing

Draft Brief in Support of Application for Certificate of Appealability with the

Clerk of the Court using the CM/ECF system which will send notification of filing

to Assistant United States Attorney Joe Gay.

*/s John Carpenter*
John Carpenter, Wash. Bar No.: 23301
Federal Public Defender
Western District of Washington
1331 Broadway, Suite 400
Tacoma, WA  98402
Phone: (253) 593-6710 / Fax: (253) 593-6714
Email: John_Carpenter@fd.org