# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA,** | ) | |
| | ) | |
| Respondent-Appellee | ) | |
| | ) | |
| v. | ) | 13-70013 |
| | ) | |
| **BRANDON BERNARD,** | ) | |
| | ) | |
| Movant - Appellant. | ) | |

## CONSOLIDATED WITH

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA**, | ) | |
| | ) | |
| Respondent - Appellee, | ) | |
| | ) | |
| v. | ) | 13-70016 |
| | ) | |
| **CHRISTOPHER ANDRE VIALVA,** | ) | |
| | ) | |
| Movant - Appellant. | ) | |

On Appeal from the United States District Court
for the Western District of Texas at Waco
W-99-CR-70

The Honorable Walter S. Smith, Jr.
United States District Judge

## MOVANT, CHRISTOPHER ANDRE VIALVA'S BRIEF IN SUPPORT OF APPLICATION FOR CERTIFICATE OF APPEALABILITY

SUSAN M. OTTO
Oklahoma Bar Association # 6818
Federal Public Defender
Western District of Oklahoma
215 Dean A. McGee   Suite 109
Oklahoma City, Oklahoma 73102
Telephone: 405 609-5930
Telefacsimile: 405 609-5932
Electronic mail:  Susan_Otto@fd.org

JARED TYLER
Texas Bar Association #24042073
Tyler Law Firm, PLLC
P.O. Box 764
Houston, Texas 77001
Telephone: 713 861-4004
Electronic mail: jptyler@tylerlawfirm.org

Table of Contents

Table of Authorities . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . iv

Relief Requested . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

Jurisdiction . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

Statement of Issues . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

Statement of the Case . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

Legal Standard . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

Facts . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

Summary of Argument . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

One . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

      A COA Should Issue on the District Court's Denial of Discovery and an
      Evidentiary Hearing . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

Two . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

      A COA Should Issue Regarding Learned Counsel's Unwaived Conflict
      of Interest . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

Three . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

      A COA Should Issue to Review the United States's Failure to Comply
      With *Brady v. Maryland*, 373 U.S. 83 (1963) . . . . . . . . . . . . . . . . . . . . . . . . 27

Four . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36

      A COA Should be Issued on Mr. Vialva's Claim of Ineffective
      Assistance of Counsel During the Guilt Phase of His Trial . . . . . . . . . . . . 36

1) Deficient Performance .............................. 37

    (a) Trial counsel failed to obtain funding for necessary experts, resulting in an inadequate investigation and deficient preparation. USCA5.Vol.7.1022-27. ........................ 38

    (b) Failure to conduct an adequate investigation. ....... 40

    (c) Failure to subject government's case to adversarial testing ............................. 41

    (d) Failure to present a coherent defense. ............. 42

2) Prejudice ..................................... 44

Five ........................................... 46

A COA Should Issue on Christopher Vialva's Claim of Ineffective Assistance of Counsel During the Penalty Phase of His Trial ......... 46

1) Deficient Performance .............................. 48

    (a) Failure to recognize the principles and importance of mitigation. USCA5.Vo.7.1075-78. ......................................... 48

    (b) Failure to obtain adequate funding and time, resulting in failure to prepare and present available mitigation. USCA5.Vol.7.1075-78. ...... 50

    (c) Misuse of experts and expert testimony. USCA5.Vol.7.1075-78. ........................ 52

    (d) Failure to advocate effectively for an individualized sentencing proceeding. USCA5.Vol.7.1066-72. ........................ 56

       2)     Prejudice . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 57

Six . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 59

      A COA Should Issue to Consider Whether Cumulative Errors Deprived
      Christopher Vialva of His Constitutional Right to Due Process and a Fair
      Trial. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 59

Seven . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 59

      Whether the Execution of Christopher Vialva Will Violate the Eighth
      Amendment. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

Conclusion . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 61

Certificate of Service . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 65

Certificate of Compliance . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 65

## Table of Authorities

## Supreme Court Cases

*Atkins v. Virginia*,
536 U.S. 304 (2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 60

*Banks v. Dretke*,
540 U.S. 668 (2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

*Bracy v. Gramley*,
520 U.S. 899 (1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

*Brady v. Maryland*,
373 U.S. 83 (1963) . . . . . . . . . . . . . . . 2, 11, 14, 27, 28, 29, 31, 33, 35, 36, 59

*Burger v. Kemp*,
483 U.S. 776 (1987) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

*Cuyler v. Sullivan*,
446 U.S. 335 (1980) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18, 19

*Fontaine v. United States*,
411 U.S. 213 (1973) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

*Giglio v. United States*,
405 U.S. 150 (1972) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

*Glasser v. United States*,
315 U.S. 60 (1942) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

*Graham v. Florida*,
560 U.S. 48 (2010) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 60

*Eddings v. Oklahoma*,
455 U.S. 104 (1982) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 46

*Holloway v. Arkansas*,
     435 U.S. 475 (1978) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17, 18

*Kyles v. Whitley*,
     514 U.S. 419 (1995) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28, 35

*Lockett v. Ohio*,
     438 U.S. 586 (1978) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 46, 56

*Machibroda v. United States*,
     368 U.S. 487 (1962) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14, 16

*Massaro v. United States*,
     538 U.S. 500 (2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

*McMann v. Richardson*,
     397 U.S. 759 (1970) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36

*Mickens v. Taylor*,
     535 U.S. 162 (2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

*Miller-El v. Cockrell*,
     537 U.S. 322 (2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4, 5

*Penry v. Lynaugh*,
     492 U.S. 302 (1989) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 56, 60

*Roper v. Simmons*,
     543 U.S. 551 (2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 60

*Slack v. McDaniel*,
     529 U.S. 473 (2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4, 5

*Stanford v. Kentucky*,
     492 U.S. 361 (1989) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 60

*Strickland v. Washington,*
        466 U.S. 668 (1984) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17, 36, 37, 40, 63

*Thompson v. Oklahoma,*
        487 U.S. 815 (1988) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 60

*United States v. Dominguez Benitez,*
        542 U.S. 74 (2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

*Wheat v. United States,*
        486 U.S. 153 (1988) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

*Wiggins v. Smith,*
        539 U.S. 510, 123 S. Ct. 2527 (2003) . . . . . . . . . . . . . 37, 40, 47, 49, 52, 58

*Williams v. Taylor,*
        529 U.S. 362 (2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 37, 46, 58


Federal Cases

*Anderson v. Johnson,*
        338 F.3d 382 (5th Cir. 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 46

*Avila v. Quarterman,*
        560 F.3d 299 (5th Cir. 2009) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5, 6

*Beets v. Scott,*
        65 F.3d 1258 (5th Cir. 1995) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

*Cargle v. Mullin,*
        317 F.3d 1196 (10th Cir. 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 59

*Friedman v. United States,*
        588 F.2d 1010 (5th Cir. 1979) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

*Galbraith v. United States*,
313 F.3d 1001 (7th Cir. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

*Garcia v. Bunnell*,
33 F.3d 1193 (9th Cir. 1994), *cert. denied*
514 U.S. 1024 (1995) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25, 26

*Harrison v. Quarterman*,
496 F.3d 419 (5th Cir. 2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 46

*Hooks v. Workman*,
689 F.3d 1148 (10th Cir. 2012) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 59

*Montgomery v. United States*,
469 F.2d 148 (5th Cir. 1972) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

*Moore v. Johnson*,
194 F.3d 586 (5th Cir. 1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 58

*Moreland v. Scott*,
175 F.3d 347 (5th Cir.), *cert. denied*
528 U.S. 937 (1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

*Murphy v. Johnson*,
205 F.3d 809 (5th Cir. 2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

*Parr v. Quarterman*,
472 F.3d 245 (5th Cir. 2006), *cert. denied*
551 U.S. 1133 (2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 60

*Perillo v. Johnson*,
205 F.3d 775 (5th Cir. 2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

*Potts v. Zant*,
638 F.2d 727 (5th Cir. 1981) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

*Soffar v. Dretke*,
  368 F.3d 441 (5th Cir. 2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 40, 46

*Thornburg v. Mullin*,
  422 F.3d 1113 (10th Cir. 2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

*United States v. Bartholomew,*
  974 F.2d 39 (5th Cir. 1992) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

*United States v. Bernard*,
  299 F.3d 467 (5th Cir. 2002) *cert. denied,*
  539 U.S. 928 (June 16, 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3, 56

*United States v. Franklin*,
  213 F. Supp. 2d 478 (E.D. Pa. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

*United States v. Grammas*,
  376 F.3d 433 (5th Cir. 2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36

*United States v. Herrera*,
  412 F.3d 577 (5th Cir. 2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35

*United States v. Infante*,
  404 F.3d 376 (5th Cir. 2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

*United States v. Jenkins*,
  943 F.2d 167 (2d Cir.), *cert. denied*
  502 U.S. 1014 (1991) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26, 27

*United States v. Lee*,
  89 F. Supp. 2d 1017 (E.D. Ark. 2000), *rev'd,*
  274 F.3d 485 (8th Cir. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 55

*United States v. Martinez*,
  181 F.3d 627 (5th Cir. 1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

*United States v. Rivas-Lopez*,
678 F.3d 353 (5th Cir. 2012) . . . . . . . . . . . . . . . . . . . . . . . . . . . 5, 6, 13, 14, 35

*United States v. Vaquero*,
997 F.2d 78 (5th Cir. 1993) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

## DOCKETED CASES

*United States v. Harger*,
No. 08-30332, 2009 WL 3833994 (5th Cir. 2009) . . . . . . . . . . . . . . . . . . 16

*United States v. Vialva*,
No. 00-50525 (5th Circuit) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

## FEDERAL STATUTES

18 U.S.C. §3005 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

21 U.S.C. §848(q)(10)(B) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 38

28 U.S.C. §631 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

28 U.S.C. §1291 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

28 U.S.C. §2253 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2, 4, 5

28 U.S.C. §2255 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2, 14

28 U.S.C. §2555(b) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

U.S. Const. amend. VI . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36

## MISCELLANEOUS

1989 ABA Guideline 11.4.1 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 40, 43, 52

1989 ABA Guideline 11.4.2 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 43

1989 ABA Guideline 11.7.1 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 40, 52

1989 ABA Guideline 11.8.3 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 40, 52

2003 ABA Guideline 4.1 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 52

2003 ABA Guideline 9.1(C) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 51

2003 ABA Guideline 10.5 (A) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 43

2003 ABA Guideline 10.13 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

ADMIN. OFF. U.S. COURTS, GUIDE TO JUDICIARY POLICIES AND
    PROCEDURES, Vol. VII, App. I . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

*Assessing the Risk for Violence*, AM. PSYCH. ASS'N, APA DOC.
    REF. NO. 200109 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 56

Giedd, J. N., J. Blumenthal, et al., "Brain development during childhood and
    adolescence: A longitudinal MRI study;" NATURE NEUROSCIENCE 2(10):
    861-863 (1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 60

Gogtay, N., J. N. Giedd, et al., "Dynamic mapping of human cortical
    development during childhood through early adulthood," PROCEEDINGS
    OF THE NATIONAL ACADEMY OF SCIENCES 101: 8174-8179 (2004) . . . . . . 61

Kevin Davis, *Brain Trials: Neuroscience is Taking a Stand in the Courtroom,*
    A.B.A.J. 37-42 (Nov. 2012) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 61

Mark D. Cunningham & Thomas J. Reidy, *Don't Confuse Me With the Facts:*
    *Common Errors in Violence Risk Assessment at Capital Sentencing*
    26 CRIM. JUSTICE & BEHAV. 20, 38 (1999) . . . . . . . . . . . . . . . . . . . . . . . 54

Mark D. Cunningham & Thomas J. Reidy, *Integrating Base Rate Data in Violence Risk Assessments at Capital Sentencing* 16 BEHAV. SCI. L. 71, 82, 87 (1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 54

## RELIEF REQUESTED

Christopher Vialva was convicted and sentenced to death following a trial in federal court that failed to afford him the protections secured by the Constitution and federal procedure. The same judicial officer who presided over Mr. Vialva's trial summarily denied his post conviction Motion to Vacate without allowing him to develop the record through discovery and an evidentiary hearing. The trial court insulated its errors from review by denying a certificate of appealability on all issues. There can be no confidence in the outcome of the proceedings before the lower court.

