# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA,** | ) | |
| | ) | |
| Respondent-Appellee | ) | |
| | ) | |
| v. | ) | 13-70013 |
| | ) | |
| **BRANDON BERNARD,** | ) | |
| | ) | |
| Movant - Appellant. | ) | |

## CONSOLIDATED WITH

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA**, | ) | |
| | ) | |
| Respondent - Appellee, | ) | |
| | ) | |
| v. | ) | 13-70016 |
| | ) | |
| **CHRISTOPHER ANDRE VIALVA,** | ) | |
| | ) | |
| Movant - Appellant. | ) | |

On Appeal from the United States District Court
for the Western District of Texas at Waco
W-99-CR-70
The Honorable Walter S. Smith, Jr.
United States District Judge

### MOVANT/APPELLANT CHRISTOPHER ANDRE VIALVA'S REPLY BRIEF IN SUPPORT OF APPLICATION FOR CERTIFICATE OF APPEALABILITY

SUSAN M. OTTO
Oklahoma Bar Association # 6818
Federal Public Defender
Western District of Oklahoma
215 Dean A. McGee  Suite 109
Oklahoma City, Oklahoma 73102
Telephone: 405 609-5930
Telefacsimile: 405 609-5932
Electronic mail:  Susan_Otto@fd.org

JARED TYLER
Texas Bar Association #24042073
Tyler Law Firm, PLLC
P.O. Box 764
Houston, Texas 77001
Telephone: 832 377-6161
Electronic mail: jptyler@tylerlawfirm.org

**THIS IS A FEDERAL CAPITAL CASE**

# TABLE OF CONTENTS

I.  Reasonable Jurists Could Debate Whether the Government Erred By Failing to Hold an Evidentiary Hearing Before Adjudicating the Claims in Mr. Vialva's Motion . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

    A.  Conflict of Interest . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

    B.  *Brady* Claim. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

        1.  The Record Does Not Conclusively Show Mr. Vialva Is Not Entitled to Relief As a Matter of Law on His *Brady* Claim and the District Court Addressed the Merits Prematurely. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

        2.  Appropriate Weight Has Not Been Given to the Importance of the Witnesses to the Government's Case. . . . . . . . . . . . . . 7

    C.  Ineffective Assistance of Counsel at Sentencing . . . . . . . . . . . . . . . . 9

        1.  The Motion and the Files and Records of the Case. . . . . . . . . 9

        2.  The Record Does Not Conclusively Show That Mr. Vialva Is Not Entitled to Relief. . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

II.  Reasonable Jurists Could Debate the District Court's Conclusions That Mr. Vialva's *Brady* and Conflict Claim Are Procedurally Defaulted. . . . . 25

    A.  Conflict Claim. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

    B.  *Brady* Claim. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

CERTIFICATE OF SERVICE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

CERTIFICATE OF COMPLIANCE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

# TABLE OF AUTHORITIES

## Supreme Court Cases

*Banks v. Drekte,*
  540 U.S. 668 (2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

*Brady v. Maryland,*
  373 U.S. 83 (1963) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *passim*

*Kyles v. Whitley,*
  514 U.S. 419 (1995) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6, 22

*Massaro v. United States,*
  538 US 500 (2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

*Strickland v. Washington,*
  466 U.S. 668 (1984) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *passim*

*Williams v. Taylor,*
  529 U.S. 362 (2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

## Federal Cases

*Benn v. Lambert,*
  283 F.3d 1040 (9th Cir. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

*Bigby v. Dretke,*
  402 F.3d 551 (5th Cir. 2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

*Garcia v. Bunnell,*
  33 F.3d 1193 (9th Cir. 1994) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2-3

*Hernandez v. Johnson,*
  248 F.3d 344 (5th Cir.2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

*Lucas v. Johnson,*
  132 F.3d 1069 (5th Cir.1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

*United States v. Baptiste,*
   596 F.3d 214 (4th Cir. 2010) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

*United States v. Bounds,*
   943 F.2d 541 (5th Cir. 1991) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

*United States v. Cavitt,*
   550 F.3d 430 (5th Cir. 2008) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

*United States v. Culverhouse,*
   507 F.3d 888 (5th Cir. 2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4, 25

*United States v. Dominguez Benitez,*
   542 U.S. 74 (2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

*United States v. Grammas,*
   376 F.3d 433 (5th Cir. 2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

*United States v. Gutierrez,*
   2013 WL 6354146 (5th Cir. 2013) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

*United States v. Hayes,*
   532 F.3d 349 (5th Cir. 2008) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4, 25

*United States v. Herrera,*
   412 F.3d 577 (5th Cir. 2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

*United States v. Horton,*
   845 F.2d 1414 (7th Cir. 1988) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

*United States v. Livingston,*
   88 Fed. Appx. 545 (3d Cir. 2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

*United States v. Rivas-Lopez,*
   678 F.3d 353 (5th Cir. 2012) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

*United States v. Sipe,*
   388 F.3d 471 (5th Cir. 2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

*United States v. Tucker*,
393 Fed. Appx. 827 (2d Cir. 2010) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

State Cases

*Coble v. State*,
330 S.W.3d 253 (Tex. Crim. App. 2010) . . . . . . . . . . . . . . . . . . . . . . . 19-20

Miscellaneous

American Psychiatric Association, Diagnostic and Statistical Manual of Mental
Disorders 28, 382 (4th edition text revised 2000) . . . . . . . . . . . . . . . . . 16, 21

Christopher Andre Vialva, Movant/Apppellant, by and through his counsel files this reply in response to the Government's Consolidated Brief for the United States of America in Opposition to Applications for Certificates of Appealability (hereinafter "Brief in Opposition").