Mr. Vialva requests a certificate of appealability on the issues identified in this motion to permit full briefing on the merits. Mr. Vialva submits the trial court's order denying relief should be vacated and this case should be remanded to allow discovery and an evidentiary hearing.

## JURISDICTION

Christopher Vialva timely filed a *Motion to Vacate* [hereinafter, 2255 Motion]. USCA5.Vol.7.923. Mr. Vialva filed a timely Notice of Appeal (USCA5.Vol.2.267) following the trial court's denial of his 2255 Motion (USCA5.Vol.1.171-72), entry of Judgment (USCA5.Vol.2.173), and denial (USCA5.Vol.2.253) of his post-decision motions (USCA5.Vol.2.174 and USCA5.Vol.2.190). Granting this application will

1

confer jurisdiction pursuant 28 U.S.C. §§1291 and 2253. Section 2253 vests this Court with jurisdiction to consider this application.

## STATEMENT OF ISSUES

Christopher Vialva submits reasonable jurists would debate the merits of the following Constitutional issues presented in this capital case and requests a Certificate of Appealability [hereinafter, COA] to pursue these claims:

1. The district court's disposition of Christopher Vialva's 2255 Motion, without permitting him to conduct discovery and without conducting an evidentiary hearing, denied him Due Process;

2. The attorney appointed as "learned counsel" had a conflict of interest that resulted in the denial of Christopher Vialva's Sixth Amendment right to effective assistance of counsel. Mr. Vialva did not knowingly and voluntarily waive the conflict;

3. Christopher Vialva was deprived of his Fifth Amendment right to due process and a fair trial by the United States's failure to disclose material exculpatory evidence, in violation of *Brady v. Maryland*, 373 U.S. 83 (1963);

4. Christopher Vialva was denied his Sixth Amendment right to effective assistance of counsel during the guilt phase of his capital trial;

5. Christopher Vialva was denied his Sixth Amendment right to effective assistance of counsel during the penalty phase of his capital trial;

6. Cumulative errors deprived Christopher Vialva of his Constitutional rights to due process and a fair trial; and

2

7.   The execution of Christopher Vialva will violate the Eighth Amendment because his mental age and moral culpability at the time of the offense were indistinguishable from those of a juvenile.

## STATEMENT OF THE CASE

A Superseding Indictment filed March 28, 2000 charged Christopher Vialva with four crimes committed June 21, 1999: carjacking resulting in death; conspiracy to kill with premeditation and malice aforethought; first degree murder of Todd Bagley; and first degree murder of Stacie Bagley.  Counts One, Three, and Four carried a possible punishment of death.  USCA5.Vol.4.381.

The first stage concluded June 1, 2000 with verdicts of guilty on all Counts. USCA5.Vol.5.665.  The court sentenced Mr. Vialva to life imprisonment on Count Two and to death on Counts One, Three, and Four at the conclusion of the penalty phase June 13.  USCA5.Vol.6.875 (filed 06/16/2000).  The convictions and sentences were affirmed.  *United States v. Bernard*, 299 F.3d 467, 498 (5th Cir. 2002), *cert. denied*, 539 U.S. 928 (June 16, 2003).

Mr. Vialva filed his 2255 Motion June 14, 2004. USCA5.Vol.7.923.  He requested an evidentiary hearing (USCA5.Vol.7.1134) and discovery on specific issues (USCA5.Vol.11.2117;V11.2160;V.13.2505).  Mr. Vialva sought leave to amend the 2255 Motion May 9, 2005.  USCA5.Vol.13.2543.

3

On September 28, 2012, the court granted Mr. Vialva leave to amend but denied his 2255 Motion without conducting an evidentiary hearing or permitting discovery. USCA5.Vol.1.110. The court denied a COA on all issues (USCA5.Vol.1.172) and entered Judgment (USCA5.Vol.2.173). Mr. Vialva's post-decision motions (USCA5.Vol.2.174;USCA5.Vol2.190) were denied February 8, 2013 (USCA5.Vol.2.253). A timely notice of appeal was filed. USCA5.Vol.2.267.

## LEGAL STANDARD

A COA must be granted if the applicant makes "a substantial showing of the denial of a constitutional right." *Miller-El v. Cockrell*, 537 U.S. 322, 336 (2003); 28 U.S.C. §2253(c)(2). This standard is satisfied when the applicant demonstrates "reasonable jurists could debate whether (or, for that matter, agree that) the petition should have been resolved in a different manner or that the issues presented were 'adequate to deserve encouragement to proceed further.'" *Id.* at 484, quoting *Barefoot v. Estelle,* 463 U.S. 880, 893 (1983).

The appellate court "should limit its examination to a threshold inquiry into the underlying merit" of the claim. *Miller-El*, 537 U.S. at 327, citing *Slack v. McDaniel,* 529 U.S. 473, 481 (2003). "The question is the debatability of the underlying constitutional claim, not the resolution of that debate." *Miller-El*, 537 U.S. at 342. Accordingly, the appellate court "should not decline the application for a COA merely

4

because it believes the applicant will not demonstrate an entitlement to relief." *Id.* at 337. "Indeed, a claim can be debatable even though every jurist of reason might agree, after the COA has been granted and the case has received full consideration, that petitioner will not prevail." *Op cit.* at 338; *Avila v. Quarterman*, 560 F.3d 299, 304 (5th Cir. 2009) (same). If even one Judge determines a claim is debatable, a COA should issue on that claim. See 28 U.S.C. §2253(c)(1) (COA must be issued by "*a circuit . . . judge*") (emphasis added); *Thornburg v. Mullin*, 422 F.3d 1113, 1118 (10th Cir. 2005) (noting district court "and a member of this court" granted COAs in §2254 capital cases).

A COA should issue on procedural issues if reasonable jurists could debate both the underlying merits of the claim and the correctness of the district court's ruling. *Slack*, 529 U.S. at 484; and see *United States v. Rivas–Lopez*, 678 F.3d 353, 356 (5th Cir. 2012) (district court denied hearing on ineffective assistance of counsel claim, COA issued on procedural ruling).

The Constitutional claims presented by Mr. Vialva concern core issues regarding the integrity of the trial process and, concomitantly, the validity of the sentences of death imposed by the district court. The same judicial officer who presided during the trial of this case considered these issues and denied them without affording Mr. Vialva the discovery process and evidentiary hearing he requested. If

5

the requested COAs are granted, this Court will review the district court's legal conclusions *de novo* and its factual findings for clear error. *Rivas–Lopez*, 678 F.3d at 356. "'Because the present case involves the death penalty, any doubts as to whether a COA should issue must be resolved in [petitioner's] favor.'" *Avila*, 560 F.3d at 304, *quoting Hernandez v. Johnson*, 213 F.3d 243, 248 (5th Cir. 2000).

**FACTS**

Christopher Vialva, who turned nineteen years old May 10, 1999, lived with his mother, stepfather, and sister in Killeen, Texas. On June 18, Christopher had an argument with his mother, Lisa Brown. USCA5.Vol.26.2488; Vol.28.2897. Ms. Brown threatened to kill herself if her current husband, Richard Brown, left her because of Christopher's behavior. Ms. Brown ordered Christopher out of the house. USCA5.Vol.26.2488. Christopher asked his friend, Andrea York, for money and a place to stay. Ms. York was unable to help. USCA5.Vol.26.2488-89.

On June 20, Mr. Vialva, Christopher Lewis, and Tony Sparks, met at the Sparks's house. USCA5.Vol.25.2309. Fifteen year old Lewis was staying at the Sparks's because he "got kicked out" of his own house. USCA5.Vol.25.2310-11. The three young men discussed a plan to get some money. The plan consisted of asking someone for a ride, putting "a gun on them," asking for their ATM card and PIN number, putting the person in the trunk, getting money from the ATM, then

6

"drive somewhere and leave them there." USCA5.Vol.25.2311. Tony Sparks's .22 caliber pistol was discussed. USCA5.Vol.25.2316.

Lewis threw the pistol into a bush when a Killeen police officer approached the trio as they were walking in the neighborhood late that night. USCA5.Vol.25.2316. Mr. Vialva was released, but Sparks and Lewis were detained for a curfew violation until Mrs. Sparks picked them up. USCA5.Vol.25.2317-18.

On June 21, Mr. Vialva came to Sparks's house with eighteen year old Brandon Bernard and the damaged pistol. USCA5.Vol.25.2320. Mr. Vialva, Sparks, Lewis, Bernard, and Terry Brown discussed the same plan. USCA5.Vol.25.2324; Vol.23.1886. One young man commented, "if you pulled that [the .22 pistol] on anybody, they'll laugh at you." *Id..* The group drove in Bernard's car to retrieve a .40 caliber Glock Greg Lynch borrowed the day before. USCA5.Vol.25.2182, 2186. The Glock was loaded with two rounds. USCA5.Vol.25.2183. Lynch said Brown was smoking a "blunt" when he came to take the gun. USCA5.Vol.25.2187.

Bernard drove Mr. Vialva, Brown, Lewis, and Sparks to a supermarket. While Brown and Bernard remained in the car, Lewis, the youngest looking of the boys, asked several people for rides. USCA5.Vol.23.1886-7. Sparks accosted Todd Bagley as he used the pay phone at a convenience store. USCA5.Vol.25.2328. Lewis, Sparks, and Mr. Vialva got into the backseat of the Bagleys' car.

7

USCA5.Vol.25.2329. The Glock was displayed to Mr. Bagley. USCA5.Vol.25.2330. Mr. Bagley continued driving as Lewis and Sparks ransacked Mrs. Bagley's purse and retrieved $60.00, an ATM card, and her identification. USCA5.Vol.25.2332-3.

The car stopped on a dirt road adjacent to a residential area. USCA5.Vol.25.2334. Sparks took the Bagleys' jewelry before locking them in the trunk. USCA5.Vol.25.2335. When attempts to obtain money from ATMs were unsuccessful, Mr. Bagley suggested pawning his wife's wedding ring. USCA5.Vol.25.2339-40. Mr. Vialva was the only person in the car old enough to pawn the jewelry, but he did not have his identification. USCA5.Vol.25.2344. Mr. Vialva drove to his mother's house to get his identification. USCA5.Vol.25.2345. His stepfather, Richard Brown, noticed the unfamiliar car parked in front of the house, but did not pursue the issue. USCA5.Vol.28.2898-99.

The trio picked up Brown and told him the owners were in the trunk. Brown pointed one of the guns at the back seat and offered to kill the Bagleys. Mr. Vialva told Brown not to kill them. USCA5.Vol.23.1898.

The group discussed what to do with the Bagleys and their car. USCA5.Vol.25.2364-65. Concerned about the curfew violation, Sparks asked to be taken home. Sparks took the Bagleys' jewelry when he left the car. USCA5.Vol.25.2367; USCA5.Vol.23.1906.

8

Bernard rejoined the group with his car in response to a request for help. Bernard and Brown purchased two cans of lighter fluid. USCA5.Vol.23.1907. The two cars proceeded to a road inside the perimeter of Fort Hood. The car containing the Bagleys was driven to the top of a steep, rutted road. USCA5.Vol.25.2377. Bernard's car remained at the foot of the hill. USCA5.Vol.23.1918.

Todd Bagley sustained a fatal gunshot wound to the left side of his head. Mr. Bagley was "instantly unconscious and very quickly dead." USCA5.Vol.24.2043. Stacie Bagley sustained a single fatal gunshot wound to the right side of her face. The bullet's force and trajectory rendered her unconscious. USCA5.Vol.24.2061. She inhaled a few breaths of sooty material as the car burned. Stacie Bagley lived "seconds to a few minutes." USCA5.Vol.24.2062.

Lewis testified he was running down the hill, looked back, and saw Christopher Vialva fire the shots that killed the Bagleys. USCA5.Vol.25.2374-76. Brown testified he was standing by the car when the shots were fired, observed the effect of the gunshots, and put lighter fluid into the trunk after the Bagleys were shot. USCA5.Vol.23.1924-27. Brown testified Bernard set the car on fire. USCA5.Vol.23.1930.