**I.  Reasonable Jurists Could Debate Whether the District Court Erred By Failing to Hold an Evidentiary Hearing Before Adjudicating the Claims in Mr. Vialva's Motion.**

The Government asserts the district court did not abuse its discretion in denying Mr. Vialva's due process and Sixth Amendment claims without holding an evidentiary hearing. Brief in Opposition at 24. The district court, however, has no discretion under the statute. *See* 28 U.S.C. § 2255(b) ("Unless the motion and the files and records of the case conclusively show that the prisoner is entitled to no relief, the court shall . . . grant a prompt hearing thereon"). Whether a § 2255 motion and the record conclusively show a prisoner is not entitled to relief is question of law. This Court reviews such questions de novo. *See United States v. Cavitt*, 550 F.3d 430, 435 (5th Cir. 2008). Accordingly, the Government must defend the district court's legal conclusion by demonstrating that Mr. Vialva was not entitled to relief as a matter of law based on the record below and assuming the allegations in Mr. Vialva's motion true.

## A. Conflict of Interest

The Government argues that Mr. Vialva is not entitled to relief on his conflict of interest claim as a matter of law and thus not entitled to an evidentiary hearing. Brief in Opposition at 72-80. The district court concluded that no actual conflict existed and that Mr. Vialva's waiver was valid. USCA5.Vol.1.143. As the Government's brief in opposition makes clear, these are disputed fact issues about which the district court did not hear evidence.

The Government's discussion of cases holding that no actual conflict of interest existed does not settle the issue as a matter of law. See Brief in Opposition at 73-80. As those cases plainly reflect, the determination requires a fact-bound assessment of whether the putative conflict affected counsel's performance. *See, e.g., Garcia v. Bunnell*, 33 F.3d 1193, 1197 (9th Cir. 1994) ("given the facts and circumstances of this particular case we do not doubt that Garcia knowingly, intelligently, and voluntarily waived any rights even potentially implicated by Holmes' announcement" (emphasis supplied)). And the circumstances of the cases relied upon by the Government diverge sufficiently from those here so as to render them an inadequate basis upon which to rule as a matter of law. *See Garcia*, 33 F.3d at 1197 (upon disclosure of conflict, defendant afforded the opportunity to obtain independent advice on his right to counsel); *United States v. Horton*, 845 F.2d 1414, 1419-20 (7th Cir. 1988) (the United States Attorney job for which defense counsel was a finalist

required presidential appointment and there was no one in the local United States Attorney's office with whom defense counsel could have curried favor in order to advance his appointment). Importantly, the district court in Garcia held an evidentiary hearing on the conflict claim before finding the relevant facts and denying it. *Garcia*, 33 F.3d at 1195.

As to the issue of whether an actual conflict of interest existed, the court below held that Mr. Vialva's allegations concerning how Goains's conflict affected his performance were "insufficient . . . as they do not indicate a failure of counsel to contest the Government's case, but rather strategic decisions based upon limited funds and the experience of counsel." USCA5.Vol.1.144. The court, however, had no evidence before it with which to draw such a conclusion. Goains did not cooperate with post-conviction counsel's investigation. USCA5.Vol.7.1000. The court did not permit Mr. Vialva to depose Goains, no declaration from Goains was before the court, and it did not hold an evidentiary hearing. To decide whether Goains's performance was affected by his pursuit of employment with his client's party opponent, an evidentiary hearing during which Goains testifies is necessary. *Garcia*, 33 F.3d at 1195.

Because the pleadings did not conclusively negate Mr. Vialva's entitlement to relief if he can prove that Goains's conflict of interest affected his representation and that Mr. Vialva's waiver was not valid as he has alleged, an evidentiary hearing is

necessary before resolving these disputed facts. *See United States v. Hayes*, 532 F.3d 349, 355 (5th Cir. 2008) (absent a hearing, there is "no way to analyze [counsel's] potential strategy"); *United States v. Culverhouse*, 507 F.3d 888, 898 (5th Cir. 2007) (absent a hearing, court could only make "hindsight guesses" about counsel's strategy). Accordingly, reasonable jurists could debate the district court's resolution.

B.      *Brady* **Claim.**[1]

1.      **The Record Does Not Conclusively Show Mr. Vialva Is Not Entitled to Relief As a Matter of Law on His *Brady* Claim and the District Court Addressed the Merits Prematurely.**

The Government defends the district court's failure to grant discovery and hold a hearing on Mr. Vialva's claim that the Government suppressed favorable and material evidence. Specifically, it endorses the district court's conclusion that Mr. Vialva cannot establish prejudice because the evidence is cumulative. Brief in Opposition at 92-101. However, the district court's merits-based rulings on this claim are premature, because Mr. Vialva has not been afforded the process to which he is entitled.

First, the court below concluded that the "unrecorded and untranscribed interviews Brown and Lewis had with government agents which contradicted their testimony at trial … are merely cumulative of the information that was included in their written statements." USCA5.Vol.1.132. Yet, there was no evidence before the

---

[1] *Brady v. Maryland*, 373 U.S. 83 (1963).

court about the content of those "unrecorded and untranscribed" statements from which such a judgment could possibly have been made, because the Government instructed investigators not to memorialize them and the district court failed to grant Mr. Vialva leave to discover them. Importantly, the Government does not deny that prior inconsistent statements were made other than those memorialized in the final CID report. It simply exclaims that Mr. Vialva has received their "full impeachment value." Brief in Opposition at 94. This assertion by the Government has never been tested. Discovery of those statements may or may not yield favorable, material evidence, but Mr. Vialva is entitled to an opportunity to discover and present the relevant facts before adjudication.