Bernard's car foundered in soft dirt at the bottom of the hill. USCA5.Vol.25.2379; USCA5.Vol.23.1933. The Bagleys' burning vehicle prompted

9

a series of fire and law enforcement responders. Mr. Vialva, Bernard, Brown, and Lewis were taken into custody at the foot of the hill when the Bagleys' bodies were discovered. USCA5.Vol.22.1653; USCA5.Vol.23.1737; USCA5.Vol.25.2386-87.

## SUMMARY OF ARGUMENT

Christopher Vialva's 2255 Motion identified substantial errors that, individually and cumulatively, warranted relief. Mr. Vialva sought leave to develop additional facts through discovery and an evidentiary hearing. The government resisted all efforts at discovery, but offered no countervailing evidence to rebut Mr. Vialva's factual assertions. Among the facts Mr. Vialva sought to develop were the details regarding the government's failure to disclose exculpatory evidence. The court summarily denied Mr. Vialva relief. This denial of Due Process and of specific statutory rights were the last in a series that began with the court's appointment of unqualified counsel.

Neither lawyer appointed to represent Christopher Vialva would have been recommended as qualified if the court would have adhered to applicable law and procedure. The initial errors were eclipsed by the fact "learned counsel" accepted the appointment while pursuing employment with the office that was prosecuting Mr. Vialva. Counsel's job ambitions were apparently well known to the court. On the last business day before trial began, the court convened a hearing on the conflict. The

record reflects that any purported waiver exacted from Mr. Vialva was neither knowing nor voluntary. The prejudice to Mr. Vialva as a result of his conflicted counsel's representation is evident from the record.

Ineffective assistance of counsel pervaded both stages of the case. Counsel eked out less than a year to prepare. Learned counsel failed to secure funding for necessary experts. Critical work halted when the statutory limit of $7,500.00 was exhausted, forcing the least experienced attorney to pursue a mandamus action. Judge Smith granted a portion of the funding minutes before jury selection began. Although critical work was unfinished, counsel proceeded to trial.

The prejudice caused by counsel's failure to prepare was exacerbated by the government's violation of its duty to disclose exculpatory evidence in compliance with *Brady v, Maryland*, 373 U.S. 83 (1963), and its progeny. This violation is egregious in light of the government's trial strategy.

The government contended its thorough investigation proved Mr. Vialva was both the leader of a gang and the person who shot the Bagleys. In fact, no forensic evidence established who shot the victims. Evidence that might have been collected was lost. The government's proof hinged on the testimony of two accomplices whose conflicting stories were intentionally not memorialized. Despite these vulnerabilities, counsel failed to marshal a coherent defense or to subject the government's case to

11

adversarial testing. The 2255 Motion and attendant evidence establish counsel's performance in the first stage was deficient. Even if these deficiencies are deemed insufficient to support a new first stage trial, they are relevant to the determination of cumulative error and bear directly on Mr. Vialva's claim for second stage relief.

Learned counsel abdicated all responsibility for the second stage, so the case for Mr. Vialva's life was presented by the least qualified attorney on the team. A mitigation specialist gleaned sufficient information from an initial records collection to alert defense counsel to the necessity of a neuropsychological examination of Mr. Vialva. As a direct result of the lapse in funding, critical work, including the mitigation specialist's complete interview of Mr. Vialva, was never finished. The complete absence of a coherent mitigation strategy is apparent from the record. The case that could have been presented to support a life sentence is contained in Mr. Vialva's 2255 Motion and supporting evidence. The mitigation specialist was correct. At the time of the offense, Mr. Vialva was suffering cognitive impairments that negatively affected his behavior. The impairments are capable of amelioration, a fact demonstrated by Mr. Vialva during his present incarceration. Through counsel's global failures, this critical evidence was never considered by the jury.

These errors, individually and cumulatively, undermine confidence in the outcome of the proceedings and warrant relief. Reasonable jurists could debate

whether Mr. Vialva was convicted and sentenced to death after a trial that comported with the Fifth and Sixth Amendments.

Evidence supports the conclusion Mr. Vialva was functioning on the intellectual and emotional level of a juvenile at the time of the offense. Whether the execution of such a person violates the Eighth Amendment is an issue worthy of further consideration.

## ONE

**A COA SHOULD ISSUE ON THE DISTRICT COURT'S DENIAL OF DISCOVERY AND AN EVIDENTIARY HEARING.**

A hearing is required "[u]nless the motion and the files and records of the case conclusively show that the prisoner is entitled to no relief." 28 U.S.C. §2555(b); *and see Fontaine v. United States*, 411 U.S. 213 (1973); *United States v. Martinez*, 181 F.3d 627, 628 (5th Cir. 1999); *Rivas-Lopez*, 678 F.3d at 358; *United States v. Bartholomew,* 974 F.2d 39, 41 (5th Cir. 1992); *Potts v. Zant*, 638 F.2d 727, 751 (5th Cir. 1981). Failure to grant a hearing is error unless the record demonstrates that "under no circumstances could the petitioner establish facts warranting relief under §2255." *Fontaine*, 411 U.S. at 215. If the movant's "specific and detailed factual assertions … cannot at this juncture be said to be incredible," and, if true, may entitle

him to relief, the function of 28 U.S.C. §2255 can be served only by affording a hearing. *See Machibroda v. United States*, 368 U.S. 487, 496 (1962).

Section 2255 proceedings are recognized as the appropriate mechanism for extra-record fact development. *See Massaro v. United States*, 538 U.S. 500, 504-506 (2003). This Court has consistently recognized that ineffective assistance of counsel claims, supported by plausible factual allegations and sufficient evidence to question trial counsel's performance, require an evidentiary hearing. *Friedman v. United States*, 588 F.2d 1010, 1016 (5th Cir. 1979); *Rivas–Lopez*, 678 F.3d 353, 359 (5th Cir. 2012).

Counsel requested discovery of specific categories of evidence and information linked to issues presented in the 2255 Motion. *See* USCA5.Vol.11.2117; USCA5.Vol.11.2160;USCA5Vol.13.2505. The discovery was sought in furtherance of Mr. Vialva's request for an evidentiary hearing. USCA5.Vol.7.1134. In turn, Mr. Vialva's request for an evidentiary hearing was related to his claims for relief based on three distinct aspects of ineffective assistance of counsel and the United States's violation of *Brady*. USCA5.Vol.7.973-1001;1020-1051;1073-1104;1001-1019. Counsel submitted a significant volume of information supporting his claims. Although the government offered no countervailing evidence, its response raised

14

material factual disputes that require a hearing to resolve.  USCA5.Vol.11.2136;

USCA5.Vol.13.2514.  These disputes include, *inter alia:*

- What mitigating evidence a reasonable investigation would have uncovered, *i.e.*, evidence of treatable bipolar disorder and organic brain impairment;

- The extent to which Goains's conflict of interest caused him both to abdicate his role as lead counsel and to fail in his duties of adequate preparation and advocacy;

- Whether Mr. Vialva knowingly, intelligently, and voluntarily waived his right to conflict-free counsel;

- What documents and information were disclosed through the government's "open file" discovery policy and whether any other information was provided to the defense;

- The content of the prior statements of Brown and Lewis, deemed untruthful or misleading during the investigation, that were not disclosed at trial;

- Whether those prior inconsistent statements of Brown and Lewis were memorialized in any form or were otherwise known by any agent;

- Whether the government failed to disclose Brown's November 5, 1999 prior inconsistent statements;

- Whether his attorney's notes concerning Brown's prior inconsistent statements were accurate and complete;

- Whether the government failed to disclose relevant information concerning Brown's prior criminal acts;

- Whether undisclosed promises to Brown were made by the government in exchange for his testimony and, if so, what those promises entailed;

- What steps trial counsel took to obtain necessary services and to investigate mitigating evidence and whether those efforts were reasonable; and

- Whether counsel's penalty phase presentation was deficient in, *inter alia*, failing to adduce key mitigating evidence through experts, in light of prevailing standards.

Mr. Vialva provided more than an ample basis for granting his request for an evidentiary hearing. *See Machibroda v. United States,* 368 U.S. 487, 495-96 (1962); *also United States v. Harger*, No. 08-30332, 2009 WL 3833994 (5th Cir. 2009) (*per curiam*) (sworn statement of movant unrefuted by evidence submitted by government sufficient to warrant evidentiary hearing). Similarly, the pleadings and evidence provided ample reason to believe Mr. Vialva could demonstrate one or more bases for relief, if he were permitted to adduce a full factual record.

Reasonable jurists could debate whether it was the duty of the trial court "to provide the necessary facilities and procedures for an adequate inquiry." *Murphy v. Johnson*, 205 F.3d 809, 813-14 (5th Cir. 2000); *and see Bracy v. Gramley*, 520 U.S. 899, 905, 908 (1997). Reasonable jurists could agree the court erred in resolving contested issues of fact without hearing evidence. *Montgomery v. United States*, 469 F.2d 148, 150 (5th Cir. 1972) ("contested fact issues" that are "bona fide" can only be resolved by an evidentiary hearing). A COA should issue on these errors.

**TWO**

**A COA SHOULD ISSUE REGARDING LEARNED COUNSEL'S UNWAIVED CONFLICT OF INTEREST.**

The Sixth Amendment guarantees all defendants the right to "the assistance of an attorney unhindered by a conflict of interests." *Holloway v. Arkansas*, 435 U.S. 475, 483 n.5 (1978). The defense attorney "owes [his] client a duty of loyalty, [and] a duty to avoid conflicts of interest." *Strickland v. Washington*, 466 U.S. 668, 688 (1984). A conflict exists "when defense counsel places himself in a position conducive to divided loyalties." *United States v. Vaquero*, 997 F.2d 78, 89 (5th Cir. 1993) (internal citation omitted). Relevant ethical standards inform the reviewing court's determination of the nature, scope, and significance of the conflict resulting from the attorney's conduct. *See Perillo v. Johnson*, 205 F.3d 775, 801 (5th Cir. 2000) (ABA MODEL RULES OF PROFESSIONAL CONDUCT recognized as "relevant ethical standards"); and *Vaquero,* 997 F.2d at 90-91 (determine "whether the integrity of the judicial system has been undermined by reference to the current national standards of legal ethics.").

If the Court finds the conflict may be waived, it must determine whether there was a waiver, when the waiver occurred, and whether the waiver was effective. The Court considers whether the defendant, through counsel, recognized and objected to

the conflict or knowingly and intelligently waived the conflict. *Compare Wheat v. United States*, 486 U.S. 153, 157 (1988) (client waiver); *with Glasser v. United States*, 315 U.S. 60, 70 (1942) (no affirmative waiver of concurrent representation); *and Holloway*, 435 U.S. at 478 (objection to concurrent conflict).

The Court must determine whether the trial court conducted an inquiry sufficient to ensure the conflict would not adversely impact the defendant or the fairness of the proceedings. The Court considers whether the trial judge knew or should have known of the conflict, or made any inquiry into the conflict. *Compare Glasser*, 315 U.S. at 71 (no meaningful inquiry); *Holloway*, 435 U.S. at 478 (failure to meaningfully inquire); *Mickens v. Taylor*, 535 U.S. 162, 174 (2002) (no inquiry); *with Cuyler v. Sullivan*, 446 U.S. 335, 347 (1980) (no duty to inquire).

To determine whether the conflict rises to the level of a Constitutional violation, the Court considers the nature and extent of the conflict. *See Mickens*, 535 U.S. at 167-73 (collecting cases); *Sullivan*, 446 U.S. at 350 (considering whether actual as opposed to potential conflict exists); *Burger v. Kemp*, 483 U.S. 776, 783 (1987) (possible conflict). The Court may conclude no proof of harm is necessary and reversal for a new trial is automatic. *E.g., Holloway*, 435 U.S. at 491; *Glasser*, 315 U.S. at 76. Alternatively, the defendant may be required to show the conflict has had an adverse effect on representation. *Sullivan*, 446 U.S. at 350. This Court has limited

the application of *Cuyler* to conflicts involving multiple representation. *Beets v. Scott*, 65 F.3d 1258, 1265-1272 (5th Cir. 1995) (*en banc*). Conflicts resulting from the attorney's self-interest are evaluated under *Strickland*. *See Moreland v. Scott*, 175 F.3d 347, 348-349 (5th Cir.), *cert. denied* 528 U.S. 937 (1999).