Second, the district court entirely ignored Brown's November 5 prior inconsistent statements which Mr. Vialva argued were both undisclosed and material. Brown's statement concerning his observation of how the fire started was not cumulative of any other evidence. The Government argues that Brown's statement about how the fire started is not material "because Brown admitted at trial that he did not see Bernard start the fire and that his prior statements had been lies." Brief in Opposition at 96. But Brown admitted at trial—without correction by the Government—to lying only on June 22, 1999, the first day his interrogation began and "before … they even knew that we had did the crime." USCA5.Vol.23.1941. Brown's November 5 statement occurred long after he testified that he had stopped fabricating

stories. Yet Brown's statement on this date about how the car fire started was (1) inconsistent with the known physical evidence which reflected that the car windows were rolled up; (2) inconsistent with Brown's prior statements known to defense counsel; and (3) inconsistent with Brown's trial testimony. Thus, the statement would have provided entirely different lines of impeachment as to Brown's willingness to please authorities and his reliability as an eyewitness.

Brown's November 5 statement claiming to have seen Bernard throw a match through the car window would have been very favorable to the State given its theory. Yet, the Government could not use it because of its inconsistency with the known physical evidence. Rather than disclose the statement to permit critical impeachment of Brown, the Government suppressed it. In short, the Government and district court are incorrect that the impeachment value of the suppressed statements was merely cumulative and the Government's conduct at trial belies its position now as to its materiality.

Third, because materiality must be assessed cumulatively, *Kyles v. Whitley*, 514 US 419, 436-37 (1995), the failure to allow Mr. Vialva the opportunity to develop the record necessarily short-circuits any prejudice assessment. Even if Brown's undisclosed November 5 statement and pre-trial mental evaluation are not alone sufficient to establish materiality, additional undisclosed impeachment evidence obtained through discovery and considered in conjunction with this information

might.[2] Specifically, the records reflect that witnesses Brown and Lewis made statements that the Government considered false. *See United States v. Rivas-Lopez*, 678 F.3d 353, 359 (5th Cir. 2012) (granting COA to appeal denial of 2255 motion and remanding for development of incomplete record); *United States v. Herrera*, 412 F.3d 577, 582 (5th Cir. 2005); *United States v. Grammas*, 376 F.3d 433, 439 (5th Cir. 2004).

### 2. Appropriate Weight Has Not Been Given to the Importance of the Witnesses to the Government's Case.

Finally, neither the district court nor the Government give appropriate weight to the importance of the witnesses' credibility to the Government's case. Brown's and Lewis's testimony was essential to the Government's case for death. The Government itself drew the distinction in terms of moral culpability between the individuals who fired the gun and started the fire and those who did not in urging death for Mr. Vialva. Impeachment information about a critical prosecution witness can be material under *Brady* even if the witness was impeached at trial. *See Banks v. Drekte*, 540 U.S. 668, 700-01 (2004) (undisclosed impeachment evidence could not be deemed "cumulative"

---

[2] The Government further argues that there is no constitutional requirement that the prosecution make a complete and detailed accounting to the defense of all police investigatory work on a case. Brief in Opposition at 91-91. Mr. Vialva seeks no such rule and does not depend upon any such rule. Mr. Vialva seeks enforcement of the rule that the Government must disclose favorable evidence. The Government seeks a rule that the Government may avoid this obligation by choosing not to memorialize such favorable evidence. No such exception to *Brady* exists.

to in-trial impeachment, because the prosecution relied on his testimony in urging a death sentence); *United States v. Sipe*, 388 F.3d 471, 478 (5th Cir. 2004) (evidence is material if it "would seriously undermine the testimony of a key witness on an essential issue or there is no strong corroboration"); *Benn v. Lambert*, 283 F.3d 1040, 1056 (9th Cir. 2002).

The Government's position that impeachment boils down to whether or not a witness can be shown to have ever lied is far too facile. It was made clear to the jury even on the Government's direct examinations that Brown and Lewis had told lies to investigators. Left wholly unexplored by the Government's failure to disclose all prior inconsistent statements was the complete picture of how their statements developed into what would become their testimony. It was certainly clear to the jury based upon what the Government did memorialize and disclose that Brown and Lewis lied initially to try to escape liability. But just as important as their initial lies to escape liability is their interactions with law enforcement that developed the stories they eventually would tell on the witness stand. This is the information the Government directed its investigating agents to stop memorializing; it is the information Mr. Vialva sought through discovery and was erroneously denied; and it is the information the district court and the Government mistakenly call "cumulative." In a case in which the Government explained to the jury that the precise details about which actors did what made the difference between life and death, Mr. Vialva was entitled to have all

favorable information material to the credibility of the only two witnesses upon whom the Government relied to establish those facts.

## C. Ineffective Assistance of Counsel at Sentencing.

The Government defends the district court's conclusion that Mr. Vialva is not entitled to relief as a matter of law based on his allegations that trial counsel failed to conduct a reasonable sentencing investigation and to adequately prepare for sentencing. The court below, however, barely addressed the heart of Mr. Vialva's *Strickland* claim.[3] A review of the record in conjunction with Mr. Vialva's allegations below concerning trial counsel's sentencing preparation amply demonstrates that the district court erred in holding that the record conclusively shows he is not entitled to relief.

### 1. The Motion and the Files and Records of the Case.

The court appointed Stanley Schwieger on June 23, 1999 and Dwight Goains on July 21, 1999. On August 2, 1999, counsel filed a proposed budget. Counsel estimated a need for $18,000 for a mitigation investigator (400 hours). Counsel urged authorization to obtain mitigation investigator Tena Francis "to prepare a social history report on Defendant ... [that] would include a summary of Defendant's medical history, educational history, employment history, family history and general life history." Doc. 46 at § IV.[Sealed]. Although counsel's requested ancillary services

---

[3] *Strickland v. Washington*, 466 U.S. 668 (1984).

exceeded $7,500.00, counsel did not request that the court certify the excess and obtain approval from the Chief Judge of this Court as required by law. See 28 U.S.C. § 3599(g). On August 9, the court "ordered that Defendant may hire a social expert to prepare a social history report on Defendant." Doc. 55 [Sealed]. No certification occurred.