On June 23, 1999, a United States Magistrate Judge appointed Stan Schwieger to represent Mr. Vialva. USCA5.Vol.3.6. On July 16, Mr. Schwieger requested the appointment of co-counsel, citing 18 U.S.C. §3005. Mr. Schwieger admitted he had "limited death penalty experience" and asked the court to appoint Dwight Goains as counsel "learned in the law applicable to capital cases." USCA5.Vol.3.34,36. Mr. Goains was appointed by Judge Smith July 21, 1999. USCA5.Vol.3.40. It is undisputed that neither judicial officer consulted with the Federal Public Defender for the Western District of Texas prior to appointing Mr. Schwieger or after determining Mr. Vialva was potentially subject to the death penalty. *See* USCA5.Vol.1.125; USCA5.Vol.7.1142. Consultation is required. 18 U.S.C. §3005; ADMIN. OFF. U.S. COURTS, GUIDE TO JUDICIARY POLICIES AND PROCEDURES [hereinafter, *Guide*], Vol. VII, App. I.

In early February 2000, Mr. Goains interviewed for a job as an Assistant United States Attorney in the same office that was prosecuting Mr. Vialva. USCA5.Vol.8.1198-1200. Mr. Goains was advised in "early March 2000" the

19

position for which he interviewed was filled.  In a letter dated March 6, 2000, Mr.

Goains expressed his continued interest in a job with that office.  *Id.*

On May 4, 2000, Mr. Schwieger sent Mr. Vialva's mother, Lisa Brown, an

electronic mail message:

> Dwight had put an application into the U.S. Attorney's office long ago
> and far away [it has to do with his retirement situation: he can roll in his
> military retirement in with a job in that office.]  Apparently, he has
> become a front runner in the race.  No decision has been made yet.
>
> Dwight spoke personally with Chris about this yesterday, and Chris
> wanted Dwight to stay on board.  I KNOW that this has had no effect on
> his effort.

USCA5.Vol.8.1210 (parentheticals in original).

On Friday, May 12, 2000, Mr. Goains requested a hearing to make a record

about his application to the United States Attorney's Office.  USCA5.Vol.8.1191.

Mr. Goains began the hearing, stating, "*as this Court is well aware*, Your Honor, for

about the last eight or ten years I've been trying to apply to be an Assistant United

States Attorney." USCA5.Vol.8.1193 (emphasis added). Mr. Goains asserted "there's

more than an excellent chance I may receive an offer" for one of two open positions.

*Id.* Mr. Goains stated he was a "Board Certified Criminal Lawyer" and had tried

"eight capital murder cases" in the past ten years.  USCA5.Vol.8.1193.

Mr. Goains admitted "if that offer [of employment] does come in, I'm going to accept it." USCA5.Vol.8.1194. Mr. Goains assured the court and Mr. Vialva his desire for a job "has absolutely nothing to do with his case." USCA5.Vol.8.1193. Mr. Goains said he conferred with his client and offered to withdraw or seek appointment of another counsel, but Mr. Vialva wanted him to continue in the case. USCA5.Vol.8.1193-94. Mr. Goains concluded, "I've always and will always do one-hundred percent what's in his best interest and defend him, to the best of my ability." USCA5.Vol.8.1194. Mr. Goains asked Mr. Vialva a series of leading questions regarding his representation to that point, ending with whether Mr. Vialva wanted to ask for substitute counsel or for him to continue. USCA5.Vol.8.1194-95. After Mr. Vialva said, "I wish that you continue representing me," Mr. Goains submitted him for questions by the court. USCA5.Vol.8.1195.

The district court deferred to Mark Frazier, the primary Assistant United States Attorney prosecuting Mr. Vialva. Mr. Frazier requested a waiver from Mr. Vialva that "to the extent there is any conflict, if there is any, that Mr. Vialva waives it and understands that that's permanent waiver of any type of potential issue." USCA5.Vol.8.1195. The district court told Mr. Vialva:

> First of all, if you did want me to appoint you a different lawyer from Mr. Goains, then, *I would certainly consider that*. The other is, that if the Court accepts your decision, that this does not create a problem for

you, then later on, if you're convicted, you couldn't come back and say, "Well, I didn't get a fair trial, because Mr. Goains had applied for a job with the U.S. Attorney's Office.["] Do you understand that?

USCA5.Vol.8.1196 (emphasis added).  Mr. Vialva responded, "Yes, sir." *Id.*  Mr. Vialva had just turned twenty.  This was his first experience with a jury trial and federal court process.

The trial of Christopher Vialva began as scheduled the following Monday, May 15, 2000.  Mr. Vialva was sentenced to death at the conclusion of the second stage, June 13, 2000.  *See* USCA5.Vol.1.27 (06/13/2000); USCA5.Vol.6.875 (filed 06/16/2000).  Mr. Goains moved to withdraw June 21, 2000, because he "d[id] not wish to represent Mr. Vialva in his appeals process."  USCA5.Vol.6.880.  The court granted the motion.  USCA5.Vol.6.883.

During the pendency of Mr. Vialva's appeal, Mr. Goains was hired as an Assistant United States Attorney for the Western District of Texas. USCA5.Vol.8.1198 at ¶¶ 6-8 and Vol.8.1201 at ¶¶ 6-8. Mr. Goains could not produce his files for post conviction counsel because, at some point, he destroyed them. *See* USCA5.Vol.8.1212 at ¶ 5; *and* Guideline 10.13, ABA GUIDELINES FOR APPOINTMENT AND PERFORMANCE OF DEFENSE COUNSEL IN DEATH PENALTY CASES (Rev. ed. 2003) (duty to retain and provide files to successor counsel).

Lawrence J. Fox, a practicing attorney who is recognized as an expert in professional responsibility and ethics, reviewed the record of this case and submitted his conclusions in a Declaration. USCA5.Vol.7.1151. Mr. Fox concluded Mr. Goains was operating under a conflict of interest that could not be waived. USCA5.Vol.7.1154-61. Even if the conflict could have been waived, the proceedings were too late, wholly inadequate, and actually provided further evidence of the conflict. Consequently, Mr. Vialva's purported "waiver" was neither knowing nor voluntary. USCA5.Vol.7.1162-66. This evidence was not refuted by the government and no contrary legal authority was advanced.

On November 10, 2007, after all briefing was completed but while the 2255 Motion was pending, Mr. Goains was appointed United States Magistrate Judge for the Western District of Texas. By statute, the Judges of the Western District of Texas were involved in the appointment process. *See* 28 U.S.C. §631. Judge Smith was serving as Chief Judge when Magistrate Judge Goains was appointed to his initial eight year term. *See* USCA5.Vol.2.174.

The trial court denied this claim without an evidentiary hearing.

The court held this issue was procedurally barred because it could have been raised on direct appeal. USCA5.Vol.1.123-124. Mr. Vialva contended post conviction was his first opportunity to raise the issue with independent counsel

23

because he was represented on appeal by trial counsel Stan Schwieger and Steve Losch, who was incapacitated by serious illness during the appeal. USCA5.Vol.7.1002. Mr. Vialva submitted evidence in support of his argument. USCA5.Vol.8.1234. The court noted Mr. Losch did not recover from his March 2002 surgery, but apparently found this irrelevant because the direct appeal brief was filed "six months prior." USCA5.Vol.1.124. The court misapprehended the record.

Mr. Losch's impaired performance is evident from the record. He filed a nonconforming brief May 30, 2001. After two opportunities, he filed a sufficient brief June 28, 2001. *See United States v. Vialva*, No. 00-50525. Mr. Losch had an initial surgery on his cervical spine in November, 2001. Mr. Losch's widow averred:

> He got no relief from the surgery. His pain was severe and constant.
> Many days, he couldn't get up, much less work, from the pain.

USCA5.Vol.8.1234 at ¶ 3. Mr. Losch's physical and mental health continued to deteriorate after his second surgery in March, 2002. The undisputed facts establish Mr. Losch, the only counsel not involved in the conflict issue at the trial level, was suffering from a serious disability at the time he was representing Mr. Vialva. Reasonable jurists could debate whether a procedural bar should be imposed on any issue under these facts.

The court concluded "no actual conflict existed" because Mr. Goains did not receive a job offer "during his representation of Vialva." USCA5.Vol.1.158. Citing two cases, the court concluded that even if a conflict existed, the waiver was effective and, even if the waiver was not effective, "[t]here is nothing in the record to reflect that the situation affected the adequacy of Goains' representation." USCA5.Vol.1.143. The court completely ignored the unrefuted expert opinions of Lawrence Fox that a conflict existed and that it could not be waived. Reasonable jurists could debate the district court's summary rejection of Mr. Fox's expert opinion. *See United States v. Franklin*, 213 F.Supp.2d 478, fn. 6 (E.D. Pa. 2002) ("emphatically" rejecting rule that application for position as a prosecutor "can never create actual conflict of interest").

The two cases cited by the court are instructive in apposition to this record. In *Garcia v. Bunnell*, 33 F.3d 1193 (9th Cir. 1994), *cert. denied* 514 U.S. 1024 (1995), the trial court engaged in two separate colloquies with Mr. Garcia. Mr. Garcia was represented by a court-appointed attorney who was going to work at the district attorney's office at the conclusion of Mr. Garcia's trial. *Id.* at 1195. The trial judge treated these facts as presenting a conflict and discussed the issue on the record and granted Mr. Garcia's request for a five day continuance so he could confer with other attorneys. *Garcia*, 33 F.3d at 1196. Mr. Garcia was clearly familiar with the trial

process and reminded the judge he had served as a juror in a criminal case. *Id.*. Five days later, Mr. Garcia reported he had conferred with members of his family "and other people" and decided to proceed with his attorney. *Garcia*, 33 F.3d at 1197.

In *United States v. Jenkins*, 943 F.2d 167, 176 (2d Cir.), *cert. denied* 502 U.S. 1014 (1991), the defendant's counsel had accepted a position with the United States Attorney's office. This fact was treated as presenting a conflict and the trial court conducted a hearing with the defendant, who was a licensed attorney who had served as a State Senator, an assistant district attorney, and defense counsel. The Second Circuit noted the trial court was required to:

> advise the defendant of his right to ... conflict-free representation, instruct the defendant as to problems inherent in being represented by an attorney with divided loyalties, allow the defendant to confer with his chosen counsel, encourage the defendant to seek advice from independent counsel, and allow a reasonable time for the defendant to make his decision.

*Id.* (internal citations omitted). Despite Mr. Jenkins's obvious sophistication, his rights were observed, including the opportunity to consult with independent counsel. *Id.*.

Mr. Vialva was advised of the conflict nine days before the hearing during a conference at the local jail where he was detained. There is no evidence to suggest Mr. Vialva consulted with any attorneys other than Mr. Schwieger, who vouched for

Mr. Goains to Mr. Vialva's mother, and Mr. Goains, who vouched for himself. Barely twenty years old at the time of the trial, Mr. Vialva was not an attorney. He did not have extensive experience with the criminal justice system. Mr. Vialva was a "neophyte to the criminal justice system." *Compare Jenkins*, 943 F.2d at 176.

The trial court neither advised Mr. Vialva of his right to confer with independent counsel nor offered a continuance to give him time to consider his options. The court said it would "consider" appointing a new attorney, but never indicated substitute counsel would be afforded time to prepare for trial. Faced with uncertainties and with his capital trial beginning the next working day, Mr. Vialva's purported waiver cannot be construed as knowing or voluntary. Indeed, the court never explicitly found Mr. Vialva waived the conflict.

Reasonable jurists could debate the district court's analysis and resolution of this issue, including the implicit finding Mr. Vialva failed to show prejudice resulting from the conflict. *See United States v. Infante*, 404 F.3d 376, 393 (5th Cir. 2005) (conflict established but record insufficient to establish prejudice). A COA should be granted on this issue.

**THREE**

**A COA SHOULD ISSUE TO REVIEW THE UNITED STATES'S FAILURE TO COMPLY WITH *BRADY V. MARYLAND*, 373 U.S. 83 (1963)**.

The prosecution has a duty to disclose favorable evidence material to the trial. *Brady v. Maryland*, 373 U.S. 83, 87 (1963). Prosecutors must seek out and disclose such evidence known by agents involved in the prosecution. *Kyles v. Whitley*, 514 U.S. 419, 432-34, 437 (1995). Failing to discharge that duty requires a new trial if there is a "reasonable probability" of a different result. *Banks v. Dretke*, 540 U.S. 668, 699 (2004); *Giglio v. United States*, 405 U.S. 150, 154, (1972). To prevail on a *Brady* claim, the defendant is not required to prove the suppressed evidence would have rendered the prosecution's case legally insufficient. *Banks*, 540 U.S. at 698-99.