Counsel retained Francis the week of August 21. USCA5.Vol.9.1436. Because a mitigation specialist's social history investigation and mental health expertise should inform the determination of the appropriate mental health professional to retain, Francis advised counsel not to retain a mental health expert until her investigation was complete. USCA5.Vol.9.1437. On October 6, 1999, counsel expressed to Francis their intent to retain psychiatrist William Reid. USCA5.Vol.9.1438. Francis advised counsel it was premature to retain a mental health expert because her investigation was incomplete. Id. She nevertheless expressed her opinion based on her limited investigation to date that the services of a neuropsychologist would most likely be needed. Id. Counsel ignored Francis's advice and retained Dr. Reid. *Id.*

Counsel submitted interim vouchers for payment of ancillary services as the case progressed. USCA5.Vol.3.140, 142, 158, 163, 166, 183, 188. By January 26, 2000, counsel had requested over $12,000 in payment for ancillary services. *Id.* According to a pre-trial mandamus petition filed by trial counsel,

> Suddenly and without warning, Petitioner's counsel learned that funding
> for the entire defense expert/investigator team was considered to be

> "capped." This information came from the Clerk of the District Court of the Waco Division. Counsel then spoke with Waco Division District Judge Walter S. Smith, Jr., in an ex parte, unrecorded conference about the "cap." Judge Smith indicated that no approval had been sought for the budget, although this had been specifically requested, and which the Judge had indicated had been granted within his first order.

Petition for Writ of Mandamus at 5-6, *In re Christopher Vialva* (May 5, 2000).

Once payments stopped, so, too, did the work. At the time, Francis had expended only one-third of the time counsel had estimated was required to conduct a thorough background investigation. USCA5.Vol.3.158, 166. As a result, Francis had completed only a rough draft of a social history. The report, dated January 17, 2000, warned, "This report . . . is by no mean complete and will be revised as more information is available." USCA5.Vol.9.1445. Francis had not yet investigated Mr. Vialva's family's medical and mental health history, highly relevant to properly assessing Mr. Vialva's own mental health. The report observed that Mr. Vialva's mother "appears to have always been an 'emotional' person. We have yet to receive all records of her various therapies and counseling sessions." USCA5.Vol.9.1447.

Despite the report's incompleteness, counsel gave the rough draft to Reid. In March, Reid told counsel after reviewing just some of the materials provided him that some of what he had seen suggested the possibility of antisocial traits. USCA5.Vol.9.1438; USCA5.Vol.10.1834. After further evaluation, Reid conveyed to counsel the existence of a significant possibility that Mr. Vialva suffered from neurological deficits. USCA5.Vol.9.1515.   On April 24, 2000, three weeks before

trial, counsel filed an amended "motion of proposed litigation budget" for additional ancillary services. The motion asserted that "[t]he mitigation/social study investigation remains uncompleted due to lack of funding." Counsel estimated that completing the investigation required an additional 250 hours and requested to spend $15,000 to continue retaining Francis. Although counsel had already utilized services from Reid against the advice of their mitigation expert, counsel for the first time requested authorization to obtain his services from the court. Counsel requested $8,000.00. Also for the first time, counsel requested $8,610.00 to obtain the services of psychologist Mark Cunningham as a risk assessment expert. See Doc. 199 [Sealed].

The court heard the funding request on April 28, 2000. Believing defense counsel's failure to follow procedure respecting limits on ancillary services spending had placed it in a "dilemma," and that counsel's motion amounted only to a "broad based request" for money, the court denied authorization and invited appeal. Ex Parte Proceeding at 4 (Apr. 28, 2000). Counsel did not request a continuance. On May 5, 2000, one week before trial, counsel filed a mandamus petition in this Court. This Court "recognize[d] that Petitioner ha[d] made a colorable claim regarding a need of additional funds," but like the district court found that counsel had failed to document with specificity the need for the requested services as required by law. USCA5.Vol.15.3–4.

On May 12, 2000, while the mandamus petition was pending, counsel made another request for $4,500.00 to retain neuropsychologist Gary Mears based upon Reid's conclusion that Mr. Vialva suffered from neurological deficits. USCA5.Vol.9.1515. On May 15, the first day of voir dire, the court held another hearing on counsel's outstanding requests. Related to sentencing, the court granted the request for neuropsychological assistance and for a future dangerousness expert. USCA5.Vol.15.4. Counsel reaffirmed the defense's need for $15,000 to obtain 250 additional hours of mitigation services and detailed several critical and unfinished investigative tasks. USCA5.Vol.15.5–7. The court granted $3,000 of additional funding. USCA5.Vol.15.7. Despite needing over six weeks of full-time work to complete the mitigation investigation and having just retained two additional experts, counsel did not request a continuance to complete their work. Jury selection began immediately at the conclusion of the hearing.

As sentencing approached, the wheels fell entirely off counsel's mismanaged sentencing investigation. Given time constraints, the additional $3,000.00 did not allow Francis to complete her investigation.

> When the second stage of Mr. Vialva's trial began, I had not completed interviews of the client, his family, or his friends.  I had not developed a complete history of Mr. Vialva's life . . . . Most importantly, I had not developed information that would have provided the jury with insight into Mr. Vialva's cognitive and emotional processes.

USCA5.Vol.9.1440. The funding authorized to retain neuropsychological services in the midst of trial was squandered. USCA5.Vol.9.1515. Counsel may not even have learned the results of their own investigation. *Id.*

Trial counsel having all but abandoned their mitigation investigation, all that remained was Dr. Cunningham, retained as a future dangerousness expert.