The trial court held this claim was procedurally defaulted because it could have been raised on direct appeal. USCA5.Vol.1.131. Alternatively, the court held additional "unrecorded and untranscribed interviews" of Brown and Lewis contradicting their trial testimony were cumulative of the information in their disclosed written statements. USCA5.Vol.1.132. The court faulted Mr. Vialva for failing to present "anything other than unsupported allegations that information has been suppressed or that it is material." USCA5.Vol.1.134. The court denied Mr. Vialva's discovery requests because "they do not request information which would be relevant to the decision in this case." USCA5.Vol.1.172. Reasonable jurists could debate each of these points.

Direct appeal is limited to the trial record. *Galbraith v. United States*, 313 F.3d 1001, 1007 (7th Cir. 2002). This case illustrates clearly why *Brady* claims are properly raised in 2255 proceedings that permit greater development of the record. See *United States v. Dominguez Benitez*, 542 U.S. 74, 83 n.9 (2004).

The factual support for Mr. Vialva's *Brady* claim was developed by counsel during post conviction investigation. The entire scope of omitted information remains unknown because discovery efforts were thwarted by the government and the trial court. Reviewing the information presented in Mr. Vialva's claim, reasonable jurists could conclude his allegations were factually supported and highly material. Reasonable jurists could conclude the trial court's summary disposition of the claim was predicated on a misconstruction of the evidence and a misapplication of the law.

The 2255 Motion and attendant evidence document an array of critical, relevant information bearing on the credibility of witnesses that was not disclosed to trial counsel. See USCA5.Vol.7.1004-1018;USCA5.Vol.8.1236-Vol.9.1528. Of all the omitted evidence, the most crucial related to the two witnesses on whom the prosecution's case depended.

The absence of forensic evidence indicating who shot the Bagleys meant the government's theory of guilt and its contention the defendants deserved death depended on the credibility of the two juveniles arrested at the scene, Terry Brown

and Christopher Lewis.  Convincing the jury of the veracity of Brown and Lewis was

crucial to the government's case.  In the guilt phase closing argument, the government

told the jury:

> Someone poured the lighter fluid.  That was a heinous act.  And those
> folk that did it ought to be punished it for it.  Someone has to supply the
> gun.  And that person did and you heard him.  He's Greg Lynch.  But
> then there's a distinction between people who do that and do the act that
> caused the death, the pulling of the trigger, the lighting of the fire.

USCA5.Vol.27.2689.  The government's penalty phase argument was even more

explicit:

> There are not two defendants equally culpable to Mr. Vialva in this case,
> or Brandon Bernard in this case.  Because think about their actions, what
> the evidence shows, and the only evidence you have in front of
> you—and this is what the evidence shows that they did—is that Mr.
> Vialva pulled the trigger, and Mr. Bernard set the fire.  Sure, Terry
> Brown spread lighter fluid.  Sure, Christopher Lewis went ahead and
> participated in the carjacking. But are they equally culpable?  They are
> not.  They don't even meet the first definition, neither defendant.  They
> do not share the same degree of culpability, and they will not be
> punished to death, not because that was a decision on the Government's
> part, but because the law says.  So, therefore, that is not a mitigating
> factor.  It does not mitigate against giving the death penalty, because the
> only persons who could get the death penalty for this cruel and heinous
> crime are sitting right over there.  No one else could get it, and it is
> appropriate, based on the facts.

USCA5.Vol.30.3272.  The jury's unanimous rejection of the "relative culpability"

mitigating   factor   indicates   the   government's   rhetoric   was   persuasive.

USCA5.Vol.6.802. The exculpatory evidence withheld by the government would certainly have jeopardized the viability of its arguments.

Mr. Vialva's *Brady* claim is rooted in the records of the Criminal Investigation Division of Fort Hood, Texas. The CID report disclosed to trial counsel contained two written statements by Brown and one by Lewis, given June 22, 1999. USCA5.Vol.8.1254–55, 1265, 1273–78. The Report summarized the agents' contacts with Brown and Lewis, but provided little or no substance. USCA5.Vol.8.1267–70. The absence of detail was deliberate.

Investigators attempted to interview Brown at 1:50 a.m., June 22. USCA5.Vol.8.1259. A series of encounters ensued throughout the day, culminating at 7:10 p.m., with Brown's admission "he had not been totally truthful" in his prior statements. USCA5.Vol.8.1263. Brown sought to minimize his culpability by claiming he attempted to save the Bagleys' lives by pouring lighter fluid into his shirt instead of into the car. He continued to deny seeing who shot the Bagleys. Subsequently:

> ... SA NELSON re-interviewed BROWN on and off approximately 12 times. BROWN would provide additional information about the incident each time SA NELSON went back into the room. After BROWN provided SA NELSON with additional information he would ask SA NELSON if he could think about a particular incident and SA NELSON would leave the room. Upon SA NELSON's return, BROWN would provide info consistent with BERNARD's statement.

31

USCA5.Vol.8.1263.  The CID Report noted, "A sworn statement was not taken by SA NELSON as the US Attorney and SA CHADWICK stated no further written statements would be taken."  USCA5.Vol.8.1268.

Brown met with the government July 26, 1999 with his attorney as part of a Rule 11 plea proffer.  USCA5.Vol.8.1268.  After summarizing Brown's latest version of his involvement, the agent commented, "[n]o written statement was taken from Master BROWN at the time because the investigators believed Master BROWN was not completely truthful in all of his testimony."  USCA5.Vol.8.1269.

Brown was interviewed again November 5, 1999.  USCA5.Vol.8.1292. Information about this interview was discovered in notes taken by Brown's lawyer. Those notes reflect Brown told investigators that he "put lighter fluid in the trunk right after the shooting, then Brandon threw the match through the front window of passengers seat."  USCA5.Vol.8.1294.  Brown also admitted he sold a stolen firearm to Bernard, committed burglaries in various neighborhoods, beat a man with a sledgehammer during a fight, and attempted to commit murder in a drive-by shooting. USCA5.Vol.8.1294-1295.  Telephone messages from the attorney's files reflect further government contacts on March 15, 2000, and prior to Brown's trial testimony. USCA5.Vol.8.1347–49.  Nothing is known about the content or scope of these interactions.

The CID investigators' first interview of Lewis was noted at 8:00 a.m., June 22. USCA5.Vol.8.1273–78. Lewis's story was a complete fabrication in which he was a victimized, innocent bystander. *Id.*. Agents conducted a second interview while transporting Lewis to jail later that day. The Report noted Lewis admitted only that he asked the Bagleys for a ride. USCA5.Vol.8.1269. Lewis attended a Rule 11 proffer with his counsel July 2. No record of that interview was provided, but the Report noted "Master LEWIS omitted several facts concerning the events of 21 Jun 99, and failed to fully confess his involvement." USCA5.Vol.8.1269.

The parties met again July 6. The Report noted Lewis admitted being part of the carjacking. USCA5.Vol.8.1269–70. FBI Agent Chadwick directed that no formal statement would be taken. USCA5.Vol.8.1270. On July 8, Lewis accompanied the investigators on the route he alleged they took in the Bagleys' vehicle. *Id.* Despite the purpose of this encounter, no statements made by Lewis were noted in the Report. *Id.*.

The government's deliberate decision to avoid memorializing the series of inconsistent, untruthful, and constantly evolving statements of its linchpin witnesses does not satisfy its obligations under *Brady*. The government was aware Brown's November 5 version in which Bernard threw the match through the front window on the passenger's side was in direct conflict with the Fire Marshal's statement the

windows were up when the car was on fire. USCA5.Vol.24.2094–96. Brown's admissions of other criminal activity in the November 5 statement conflicted directly with statements to the psychologist the court appointed to evaluate Brown as part of the juvenile transfer process. Doc. 373 Exhibit III-P [Sealed]; USCA5.Vol.7.1009–17; USCA5.Vol.11.2119–20. The psychologist concluded Brown "attempted to present himself in an unrealistic manner," and to "fake good" in an effort to present himself in "a much more favorable manner than is truly the case." Doc. 373 Exhibit III-P, p. 8 [Sealed].

All this information was in the possession of the government when it presented Brown to the jury as little more than a truant kid, asking him to confirm that he had only one minor juvenile misdemeanor adjudication, had no felony convictions, and was not under any supervision. USCA5.Vol.23.1859–60. Mr. Vialva contended, and the government did not dispute, that it failed to disclose Brown's mental illness and use of psychotropic drugs at the time of trial and Lewis's criminal history. USCA5.Vol.11.2119–20.

The significance of this information cannot be overstated in the context of this capital case. Counsel attempted to verify this evidence was not disclosed to trial counsel. While employed as an Assistant United States Attorney, Goains told post conviction counsel he no longer had Mr. Vialva's file, could not produce it, and did

not know what happened to it. USCA5.Vol.8.1212. Counsel then requested the same "open file" access offered to trial counsel in an effort to reconcile the discovery. Counsel for the government advised he would produce the file only if ordered to do so by the trial court. USCA5.Vol.7.1018. As a last resort, counsel sought access through a Freedom of Information Act request. Ultimately, an analyst advised the FBI would provide materials in the "public record," *i.e.*, pleadings from the court file. The analyst attributed this decision to Assistant United States Attorney Mark Frazier, who prosecuted Mr. Vialva. USCA5.Vol.11.2160–66.

Until Mr. Vialva has been afforded discovery, it is premature to address the merits of his *Brady* claim. There was no factual basis from which the trial court could determine the inconsistent statements of Brown and Lewis were " merely cumulative of the information that was included in their written statements." USCA5.Vol.1.132. The trial court's unsupported holding ignores the patent significance of the concealed evidence on the credibility of Brown and Lewis. Materiality must be assessed cumulatively. *Kyles v. Whitley*, 514 US 419, 436-37 (1995). Denying Mr. Vialva the opportunity to develop the record necessarily short-circuits any prejudice assessment. *See Rivas-Lopez*, 678 F.3d at 359 (granting COA to appeal denial of 2255 motion and remanding for development of incomplete record); *United States v. Herrera*, 412 F.3d

577, 582 (5th Cir. 2005); *United States v. Grammas*, 376 F.3d 433, 439 (5th Cir. 2004).

This Court should grant COA, vacate the district court's opinion as it relates to his *Brady* claim, and remand with instructions to grant Mr. Vialva leave to conduct discovery and an evidentiary hearing.

## FOUR

### A  COA SHOULD BE ISSUE ON MR. VIALVA'S CLAIM OF INEFFECTIVE ASSISTANCE OF COUNSEL DURING THE GUILT PHASE OF HIS TRIAL.

"In all criminal prosecutions, the accused shall enjoy the right . . . to have the Assistance of Counsel for his defence."  U.S. Const. amend. VI.  The right to counsel encompasses the right to the effective assistance of counsel.  *McMann v. Richardson*, 397 U.S. 759, 771, n. 14 (1970).  The standard enunciated in *Strickland v. Washington*, 466 U.S. 668 (1984), is two-pronged.  The defendant must show counsel's performance was deficient in that it "fell below an objective standard of reasonableness."  *Id.* at 688.  The defendant must demonstrate counsel's deficient performance prejudiced the defense through errors that "undermine confidence in the outcome" of the proceedings.  *Id.* at 694.

The Court recognized the American Bar Association's *Standards for Criminal Justice* were "guides to determining what is reasonable, but they are only guides."

36

*Strickland*, 466 U.S. at 688. Subsequent revisions and specialized guidance for capital cases continue to be the standards against which the reasonableness of counsel's performance will be judged. *Williams v. Taylor*, 529 U.S. 362, 396 (2000) (citing ABA Standards for Criminal Justice); *Wiggins v. Smith*, 539 U.S. 510, 123 S.Ct. 2527, 2536-2537 (2003) (citing ABA Guidelines).

Counsel's individual errors will be evaluated against recognized standards of practice and the errors, individually and cumulatively, will be measured against *Strickland*'s due process standard.