> I was not tasked with creating a mitigation presentation by counsel. However, I realized that such a presentation by a mental health expert was not going to be made, and therefore prepared a basic mitigation presentation and conducted limited family interviews while the trial was underway. I made Mr. Vialva's trial counsel aware of my readiness and willingness to make a mitigation presentation because it was necessary that this component of the case be presented to the jury, and I did as much as I could in the time and information I had, revising the mitigation presentation on June 8, the day before my testimony at trial.

USCA5.Vol.10.1774. Cunningham had at his disposal educational, psychological, medical, and criminal records, but because of the inadequate mitigation investigation there was "an obvious absence of extended family records, no conversations with the father, and no mental health history of Mr. Vialva's family." USCA5.Vol.10.1773. Because of counsel's delay in retaining him and failure to request a continuance, Cunningham had no time to locate and incorporate the missing information prior to trial. *Id.*

Mr. Vialva argued below that trial counsel's inadequate preparation for sentencing fell below the standard of care. Although counsel promptly secured some funding for important ancillary services like a mitigation investigator, counsel's

ignorance of federal law regarding procedures for authorizing funds in excess of $7,500.00 and failure to adequately specify their need for them caused their investigation into Mr. Vialva's background to grind to a halt for several months. Counsel was forced needlessly to spend time litigating funding issues before the district court and this Court in the critical weeks before trial was to begin. When funding for additional services was secured, counsel did not even attempt to afford his mitigation specialist time to meaningfully complete her work. This resulted in an incomplete social history even at the time of trial.

The incomplete social history in turn impaired counsel's attempts to investigate Mr. Vialva's mental health. Reid's preliminary opinion that records suggested a possibility of antisocial traits was not informed by a thorough social history. After further evaluation Reid advised counsel to retain a neuropsychologist to investigate how neurological deficits could be affecting Mr. Vialva's behavior. Counsel obtained funding for these services during trial and did not request additional time to complete his investigation or meaningfully use the resources afforded him by the court.

Counsel's deficient investigation into Mr. Vialva's mental health in turn led counsel into the arms of future dangerousness expert Mark Cunningham, whom they were forced by their mismanaged investigation into using as a conduit to present mitigating evidence. Further, having chosen to tackle future dangerousness head on through an expert, counsel inexplicably failed to prepare to exclude Coons's

scientifically unreliable rebuttal testimony or even meaningfully cross-examine it. USCA5.Vol.7.1086.

In the court below, Mr. Vialva alleged substantial prejudice from counsel's deficient representation based upon post-conviction counsel's thorough mitigation investigation. Principally, trial counsel's failure to thoroughly investigate Mr. Vialva's background caused counsel to miss a family history of bipolar disorder. Counsel failed to follow up on red flags that Mr. Vialva's mother had mental health issues involving being "emotional" and for which she received therapy. This failure caused counsel's consulting expert to miss critical evidence of Mr. Vialva's untreated bipolar disorder. USCA5.Vol.9.1563, 1611-12; USCA5.Vol.10.1699 (Mr. Vialva's maternal aunts diagnosed with bipolar disorder). Bipolar disorder is a brain disorder with severe symptoms, including unusual shifts in mood, energy, activity levels, and the ability to carry out day-to-day tasks. It is classified in the DSM-IV as an Axis I mood disorder. See American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders 28, 382 (4th edition text revised 2000) [hereinafter DSM-IV-TR].

Neuropsychologist Daneen Milam, retained by post-conviction counsel and provided by them a thorough social history, concluded that "multiple, overlapping indicators [in Mr. Vialva's thorough social history] . . . would have led a neuropsychologist or similar specialist . . . to suspect that [Mr. Vialva] may suffer from organic brain damage and/or Bi-Polar Disorder." USCA5.Vol.9.1578.

Firstly, a review of his family history indicates a strong maternal history of Bi-Polar disorder. Both of Chris's maternal Aunts, his cousin have been diagnosed as suffering from Bi-Polar disorder and his mother was diagnosed with depression. His maternal Grandmother and his sister have not been formally diagnosed, but also show signs of Bi-Polar disorder from their social histories. There is a strong genetic predisposition to Bi-Polar disorder and the strong presence in his family history should have been a signal to anyone evaluating his records that this was an issue requiring further investigation. Secondly, there are a number of factors in Chris's life history which indicate organic brain damage and/or Bi-Polar Disorder. . . . Thirdly, Chris was with a friend who was stealing and Chris subsequently stated he would rather die than go to jail. Comparing across these issues, Chris was depressed, and not gaining problem solving skills.

*Id.*

On neuropsychological tests, Mr. Vialva scored in a range generally considered to reflect organic impairment of the brain. USCA5.Vol.9.1582. He exhibited verbal attentional deficits, impulsivity, organizational deficits and the partial loss of the ability to perform coordinated acts. *Id.* Testing indicated frontal and temporal lobe dysfunction that causes poor planning and organization skills and which has a significant impact on a person's ability to benefit from feedback and alter behavior. *Id.*

Dr. Milam further concluded that Mr. Vialva has bipolar disorder. Mr. Vialva's bipolar disorder, as well as that of his mother, would have placed the entire sentencing proceedings in a different light:

The effects of [Mr. Vialva's] inherited disorder were no doubt aggravated by the chaotic, traumatic home environment in which he spent his formative years. Children who suffer from Bi-Polar disorder

-17-

require intensive limit setting and a stable environment. . . . The impact of positive structure on [Mr. Vialva] is most clearly demonstrated by his good behavior and privileges earned at the U.S.P. at Terre Haute. It appears extremely unlikely that any adult in [Mr. Vialva's] home could provide this kind of structure and stability. This problem was particularly exacerbated by his mother's mental disorder. I performed a thorough evaluation of Lisa Brown based upon an eight (8) hour psychological evaluation indicated a strong Bi-Polar profile, with a concurrent diagnosis of Borderline Personality Disorder. Her ability to provide a structured and stable environment was significantly impaired by her longstanding (early childhood onset) mental disorder. This would have an impact on her ability to successfully parent [Mr. Vialva] throughout his life, and was probably tbe reason for a long history of poor parenting decisions such as leaving a 7 year old in charge of a 4 year old, and bringing a succession of abusive men into their home. This was particularly damaging to [Mr. Vialva] given his Bi-Polar disorder. . . .