### 1)     **Deficient Performance**

The 2255 Motion detailed the multiple failures of trial counsel and submitted evidence in support of the claims. USCA5.Vol.7.1020-51;Vol.8.135-Vol.9.1518. The government responded with recitations from the trial record (USCA5.Vol.12.2284-2315) and the assertion Mr. Vialva made "no viable showing of alternative perpetrators" (USCA5.Vol.12.2287). But the government offered no countervailing evidence explaining how counsel's performance met standards recognized by the Supreme Court. The trial court also conflated the record that developed when trial counsel failed to provide effective assistance with what could have been done by effective counsel. Mr. Vialva identified the following specific instances of ineffective assistance of counsel at the guilt phase.

**(a)** ***Trial counsel failed to obtain funding for necessary experts, resulting in an inadequate investigation and deficient preparation. USCA5.Vol.7.1022-27.***

Goains submitted a proposed budget that identified eight categories of experts. Doc. 46 at §IV [Sealed]. Fees and expenses for investigative, expert, and other "reasonably necessary services" are limited to $7,500.00 unless the excess amount is "certified by the court" and "approved by the chief judge of the circuit." *See* 21 U.S.C. §848(q)(10)(B). Unaccountably, Goains failed to direct the trial court to the process for certification by the presiding judge and submission to the Circuit. *See Guide*, USCA5.Vol.8.1396-99. Counsel's draft order failed to comply in any respect with the proposed sample orders contained in the *Guide*. *See Guide*, USCA5.Vol.8.1401-1406.

In a separate, unsealed motion, counsel requested the appointment of a fact investigator, Leon Cheney. USCA5.Vol.3.65. The trial court granted that request (USCA5.Vol.3.97) and, in a separate order, approved a portion of the initial litigation budget (Doc. 55) [Sealed]. Neither order approved specific rates, hours, or total amounts for each expert, or an overall total. Trial counsel did not request clarification of the orders. A total of $7,500.00 was approved to fund the work of all the defense experts.

When the budget was exhausted, payments to the defense experts stopped. Several experts had not completed their work. On or about April 18, 2000, the trial judge directed counsel to substantiate their requests. During an *ex parte* hearing April 28, the judge noted the defense was requesting an additional $39,110. USCA5.Vol.8.1408. Judge Smith advised counsel he told the Chief Judge of the Fifth Circuit:

> . . . I was faced with what I considered a dilemma, because the defense team for Mr. Vialva had exceeded the $7,500 and may or may not have spent that money wisely, but it was gone and they were wringing their hands and telling me that that wasn't enough.

USCA5.Vol.31.42. Judge Smith said the Chief Judge directed him to determine what he thought was "reasonable and necessary." *Id.* USCA5.Vol.31.43. The trial court denied counsel's request for an additional $40,000.00 and suggested "an immediate appeal. . . would be what's appropriate." *Id.* USCA5.Vol.31.43. The court entered the order denying the request May 1, 2000, two weeks before trial. USCA5.Vol.5.524.

Mr. Schwieger sought and obtained a writ of mandamus in this Court. The trial court conducted an *ex parte* hearing May 15, 2000, immediately before the trial began, and approved a portion of the requested funding. The defense did not request a continuance. USCA5.Vol.9.1514 at ¶ 6.

Counsel had an affirmative duty to pursue a thorough investigation of all matters relating to the guilt and penalty phase of the case. *See* 1989 ABA Guidelines 11.4.1, 11.7.1, and 11.8.3. The responsibility to obtain and utilize necessary resources is coextensive with this duty. *See Wiggins*, 539 U.S. at 524 ("Despite the fact that the Public Defender's office made funds available for the retention of a forensic social worker, counsel chose not to commission such a report. Counsel's conduct similarly fell short of the standards for capital defense work articulated by the American Bar Association (ABA) – standards to which we have long referred as 'guides to determining what is reasonable.'") (internal citations omitted).

Counsel's "strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitation on investigation." *Strickland*, 466 U.S. at 690-691. Complimentarily, the scope of defense counsel's pretrial investigation "necessarily follows from the decision as to what the theory of defense will be." *Soffar v. Dretke*, 368 F.3d 441, 473 (5th Cir. 2004). In this case, counsel proceeded to trial without a cognizable theory of defense, based on a limited and largely fruitless investigation conducted under the dual pressures of little time and less money.

b) *Failure to conduct an adequate investigation.*

Counsel proceeded to trial less than a year after the homicides, with several critical tasks unfinished. USCA5.Vol.7.1027-32;USCA5.Vol.9.1514 at ¶¶ 5(sic), 7, 8, 9. It appears counsel decided to pursue a defense based on the idea someone other than Mr. Vialva shot and killed the Bagleys at some location other than Fort Hood. *See* USCA5.Vol.22.1488-89;USCA5.Vol.27.2633-34. Neither the "fact investigator" nor the "forensic consultant" were tasked with developing evidence that supported these ideas. *See* USCA5.Vol.8.1428 at ¶¶ 6-8;USCA5.Vol.9.1432-33. A similar failure resulted from the fact investigator's superficial inquiry regarding the government's key witnesses, Terry Brown and Christopher Lewis. The "fact investigator" believed both young men were "lying about their actions," but his "criminal history background checks" consisted of searching a computer database. USCA5.Vol.8.1428 ¶ 6. Since Brown and Lewis were juveniles, it is unclear how much information might have been gleaned from public sources. A review of counsel's cross examinations reveals nothing that could be attributed to pretrial investigation.

### c) *Failure to subject government's case to adversarial testing.*

The prosecution contended that law enforcement efforts were diligent and thorough, that Mr. Vialva, the leader of a violent street gang targeting innocent victims, orchestrated the plan to kill the Bagleys, and that the eyewitness testimony

of participating codefendants was conclusive proof of guilt. The defense failed to subject any of these three points to genuine adversarial testing. Challenges were available. USCA5.Vol.7.1032-45; USCA5.Vol.9.1503;1509;1518. Counsel failed to develop available impeachment of Christopher Lewis and Terry Brown. USCA5.Vol.7.1036-41;USCA5.Vol.8.1267;1357; *and see* Govt. Exh. 39. Further, the defense failed to present documented neurological and developmental issues bearing on Mr. Vialva's cognitive capacity, which would have rebutted the contention he was the "leader" of a gang. USCA5.Vol.7.1043-45;USCA5.Vol.9.1577. There is no conceivable reason for these failures.

### d) *Failure to present a coherent defense.*

The absence of effective pretrial preparation resulted in counsel being ill-prepared or completely unprepared to present a coherent defense in the guilt phase. The trial record reflects counsel's misuse of expert testimony, misunderstanding of forensic evidence, and ill-advised efforts to cast doubt on witnesses who had no connection with the events. In the process, they failed to recognize legitimate areas of cross examination of critical prosecution witnesses. USCA5.Vol.7.1045-48;USCA5.Vol.8.1428.

Exacerbating, or perhaps explaining, this disarray was the attorneys' failure to develop a working relationship with the client, either personally or through other team

members.  USCA5.Vol.7.1048-49.  Mr. Goains, who was in charge of the first stage, spent 16.3 hours meeting with Mr. Vialva.  Since Mr. Goains destroyed his files, no notes of his meetings were available.  Other records document some of the meetings.

Two hours were spent with the fact investigator during the May 3, 2000 visit when Mr. Goains disclosed his ongoing efforts to gain employment with the United States Attorney.  USCA5.Vol.8.1429 at ¶ 11.  The investigator recalled an additional purpose of the meeting, less than two weeks prior to trial, was "to discuss our progress related to this case."  USCA5.Vol.8.1430 at ¶ 12.  The investigator's records indicate he spent three hours at a meeting with both lawyers and Mr. Vialva in the jail  August 6, 1999, five days after being retained (USCA5.Vol.8.1429 at ¶ 11) and another 1.5 hours conferring with the client (USCA5.Vol.7.1049).   No other team member involved in the first stage spent time conferring with Mr. Vialva.  Counsel's efforts fell substantially below recognized standards of practice.  *See* 1989 ABA Guidelines 11.4.1(D)(2) (counsel required to conduct independent investigation; timely interview of client required); 11.4.2 ("Trial counsel should maintain close contact with the client throughout the preparation of the case, discussing (<u>inter</u> <u>alia</u>) the investigation, potential legal issues that exist or develop, and the development of the defense theory."); *and* 2003 ABA Guidelines 10.5 (A) ("Counsel at all stages of the case

should make every appropriate effort to establish a relationship of trust with the client, and should maintain close contact with the client.").

### 2) Prejudice

Mr. Vialva was assured his "learned counsel," who was taking the lead in the first stage, was expending "one-hundred percent" effort on his behalf. In fact, counsel failed to exercise the skill and diligence a reasonably competent lawyer would have expended on a far less serious charge. The prejudice to Mr. Vialva resulted from this deficient performance is evident.

Christopher Lewis and Terry Brown were interviewed repeatedly, but the substance of those statements were not memorialized on the instructions of the Federal Bureau of Investigation Agent. USCA5.Vol.8.1268-69. Counsel failed to present this information, despite its obvious value as impeaching the witnesses' credibility and casting doubt on the integrity of the investigation.

Brown's account of the shooting placed him in proximity to the victims. He was the only witness who claimed Mr. Vialva shot the Bagleys. No forensic evidence corroborated Mr. Brown's account. Counsel never pursued this fact with the government's witnesses, nor did they attempt any independent testing of the physical evidence. There was no evidence on which counsel could explain these failures as a strategic decision. Similarly, Brown's exposure to a possible capital prosecution by

the State of Texas was never disclosed to the jury, despite its obvious implications to his credibility.

Federal law enforcement narrowed the scope of the investigation at the earliest stages of witness interviews and evidence collection. Expert testimony would have exposed the government's reliance on an arbitrary protocol and outdated evidence collection methods, rebutting the prosecution's claim the investigation was thorough and diligent. USCA5.Vol.9.1509.

Counsel misused their limited resources, effectively obviating a coherent defense strategy. The result was ineffective, disconnected, and frequently incoherent cross examination of a limited number of government witnesses. *Compare* USCA5.Vol.5.509; Vol.22.1471; *with* USCA5.Vol.8.1429 at ¶ 6; USCA5.Vol.9.1518; and Vol.10.1772 (gang affiliation, mental age); *and* USCA5.Vol.24.2112 *with* USCA5.Vol.9.1433 at ¶ 6 (melting point of brass casing); *and* USCA5.Vol.24.1989-1995 (cross examination of serologist; DNA question about "mummies out of the Egyptian pyramids").

Without allowing discovery or conducting an evidentiary hearing, the trial court dismissed these failures as the consequence of overwhelming evidence of guilt. *See* USCA5.Vol.1.149-159. The court wholly failed to consider the impact of this omitted evidence on the jury's assessment of the government's case in chief and its

second stage argument for death. By failing to challenge the government's witnesses and evidence, the possibility of residual doubt as a mitigating factor in the second stage was obviated.

Reasonable jurists could debate whether the court's tautological conclusion resolves this Constitutional issue correctly. *See Harrison v. Quarterman*, 496 F.3d 419, 425-428 (5th Cir. 2007); *Soffar*, 368 F.3d at 473-474 (5th Cir. 2004); *Anderson v. Johnson*, 338 F.3d 382, 392 (5th Cir. 2003). A COA should be granted on this pivotal issue.

## FIVE

**A COA SHOULD ISSUE ON CHRISTOPHER VIALVA'S CLAIM OF INEFFECTIVE ASSISTANCE OF COUNSEL DURING THE PENALTY PHASE OF HIS TRIAL.**

Capital defense counsel must investigate and present evidence so that the jury's determination of life or death takes place in the full context of the defendant's life. *E.g., Williams v. Taylor*, 529 U.S. 362, 395-96 (2000) (affirming longstanding recognition of the importance of a wide range of evidence as relevant for purposes of mitigation); *Eddings v. Oklahoma*, 455 U.S. 104, 115-117 (1982) (family history of capital defendant is vital mitigating evidence); *Lockett v. Ohio*, 438 U.S. 586, 604-05 (1978) (individualized consideration of capital defendant must take place prior to Constitutional imposition of death penalty). "To establish deficient performance, a

petitioner must demonstrate that counsel's representation 'fell below an objective standard of reasonableness.'" *Wiggins*, 539 U.S. at 521 (quoting *Strickland*, 466 U.S. at 688). "[T]o establish prejudice, a 'defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome.'" *Id.* at 534 (quoting *Strickland*, at 694).