Due to his distractibility, [Mr. Vialva] was often misdiagnosed as Attention Deficit Disorder with Hyperactivity (ADHD).However, while Bi-Polar children are distractible, the primary problem is poor mood regulation. The appropriate medication for Bi-Polar children is a mood regulator. Stimulants, which are the drug of choice for ADHD, make a mood disorder worse. In addition, life stressors, difficult relationships and disruption of sleep cycles bring on symptoms and impact the course of a Bi-Polar episode.

USCA5.Vol.9.1583–84. Thus, not only was Mr. Vialva's bipolar disorder left untreated, its misdiagnosis and treatment as ADHD exacerbated his illness.

Dr. Cunningham had no information about Mr. Vialva's family history of bipolar disorder when assisting the defense at trial. USCA5.Vol.10.1775. That knowledge would have impacted Cunningham's analysis.

Affective disorders such as bipolar disorder have a significant genetic predisposition, that may be reflected in the experience of a full syndrome in other family members or "partial penetration" manifested by symptoms on a continuum short of diagnostic criteria. Accordingly, the

familial incidence of bipolar disorder has implications for Mr. Vialva's mother's adjustment and the associated quality of maternal care Mr. Vialva received. Further, when trying to understand Mr. Vialva's attention problems, impulsivity, irritability, mood lability, and behavior problems as a juvenile, this information could indicate the early onset of a bipolar disorder or partial genetic penetration. It is also possible that [Mr. Vialva's] juvenile diagnosis of Attention Deficit Hyperactivity Disorder (ADHO) or Oppositional Defiant Disorder (ODD) was a misdiagnosis of early onset of bipolar disorder.

USCA5.Vol.10.1775. As well, such information would have affected Cunningham's risk assessment analysis. *Id. ("Bipolar* disorder . . . can be controlled by medication, thereby minimizing the risk of disruptive behavior in a prison setting").

Finally, had counsel actually prepared to take on the future dangerousness issue by doing anything other than retaining Cunningham, counsel could have successfully excluded Coons's prejudicial and unreliable rebuttal testimony. In *Coble v. State*, 330 S.W.3d 253 (Tex. Crim. App. 2010), Texas's highest criminal court found that a trial court abused its discretion in admitting Coons's future dangerousness testimony because it was not reliable. At Coble's trial,

Dr. Coons explained his standard methodology in assessing the issue of future dangerousness. For at least the past twenty years he has relied upon several different factors:

(1) The person's history of violence;
(2) The person's attitude toward violence;
(3) The particulars of the criminal offense;
(4) The person's personality and general behavior;
(5) The person's conscience; and
(6) Where the person will be—in or out of prison.

He assesses these factors based on the information that he has been given. This is his own personal methodology. He does not know whether others rely upon this method, and he does not know of any psychiatric or psychology books or articles that use his factors.

*Id.* at 271. The court found Dr. Coons's testimony failed to meet even the low standard of reliability governing admission of soft science testimony in Texas:

[W]e cannot tell what principles of forensic psychiatry Dr. Coons might have relied upon because he cited no books, articles, journals, or even other forensic psychiatrists who practice in this area. There is no objective source material in this record to substantiate Dr. Coons's methodology as one that is appropriate in the practice of forensic psychiatry. . . . Dr. Coons agreed that his methodology is idiosyncratic and one that he has developed and used on his own for the past twenty to thirty years. Although there is a significant body of literature concerning the empirical accuracy of clinical predictions versus actuarial and risk assessment predictions, Dr. Coons did not cite or rely upon any of these studies and was unfamiliar with the journal articles given to him by the prosecution.

Some of Dr. Coons's factors have great intuitive appeal to jurors and judges, but are they actually accurate predictors of future behavior? Dr. Coons forthrightly stated that "he does it his way" with his own methodology and has never gone back to see whether his prior predictions of future dangerousness have, in fact, been accurate. . . . [Dr. Coons] relied entirely upon the documentary materials given to him by the prosecution . . . . Dr. Coons, therefore, did not perform any psychiatric assessment of appellant after his eighteen years of nonviolent behavior on death row, nor did he refer to any psychological testing that might have occurred in that time frame.

*Id.* at 277–79. Coons's testimony in *Coble* was identical in nature to the testimony in

Mr. Vialva's case. Accordingly, had counsel prepared to object to Coons's opinion

testimony based upon its lack of reliability, it should have been excluded.[4]

### 2. The Record Does Not Conclusively Show That Mr. Vialva Is Not Entitled to Relief.

An examination of the district court's rulings on Mr. Vialva's IATC-sentencing

claim demonstrate why the record and pleadings cannot conclusively show that Mr.