One of counsel's duties is to diligently pursue evidence of the client's mental disorders that may mitigate the offense. Counsel failed to pursue evidence of Mr. Vialva's brain impairment, expressed as bipolar disorder. This information was critical to place the offense and Mr. Vialva's prior behavior in context. Contrary to the trial court's conclusions, evidence of this disorder was not "double-edged" because it explained aggravating conduct already before the jury and the condition was treatable, as indicated by Dr. Daneen Milam. The reason counsel failed to find this readily available evidence can be traced directly to the deficient performance that began pretrial.

As noted in Ground Four, the investigation was derailed by counsel's inept pursuit of experts, the trial court's wholly insufficient and late funding of the experts, and counsel's unaccountable failure to request a continuance to permit the experts to complete their essential work. These errors, which infected the entire trial, culminated

in a complete denial of Mr. Vialva's Sixth Amendment rights in the penalty phase of his trial. This issue cannot be resolved without an evidentiary hearing.

### 1) Deficient Performance

The 2255 Motion detailed trial counsel's multiple failures to prepare and present an effective defense to the death penalty. USCA5.Vol.7.1066-72; USCA5.Vol.7.1073-1104. The Motion was supported by significant evidence. *See* USCA5.Vol.9.1567-USCA5.Vol.10.1772 and 1834; USCA5.Vol.9.1435;1514; and USCA5.Vol.7.1144. In response, the United States cited the second stage testimony of the three lay witnesses presented by the defense, Mr. Vialva's mother, step-father, and friend, and the disastrous testimony of Dr. Mark Cunningham, apparently as rebuttal to the evidence developed during post conviction. USCA5.Vol.12.2366. Counsel submit the comparison invited by the United States illustrates clearly the deficient performance of trial counsel.

> ### (a) *Failure to recognize the principles and importance of mitigation. USCA5.Vol.7.1075-78.*

Richard Burr, an attorney retained by the Administrative Office of the United States Courts to serve as resource counsel for attorneys representing defendants charged with capital crimes in federal court, met with the defense team August 25,

1999.[1]  USCA5.Vol.7.1147 ¶ 13.  Despite Mr. Burr's effort to explain the importance of mitigation, Mr. Goains expressed resistance to committing the significant resources necessary for penalty phase preparation.  *Id.* at ¶ 15.  This was Mr. Burr's first and last meeting with Mr. Goains.  USCA5.Vol.7.1147 at ¶ 13.  The task of preparing the second stage fell to Mr. Schwieger.  Subsequent interactions reinforced Mr. Burr's belief that  Mr. Schwieger needed "knowledgeable co-counsel . . . who had expertise in preparing for a penalty phase and who appreciated the critical significance of it.  He did not have such co-counsel."  USCA5.Vol.7.1149 at ¶ 17.

Counsel had an affirmative duty to pursue all reasonably available mitigation evidence to rebut the government's evidence supporting the aggravating factors.  *See Wiggins,* 539 U.S. at 524 (citing 1989 ABA Guidelines).  Counsel succeeded in hiring Tena Francis, a qualified mitigation specialist but failed to heed her advice, to secure her adequate time and funding to do her job, or to request additional time to prepare when some fraction of the requested funding was made available just prior to jury selection.

---

[1]Mr. Burr was contacted first by Mr. Schwieger July 14, 1999.  During the telephone call, Mr. Burr was advised a capital case was pending and that Mr. Goains had been appointed as learned counsel.  USCA5.Vol.7.1145 at ¶¶ 4-5.  As resource counsel, Mr. Burr would not have recommended the appointment of either attorney and, if he would have known Mr. Goains was seeking employment with the office that was prosecuting Mr. Vialva, he would have encouraged Mr. Schwieger to seek substitute co-counsel. *Id.* at ¶¶ 8-10.

The investigation conducted during post conviction proved Ms. Francis's preliminary impressions were correct regarding Mr. Vialva's family history of bipolar disorder, his manifestations of symptoms, and clear markers for organic brain impairment affecting his behavior. *Compare* USCA5.Vol.9.1435 at ¶¶11, 15; USCA5.Vol.9.1577 at ¶¶ 5-16. Testing established Mr. Vialva does, in fact, exhibit a clear pattern of bipolar disorder, which is a biological and chemical dysfunction that impairs the person's ability to solve problems, respond to stressors, and to exercise mature judgment in stressful situations. See USCA5.Vol.9.1577 at ¶¶ 19, 22. As the events of June 21, 1991 unfolded, Mr. Vialva's deficits were exacerbated by the fact he was at least six years from having a fully mature brain with a functional frontal lobe. USCA5.Vol.9.1577 at ¶25. Neither these facts nor their significance were explained to the jury that weighed life against death for Mr. Vialva.

### (b) *Failure to obtain adequate funding and time, resulting in failure to prepare and present available mitigation. USCA5.Vol.7.1075-78.*

The initial budget was submitted by Mr. Goains more than three weeks before his first and last meeting with Mr. Burr. The proposed budget included a request for Tena Francis, a "mitigation/social study expert/investigator." Doc. 46 at §IV [Sealed]. Mr. Goains proposed hiring Ms. Francis to "prepare a social history report on Defendant" for submission during the death penalty authorization process. Mr.

Goains estimated costs based on 400 hours' work at $60.00 per hour and requested "$18,000.00." Doc. 46, appended "Proposed Litigation Budget (Estimated)." [Sealed]. The mathematical discrepancy was not explained. Mr. Goains indicated Ms. Francis would "assist the defense in the investigation of mitigating circumstances," but did not differentiate the costs for pre-authorization and post-authorization work. Doc. 46 at §IV [Sealed].

During the week of August 21, 1999, Mr. Schwieger advised Ms. Francis of her "appointment" as the mitigation specialist. USCA5.Vol.9.1433 at ¶ 7. Ms. Francis recalls being advised "in early 2000" that "the court cut off funding." USCA5.Vol.9.1438 at ¶ 13. During the May 15, 2000 *ex parte* hearing, counsel requested $15,000.00, in addition to the $5,760.00 Ms. Francis was paid before funding was suspended. The court responded, "Well, I'm sure she would love to have $30,000.00, too. Talk to her and see what she can do for an additional $3,000.00." USCA5.Vol.15.6-7. Counsel detailed several critical tasks that remained unfinished, but did not request additional time for the experts to complete their work. Jury selection began at the conclusion of the *ex parte* hearing.

Adequate funding for non-attorney defense team members is essential to the defense of a capital prosecution. 2003 ABA Guideline 9.1(C). By failing to obtain adequate funding and sufficient time for Ms. Francis to complete her work, counsel

failed to provide Mr. Vialva with "an indispensable member of the defense team throughout all capital proceedings." *Id.* at 4.1, *Commentary*, *The Core Defense Team* (B). Counsel's performance was deficient.

### (c) Misuse of experts and of expert testimony. USCA5.Vol.7.1075-78.

Counsel had an affirmative duty to pursue a thorough investigation of all matters relating to the guilt and penalty phase of the case. *See* 1989 ABA Guidelines 11.4.1, 11.7.1, and 11.8.3. The responsibility to obtain and utilize necessary resources is coextensive with this duty. *See Wiggins*, 539 U.S. at 524. Qualified by experience and training, the mitigation specialist "insures that the presentation to be made at the penalty phase is integrated into the overall preparation of the case rather than being hurriedly thrown together by defense counsel still in shock at the guilty verdict." 2003 ABA Guidelines 4.1, *Commentary, The Core Defense Team* (B).

Between August 25, 1999 and early February, 2000, Ms. Francis prepared a preliminary summary of Mr. Vialva's life, based primarily on the records she collected and information from immediate family members. On October 17, 1999, Ms. Francis sent the preliminary summary to counsel, who apparently "cut and pasted" the information into a submission to the Department of Justice. USCA5.Vol.9.1437 at ¶¶

10-11. This haphazard use of Ms. Francis's preliminary work reflects counsel's fundamental misunderstanding of mitigation.

When the penalty phase began, Ms. Francis "had not completed interviews of the client, his family, or his friends," and so "had not developed a complete history of Mr. Vialva's life." USCA5.Vol.9.1440 at ¶ 21. Ms. Francis cautioned counsel against hiring any mental health experts until this fundamental task was completed. USCA5.Vol.9.1437 at ¶ 11; Vol.9.1514 at ¶ 5. Counsel ignored Ms. Francis and proceeded to hire a psychiatrist, rather than the neuropsychologist Ms. Francis felt was indicated, based on the limited history she had been able to develop. USCA5.Vol.9.1438 at ¶ 12.

In March 2000, Mr. Schwieger reported the psychiatrist's opinion was not helpful and there was no funding for the neuropsychologist Ms. Francis continued to suggest. USCA5.Vol.9.1438 at ¶ 14. Subsequently, Mr. Schwieger read an article that illuminated Ms. Francis's advice and persuaded him of the need for a neuropsychologist. USCA5.Vol.9.1439 at ¶ 16. Mr. Schwieger requested funds for a neuropsychologist May 12, 2000, three days before trial began. Doc. 226 [Sealed]. Although Mr. Schwieger retained the expert, he could not recall receiving a copy of the tests. Mr. Schwieger did not present "any evidence about Mr. Vialva's mental or

emotional health during the penalty phase through a neuropsychologist or any other mental health professional." USCA5.Vol.9.1515 at ¶ 7.

The only expert presented by the defense at the second stage was Dr. Mark Cunningham. The ostensible purpose of the testimony was to rebut the "future dangerousness" aggravating factor. Instead, during direct examination, Dr. Cunningham told the jury Mr. Vialva had "many of the risk factors that have been identified by the research as risk factors, and he has very few of the protective factors operating." USCA5.Vol.29.3068. Counsel's fundamental ignorance of the limits and vulnerabilities of Dr. Cunningham's opinion led to the presentation of this disastrous testimony.

The "risk factors" to which Dr. Cunningham referred in his direct testimony were discussed in his published work. *E.g.,* Mark D. Cunningham & Thomas J. Reidy, *Integrating Base Rate Data in Violence Risk Assessments at Capital Sentencing*, 16 BEHAV. SCI. L. 71, 82, 87 (1998) (youthful age, past aggression/violence); *and* Mark D. Cunningham & Thomas J. Reidy, *Don't Confuse Me With the Facts: Common Errors in Violence Risk Assessment at Capital Sentencing*, 26 CRIM. JUSTICE & BEHAV. 20, 38 (1999) (gang participation)[2].

---

[2]The deficiencies in Dr. Cunningham's methodology and the extent to which his testimony exceeded the scope of legitimate science are discussed in detail in the 2255 Motion and attendant evidence. USCA5.Vol.7.1094-97; Vol.10.1722.

Alternatively, counsel could have reviewed the published opinion in another federal capital prosecution, *United States v. Lee*, 89 F. Supp. 2d 1017 (E.D. Ark. 2000), *rev'd*, 274 F.3d 485 (8th Cir. 2002) (reversing order of new trial on penalty phase). The opinion, which exposed the pitfalls inherent in Dr. Cunningham's testimony, was published in March 2000. Finally, Dr. Cunningham identified relevant information and further evaluation that would have changed his equivocal, tentative opinion in Mr. Vialva's favor. USCA5.Vol.10.1773-75 at ¶¶ 8, 14-19.

During cross examination, Dr. Cunningham told the jury his "heart" told him he would not want to be in a jail cell with Mr. Vialva. USCA5.Vol.29.3081-82. This response, like Dr. Cunningham's equivocal opinion, was the result of being instructed by trial counsel not to interview Mr. Vialva. USCA5.Vol.10.1773 at ¶¶ 10, 11. Counsel's instruction was predicated on his misunderstanding of the incomplete and misleading information communicated by Dr. Reid, the psychiatrist hired by the defense before Ms. Francis completed Mr. Vialva's social history. USCA5.Vol.10.1834 at ¶ 4; and USCA5.Vol.9.1437 at ¶¶ 11-12. Even if Dr. Reid's tentative diagnosis was accurate, it would have had no impact on Dr. Cunningham's analysis. USCA5.Vol.10.1773 at ¶ 12.