Vialva is not entitled to relief. The court held that Mr. Vialva did not prove that he

was prejudiced. Instead of asking whether a reasonable probability of a different result

but for trial counsel's deficiencies existed, the court took a scattershot approach by

reciting a string of aggravating facts from the trial, culminating in a conclusion that

Mr. Vialva "had a history of violence, from which the jury was entitled to find that he

---

[4] Even if the district court would have admitted Coons's unreliable opinion testimony over Mr. Vialva's objections, a thorough background investigation would have diffused it. While Coons did not diagnose Mr. Vialva as having antisocial personality disorder per se, he did express his opinion that Mr. Vialva "lacked a conscience," the sine qua non of ASPD. However, bipolar disorder would rule out ASPD. See DSM-IV-TR at 688 (because criteria may often overlap between clinical and personality disorders, a personality disorder should be diagnosed "only when the defining characteristics . . . do not occur exclusively during an episode of an Axis I disorder"); *id.* at 689 (Axis I disorders must be considered and ruled out before an expert concludes an individual suffers from a personality disorder, because the "enduring pattern" of a personality disorder must not be "better accounted for as a manifestation or consequence of another mental disorder" like bipolar disorder).

would constitute a continuing danger." USCA5.Vol.1.168. Be that as it may,[5] a conclusion that there was sufficient evidence from which a jury could find as a fact that Mr. Vialva would constitute a continuing danger does not address the legal question presented by Mr. Vialva's constitutional claim, which is not about what a jury was *entitled* to find, but about what is reasonably probable that a hypothetical jury could find in light of the changed evidentiary picture. *Kyles*, 514 U.S. at 434 (a reasonable probability of a different result "is not a sufficiency of evidence test"). The court inappropriately substituted its own opinion of Mr. Vialva's deathworthiness for a hypothetical jury's.

The Government defends the district court's conclusion that much of the mitigating evidence post-conviction counsel developed "was presented to the jury through the testimony of Vialva's friends and family and through the testimony of Dr. Cunningham," but the district court did not identify which evidence was cumulative. USCA5.Vol.1.165–67. Evidence that Mr. Vialva had untreated bipoloar disorder, and that his bipolar disorder was exacerbated by medications for misdiagnosed ADHD, was not cumulative of anything presented at sentencing. As to this evidence, the court held that Mr. Vialva's counsel would have "faced the proverbial double-edged sword"

---

[5] The Government actually presented no evidence of a "history" of violence perpetrated directly by Mr. Vialva against others. Although Mr. Vialva appears to have had convictions for two incidents that involved violence against others, there was no evidence he was the perpetrator of the violence in either. All of the other criminal acts the Government presented to the jury were property crimes.

because if counsel had "introduced even more evidence of mental and/or brain disorders, the jury could very well have concluded from that alone that Vialva would continue to be a danger to others, whether incarcerated or not." USCA5.Vol.1.167–68.

First, this again does not answer the relevant legal question, which is not whether a jury "could very well have" sentenced Mr. Vialva to death, but whether there exists a reasonable probability that a jury would not have. The district court utilized a standard orders of magnitude higher than *Strickland* allows, effectively requiring Mr. Vialva to prove that under no circumstance could the jury have sentenced him to death. This is contrary to *Strickland*. *Williams v. Taylor*, 529 U.S. 362, 405-06 (2000) ("If a . . . court were to reject a prisoner's claim of ineffective assistance of counsel on the grounds that the prisoner had not established by a preponderance of the evidence that the result of his criminal proceeding would have been different, that decision would be 'diametrically different,' 'opposite in character or nature,' and 'mutually opposed' to our clearly established precedent because we held in *Strickland* that the prisoner need only demonstrate a 'reasonable probability that . . . the result of the proceeding would have been different'").

Second, the court's holding is wrong as a matter of law. Mr. Vialva's bipolar disorder is not "double edged" precisely because bipolar disorder is treatable. USCA5.Vol.9.1585. This Court has repeatedly held that evidence that a mental illness is treatable mitigates future dangerousness. *See Bigby v. Dretke*, 402 F.3d 551, 571

(5th Cir. 2005); *Hernandez v. Johnson*, 248 F.3d 344, 349 (5th Cir.2001); *Lucas v. Johnson*, 132 F.3d 1069, 1082-83 (5th Cir.1998). Evidence that Mr. Vialva had bipolar disorder; how his bipolar disorder in conjunction with his neuropsychological deficits affected his behavior; that Mr. Vialva's bipolar disorder was exacerbated by mistreatment of ADHD; and that his bipolar disorder could be controlled in prison with proper medication could only have benefitted Mr. Vialva at sentencing. It has direct mitigating relevance both to the circumstances of the underlying offense and to predictions of his future dangerousness.

Finally, the court failed entirely to consider how Mr. Vialva's allegations concerning counsel's failure to exclude Coons's unreliable opinion testimony in conjunction with counsel's other errors would have affected the verdict. In a footnote, the court observed that Mr. Vialva's *Strickland* allegations concerning counsel's failure to object which the court did not mention "all fall within the categories of strategy and tactics and cannot form the basis for an ineffective assistance of counsel claim." USCA5.Vol.1.137. This misstates the law. Deference is paid only to strategy informed by reasonable investigation and preparation, and even then not absolute deference. *Strickland*, 466 U.S. at 690–91 ("strategic choices made ***after thorough investigation of law and facts*** relevant to plausible options are virtually unchallengeable" and "strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support

the limitations on investigation" (emphasis supplied)). Thus, the court first had to find counsel's legal and factual preparation to have been "thorough" as a factual matter before deferring to any alleged strategic decisions. This the court did not do, and cannot do without holding an evidentiary hearing.

Additionally, the court's speculation cannot suffice as a basis for merits disposition. Mr. Vialva had alleged that the failure to move to exclude Coons's unreliable testimony was a neglectful omission. USCA5.Vol.7.1086. He asked the district court for leave to depose Mr. Goains, who was uncooperative with and failed to turn over Mr. Vialva's file to Mr. Vialva's post-conviction counsel. USCA5.Vol.11.2124–25; USCA5.Vol.7.1000. The district court denied the request. USCA5.Vol.1.172. Thus there was no evidence from Mr. Goains in the record about any decisions related to failing to exclude Coons's testimony. Nor is any strategy to needlessly allow harmful and inadmissible evidence against a client conceivable. Regardless, any holding that counsel's lack of preparedness to exclude Coons's testimony was strategy must be based on evidence, necessitating an evidentiary hearing. *See Hayes*, 532 F.3d at 355; *Culverhouse*, 507 F.3d at 898.