The net effect of Dr. Cunningham's testimony was to invite rebuttal testimony. The United States presented two rebuttal witnesses, Dr. Richard Coons and Anthony

Davis.  Dr. Coons, a psychiatrist, testified well outside the parameters of both his profession and any legitimate methodology.  *Compare* USCA5.Vol.29 at 3154-3164 *with Assessing the Risk for Violence*, AM. PSYCH. ASS'N, APA DOC. REF. NO. 200109 ("psychiatrists cannot predict dangerousness with definitive accuracy").  Mr. Davis, an employee of the United States Bureau of Prisons, testified generally about gangs in prison, apparently to bolster Dr. Coons's testimony a street gang member invariably becomes a prison gang member.  USCA5.Vol.29.3164-3167.    Although patently subject to challenge, both witnesses testified without being cross examined.

### (d) *Failure to advocate effectively for an individualized sentencing proceeding.  USCA5.Vol.7.1066-72.*

Counsel requested a separate penalty phase trial through a pretrial motion (USCA5.Vol.4.408) that was denied (USCA5.Vol.31.22).  The request was renewed at the end of jury selection (USCA5.Vol.21.1452) and at the beginning of the penalty phase (USCA5.Vol.28.2708-09).[3]  All of counsel's requests were plagued by the absence of any factual or empirical support for the request.  Such support was readily available.  *See* USCA5.Vol.9.1535.  The majority of federal death penalty cases

---

[3]This Court reviewed this issue on appeal under plain error, based on the conclusion Mr. Vialva's counsel failed to renew their pretrial motion.  *United States v. Bernard*, 299 F.3d 467, 475 (5th Cir. 2002).  The instant issue presents a distinct Constitutional question that is not foreclosed by the Court's prior decision.  *See Penry v. Lynaugh*, 492 U.S. 302, 319 (1989); *and Lockett v. Ohio*, 438 U.S. 586, 604-05 (1978).

involving multiple defendants facing multiple capital counts result in some form of severance.  USCA5.Vol.9.1555.

Counsel's bare legal argument wholly failed to identify critical facts that would have supported severance.  From the initial charge forward, trial counsel was on notice that the United States would argue Mr. Vialva was primarily responsible for the events.  The risks associated with a jury's deliberation of the fate of a "leader" and a "follower" in a single penalty phase were patent.  Counsel's failure to adduce facts supporting a request for an individualized sentencing proceeding falls below the standards of professional competence.

**2)** **Prejudice**

In rebuttal to Mr. Vialva's claim of prejudice, the United States offered no evidence beyond recounting its version of the facts and concluding those facts "would have doomed the strategy he proposes in hindsight."  USCA5.Vol.12.2371.  This result oriented rhetoric ignores recognized standards of practice.

The evidence appended to the 2255 Motion demonstrates exactly what Ms. Francis suspected: there was a wealth of information that supported a cogent second stage defense.  *Compare* USCA5.Vol.9.1461 (Francis draft chronology) *with* USCA5.Vol.9.1606 (McHan psychosocial history); *and*  USCA5.Vol.10.1774 at ¶¶ 17-19 (Cunningham effect of developmental age and bipolar disorder) *with*

USCA5.Vol.9.1577 (Milam evaluation); *and* USCA5.Vol.29.3164-3167 (Davis "gang" testimony) *with* USCA5.Vol.9.1518 (Dwight Stewart Killeen "gang" activity); *and* USCA5.Vol.28-29.2902-2958 (testimony of Lisa Brown) *with* USCA5.Vol.9.1563.USCA5.Vol.10.1699;1702 (declarations of Lisa Brown's sisters and Rowallan Vialva) *and* USCA5.Vol.9.1580-84 at ¶¶ 13-14, 18-24 (clinical assessment, organic brain component, effects of environment on development). Counsel's attempt to humanize Mr. Vialva through the testimony of a former neighbor reflects precisely the sort of haphazard eleventh hour effort emblematic of deficient performance. The existence of readily available persuasive evidence illuminating and contextualizing Mr. Vialva's life demonstrates the prejudice resulting from that deficient performance. *Compare* USCA5.Vol.28.2969-2871 (Cedrick Young); *with* USCA5.Vol.10.1699 ¶ 6 (Aunt Dee Bynum); USCA5.Vol.10.1719 (friend's mother); and USCA5.Vol.10.1706; 1709, 1712, 1715, 1834 (peers and girlfriends). This evidence would have provided the defense with compelling mitigation that would have responded to the government's case for death. Trial counsel's failure to develop this evidence denied Mr. Vialva the most critical portion of his defense.

The trial court denied this claim without conducting an evidentiary hearing, implicitly holding a verdict of death was inevitable. Reasonable jurists could debate this conclusion. *See Williams*, 529 U.S. at 398; *Wiggins,* 539 U.S. at 534-536; *Moore*

*v. Johnson*, 194 F.3d 586, 620-621 (5th Cir. 1999); *and Hooks v. Workman,* 689 F.3d 1148, 1201-1208 (10th Cir. 2012).  A COA should issue on this claim.

## SIX

**A COA SHOULD ISSUE TO CONSIDER WHETHER CUMULATIVE ERRORS DEPRIVED CHRISTOPHER VIALVA OF HIS CONSTITUTIONAL RIGHT TO DUE PROCESS AND A FAIR TRIAL.**

Mr. Vialva presented argument and authority in support of his contention cumulative errors at the punishment phase deprived him of his Constitutional right to a fair trial.  USCA5.Vol.7.1115-19.  Through the evidence adduced in support of the 2255 Motion, Mr. Vialva demonstrated multiple errors during both phases of his trial.  The government's violations of *Brady* and trial counsel's failure to render effective assistance deprived Mr. Vialva of the rights guaranteed to him by the Fifth and Sixth Amendments.  Reasonable jurists could debate whether the prejudice resulting from these errors undermine confidence in the outcome of the proceedings, warranting relief.  *See Cargle v. Mullin*, 317 F.3d 1196, 1220-21, 1224-25 (10th Cir. 2003).  A COA should be granted on this issue.

## SEVEN

**WHETHER THE EXECUTION OF CHRISTOPHER VIALVA WILL VIOLATE THE EIGHTH AMENDMENT.**

Counsel recognize the Supreme Court established eighteen as the "age at which the line for death eligibility ought to rest." *Roper v. Simmons*, 543 U.S. 551, 574 (2005). Counsel also recognize this Court has recognized that line as insuperable. *E.g., Parr v. Quarterman*, 472 F.3d 245, 261 (5th Cir. 2006), *cert. denied* 551 U.S. 1133 (2007). The history of this issue militates against such an interpretation.

In the process of setting "the line," the Court noted eighteen is "the point where society draws the line for many purposes between childhood and adulthood." *Roper*, 543 U.S. at 574. But Eighth Amendment analysis has moved this line in the direction of greater maturity. *Compare Thompson v. Oklahoma*, 487 U.S. 815 (1988); *Stanford v. Kentucky*, 492 U.S. 361 (1989); *and Graham v. Florida*, 560 U.S. 48 (2010). These cases reflect the Court's reconciliation of the Eighth Amendment with prevailing societal norms. In turn, the "evolving standards of decency that mark the progress of a maturing society" are influenced by our developing understanding of the relationship between cognitive capacity and moral culpability. *Compare Penry v. Lynaugh,* 492 U.S. 302 (1989)*, with Atkins v. Virginia,* 536 U.S. 304 (2002).

Developments in neuroscience indicate a healthy human brain, unimpaired by any negative factors, does not develop the critical executive decision making mechanisms until the person is in his twenties. *See* Giedd, J. N., J. Blumenthal, et al., "Brain development during childhood and adolescence: A longitudinal MRI study;"

NATURE NEUROSCIENCE 2(10): 861-863 (1999); *and* Gogtay, N., J. N. Giedd, et al., "Dynamic mapping of human cortical development during childhood through early adulthood," PROCEEDINGS OF THE NATIONAL ACADEMY OF SCIENCES 101: 8174-8179 (2004). Mr. Vialva, barely nineteen and operating at a much lower mental age at the time of the offense, falls within the group of people for whom this issue remains extant.

This information is now widely known, informing and influencing societal norms. *See* USCA5.Vol.9.1597, Exhibit 3 (What Makes Teens Tick); Kevin Davis, *Brain Trials: Neuroscience is Taking a Stand in the Courtroom*, A.B.A.J. 37-42 (Nov. 2012). Counsel respectfully submit this issue merits further development and request leave to preserve this issue for further review.

## CONCLUSION

In response to Congressional mandate, the United States Courts established procedures intended to ensure defendants in federal capital proceedings would be represented by adequately resourced, qualified counsel. These procedures were in place in 1999, when the United States charged Christopher Vialva with crimes subject to the death penalty. The trial court abandoned procedure and appointed one lawyer who admitted he was not qualified and a lawyer intended to act as "learned counsel" who failed to provide legal counsel consonant with that status. It appears the trial

court knowingly appointed "learned counsel" despite being aware of counsel's aspirations for employment with the office that was prosecuting his client.

Christopher Vialva should have been represented by qualified, experienced counsel who, using the resources provided through the Criminal Justice Act, would have prepared a cohesive defense strategy. Consistent with the recognized standards of practice, competent defense counsel would have incorporated a coherent guilt stage approach to the evidence with a cohesive defense to the death penalty. At the penalty stage, competent counsel would have found and focused on the significant, documented, mental impairments that manifested in the disordered array of behavior characteristic of bipolar disorder. The jury that was charged with deliberating Mr. Vialva's fate would have been presented with the readily available, complete life history that placed the events of June 21, 1999 into an accurate context. Through the errors of the trial court and defense counsel, none of this occurred.

Instead, counsel proceeded to trial less than a year after the events, without having completed the most important and most fundamental aspects of preparation. The least experienced lawyer on the team was left in charge of the second stage defense. Critical and absolutely essential work remained unfinished as the jury was being impaneled. The post conviction investigation revealed precisely the evidence the defense mitigation specialist believed existed, but which she was prevented from

pursuing through counsel's ineffective advocacy for time and resources. This information bore directly on the jury's assessment of relative culpability and its ultimate determination of an appropriate punishment. It is the type of information the Supreme Court has repeatedly deemed critical to reliable capital sentencing. Counsel's failure to find and present this readily available evidence violated both prongs of *Strickland*. All of these errors, standing alone and in accumulation, undermine confidence in the outcome of this capital case.

Mr. Vialva's claims for relief before the trial court went substantially unrefuted by the United States. The trial court's refusal to grant Mr. Vialva additional discovery of specific facts is unaccountable. The trial court's refusal to grant Mr. Vialva an evidentiary hearing despite the existence of disputed material facts, patent from the pleadings, is reversible error. The trial court's blanket denial of a certificate of appealability contravenes prevailing law. The trial court's errors should not be insulated from full review by this Court.

Counsel request this Court grant a certificate of appealability on each of the issues identified in this application to permit full briefing on the merits.

Respectfully submitted,

/*Susan M. Otto*
SUSAN M. OTTO
Oklahoma Bar Association # 6818
Federal Public Defender
Western District of Oklahoma
215 Dean A. McGee   Suite 109
Oklahoma City, Oklahoma 73102
Telephone: 405 609-5930
Telefacsimile: 405 609-5932
Electronic mail:  Susan_Otto@fd.org

JARED TYLER
Texas Bar Association #24042073
Tyler Law Firm, PLLC
P.O. Box 764
Houston, Texas 77001
Telephone: 713 861-4004
Electronic mail: jptyler@tylerlawfirm.org

COUNSEL FOR DEFENDANT/APPELLANT
CHRISTOPHER ANDRE VIALVA

# CERTIFICATE OF SERVICE

I hereby certify that on the 28th day of August, 2013, I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Fifth Circuit by using the appellate CM/ECF system.

I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

DATED this 28th day of August, 2013.

/Susan M. Otto
SUSAN M. OTTO

# CERTIFICATE OF COMPLIANCE

1.    This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because:

This brief contains 13,822 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii).

2.    This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because:

This brief has been prepared in a proportionally spaced Times New Roman typeface using WordPerfect X4 in text and footnotes.

/Susan M. Otto
SUSAN M. OTTO