## II. Reasonable Jurists Could Debate the District Court's Conclusions That Mr. Vialva's *Brady* and Conflict Claim Are Procedurally Defaulted.

The Government defends the district court's procedural default rulings with respect to Mr. Vialva's conflict and *Brady* claims. Those rulings are not only reasonably debatable, they are patently wrong.

## A.    Conflict Claim.

The Government argues that the district court's conclusion that Mr. Vialva's conflict claim is procedurally defaulted is not reasonably debatable because "any issue arising from a perceived conflict was fully known after the pre-trial hearing and certainly before Vialva's direct criminal appeal." Brief in Opposition at 66. Mr. Vialva's conflict claim is a specie of ineffective assistance of counsel.  Such claims need not be presented on direct appeal even if it is discernible from the record. *See Massaro v. United States*, 538 US 500 (2003). Indeed, *Massaro* expressly encompasses Sixth Amendment claims based upon conflicts of interest. *Id.* at 505. *See also United States v. Gutierrez*, No. 11-40331, 2013 WL 6354146 (5th Cir. Dec. 6, 2013) (addressing on appeal of denial of 2255 motion a conflict of interest claim that the court had previously declined to address on direct appeal in view of *Massaro*, *United States v. Gutierrez*, 292 F. App'x 412, 417 (5th Cir. 2008)); *United States v. Bounds*, 943 F.2d 541, 544 (5th Cir. 1991) (declining to address conflict of interest claim on direct appeal and dismissing without prejudice to raising on collateral review); *United States v. Baptiste*, 596 F.3d 214, 216 n.1 (4th Cir. 2010) (declining in view of *Massaro* to address conflict of interest claim on direct appeal); *United States v. Tucker*, 393 Fed. Appx. 827, 828 (2d Cir. 2010) (same); *United States v. Livingston*, 88 Fed. Appx. 545, 547 (3d Cir. 2004) (same). Thus, whether or not Steven Loach's illness was a factor in the claim being presented on direct review is

ultimately irrelevant. Per *Massaro*, a defendant has no duty to present such claims on direct appeal.

**B.** *Brady* **Claim.**

The Government further argues that the district court's conclusion that Mr. Vialva's *Brady* claim is likewise procedurally defaulted is not reasonably debatable because "Vialva did not claim a failure to receive the 'Final CID Report,' and thus, the *Brady* claims could have been raised on direct appeal." Brief in Opposition at 65. This is wrong in at least two respects. First, and most fundamentally, Mr. Vialva's *Brady* claim does not allege that the Government failed to disclose the Final CID Report. It alleges, in part, that the Government did not disclose information that was learned contemporaneously to, but omitted from, the Final CID Report. That report references—but does not contain—statements from witnesses Terry Brown and Christopher Lewis that the Government deemed to have been false when made, and thus presumably inconsistent with the testimony the Government elicited from them at trial. To date, Mr. Vialva has been unable to learn the content of those statements from the Government.

Mr. Vialva's *Brady* claim also alleges that the Government failed to disclose information favorable to Mr. Vialva that it learned in a November 5 meeting with Terry Brown. The information included prior inconsistent statements about how the automobile fire started and admissions about criminal activity. Mr. Vialva did not

discover the existence of these statements until post-conviction counsel was given permission to review Brown's legal file. USCA5.Vol.7.1001. Mr. Vialva's post-conviction counsel discovered the court-ordered psychological report on Mr. Brown the same way. Thus, these then-undiscovered factual allegations could not have been raised on direct appeal.

It is clear that no aspect of Mr. Vialva's *Brady* claim could have been raised on direct appeal. *Brady* claims are quintessential collateral claims precisely because they concern allegations that certain information was not disclosed at trial, and hence could not possibly be contained in the record on appeal. *See United States v. Dominguez Benitez*, 542 U.S. 74, 83 n.9 (2004) (*Brady* claims properly raised in a 2255 motion because it permits greater development of the record).

## CONCLUSION

For the foregoing reasons, the Court should grant a certificate of appealability and permit appeal of the district court's denial of the claims Mr. Vialva requests in his Application for Certificate of Appealability.

Respectfully submitted,

*/s Jared Tyler*
SUSAN M. OTTO
Oklahoma Bar Association # 6818
Federal Public Defender
Western District of Oklahoma
215 Dean A. McGee  Suite 109
Oklahoma City, Oklahoma 73102
Telephone: 405 609-5930

Telefacsimile: 405 609-5932
Electronic mail:  Susan_Otto@fd.org

JARED TYLER
Texas Bar Association #24042073
Tyler Law Firm, PLLC
P.O. Box 764
Houston, Texas 77001
Telephone: 832 377-6161
Electronic mail: jptyler@tylerlawfirm.org

COUNSEL FOR MOVANT/APPELLANT
CHRISTOPHER ANDRE VIALVA

# CERTIFICATE OF SERVICE

I hereby certify that on the 6th day of January, 2014, I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Fifth Circuit by using the appellate CM/ECF system.

I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

DATED this 6th of January, 2014.

*/s Jared Tyler*

_____

Jared Tyler

# CERTIFICATE OF COMPLIANCE

1. This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because:

   This brief contains 6,990 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii).

2. This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because:

   This brief has been prepared in a proportionally spaced Times New Roman typeface using WordPerfect X5 in text and footnotes.

*/s Jared Tyler*

_____

Jared Tyler