No. 13-70013

IN THE UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT

UNITED STATES OF AMERICA
*Plaintiff-Appellee,*

v.

BRANDON BERNARD,
*Defendant-Appellant.*

**CONSOLIDATED WITH 13-70016**

UNITED STATES OF AMERICA,
*Plaintiff-Appellee,*

v.

CHRISTOPHER ANDRE VIALVA
*Defendant-Appellant.*

On Appeal from the United States District Court
for the Western District of Texas at Waco

**DEFENDANT-APPELLANT BRANDON BERNARD'S
REPLY BRIEF IN SUPPORT OF
APPLICATION FOR CERTIFICATE OF APPEALABILITY**

Robert C. Owen,
Bluhm Legal Clinic
Northwestern University School of Law
375 East Chicago Avenue
Chicago, IL 60611
Phone: (312) 503-0135
Email:Robert.owen@law.northwestern.edu

John Carpenter,
Asst. Federal Public Defender
1331 Broadway, Suite 400
Tacoma, Washington 98402
Phone: (253) 593-6710
Email: John_Carpenter@fd.org

TABLE OF CONTENTS

TABLE OF AUTHORITIES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . iv

I.  Because the District Court clearly erred in denying a hearing
    and discovery, this Court should grant a COA on those
    issues and order a hearing.  Alternatively, this Court should
    grant COA on all claims  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

II. The District Court's systematic errors infected its analysis of
    every claim that Bernard advanced  . . . . . . . . . . . . . . . . . . . . . . . . 8

    A.  There is no evidence that the challenged actions of trial
        counsel were actually deliberate strategic decisions
        made after a professionally reasonable investigation  . . . . . 9

    B.  Bernard's allegations were supported by detailed,
        sworn evidence  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

    C.  The District Court applied an incorrect legal
        standard in requiring Bernard to show "outcome
        changing prejudice" to obtain a hearing  . . . . . . . . . . . . . . . 15

III. The District Court's systemic errors led to mistaken
     conclusions in analyzing Bernard's specific claims  . . . . . . . . . . . 16

    A.  Discovery and a hearing were warranted on Bernard's
        claim that his counsel were ineffective for not
        challenging the source of the fire and its impact on
        Stacie Bagley's death  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

i

B.  Reasonable jurists could find that counsel's desultory two-page letter to the DOJ fell below prevailing professional standards, and that had counsel performed properly, it is reasonably likely that the Government would not have sought Bernard's execution  . . . . . . . . . . . . . . . . . . . . . . . . . 23

C.  A reasonable jurist could find Bernard's counsel ineffective for failing to develop and present the wealth of available mitigating evidence  . . . . . . . . . . . . . . . 25

    1.  The Government fails to cite, much less distinguish, *Sears v. Upton*, 130 S. Ct. 3259 (2010) – unsurprisingly, since *Sears*'s rationale and outcome cannot be reconciled with the Government's argument  . . . . . . . . . . . . . . . . . . . . . . . 27

    2.  The jury knew nothing of the turbulence in Bernard's home environment  . . . . . . . . . . . . . . . . . . . 30

    3.  No evidence supports the speculation that counsels' failure to investigate or present evidence of Bernard's cognitive impairment was "strategic"  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

    4.  Counsel's failure to develop and present readily available *Skipper* evidence prejudiced Bernard  . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

    5.  Counsel performed deficiently in making no attempt to account for Bernard's involvement in the crime  . . . . . . . . . . . . . . . . . . . . . . . 36

    6.  Counsels' failure to seek a limiting instruction concerning Dr. Coons' future dangerousness predictions harmed Bernard . . . . . . . . . . . . . . . . . . . 37

D. The Court erred by denying discovery and an evidentiary hearing on Bernard's *Brady* claims . . . . . . . . . 37

    1. Summary of *Brady* argument in reply . . . . . . . . . . . 37

    2. The Government misstates the law . . . . . . . . . . . . . . 38

        a. The Government fails to apply the COA standard . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 38

        b. The Government's attempts to block development of Bernard's *Brady* allegations lack legal support . . . . . . . . . . . . . . . . . . . . . . . 38

    3. The specific *Brady* violations, when measured against the proper legal standard, require remand for an evidentiary hearing, or at least a COA . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 41

        a. Impeachment of Terry Brown regarding the source of the fire . . . . . . . . . . . . . . . . . . . . . . . . 41

        b. Brown's criminal history . . . . . . . . . . . . . . . . . . 44

        c. Brown's mental illness . . . . . . . . . . . . . . . . . . . 47

IV. Given the jury's struggle to return a single death verdict against Bernard, a reasonable jurist could believe that his allegations warrant further development . . . . . . . . . . . . . . . . . . . 51

CERTIFICATE OF COMPLIANCE . . . . . . . . . . . . . . . . . . . . . . . . . . 54

CERTIFICATE OF SERVICE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 55

# TABLE OF AUTHORITIES

## SUPREME COURT CASES:

*Banks v. Dretke,*
540 U.S. 668 (2004) ................................................... 39, 40, 46, 48

*Brady v. Maryland,*
373 U.S. 83 (1963) ............................ 7, 16, 37-42, 44, 46-47, 49, 50

*Harrington v. Richter,*
131 S. Ct. 770 (2011) ....................................................... 10

*Miller-El v. Cockrell,*
537 U.S. 322 (2003) ............................................... 4, 5, 38

*Napue v. Illinois,*
360 U.S. 264 (1959) ...................................................... 51

*Porter v. McCollum,*
558 U.S. 30 (2009) ........................................................ 36

*Sears v. Upton,*
130 S. Ct. 3259 (2010) ............................................ 27-30, 36, 53

*Skipper v. South Carolina,*
476 U.S. 1 (1986) ................................................. 33, 34, 35

*Slack v. McDaniel,*
529 U.S. 473 (2000) ......................................................... 4

*Strickland v. Washington,*
466 U.S. 688 (1984) ............................................. 9, 15, 16, 36

*Strickler v. Greene,*
527 U.S. 263 (1999) ............................................... 39, 40

*Wiggins v. Smith,*
539 U.S. 510 (2003) ...................................................................... 9, 30

*Williams v. Taylor,*
529 U.S. 362 (2000) ...................................................................... 9, 30


FEDERAL APPELLATE COURT CASES:

*Armienti v. United States,*
234 F.3d 820 (2d Cir. 2000) ............................................................. 2

*Aron v. United States,*
291 F.3d 708 (11th Cir. 2002) ..................................................... 2, 38

*Blankenship v. United States,*
159 F.3d 336 (8th Cir. 1998) ........................................................... 1

*Burns v. Mayes,*
369 F. App'x. 526 (5th Cir. 2010) ................................................... 48

*Diaz v. United States,*
930 F.2d 832 (11th Cir. 1991) .......................................................... 1

*East v. Johnson,*
123 F.3d 235 (5th Cir. 1997) .......................................................... 51

*East v. Scott,*
55 F.3d 996 (5th Cir. 1995) ............................................................. 8

*Enying Li v. Holder,*
__ F.3d __, 2013 WL 6851028 (9th Cir. Dec. 31, 2013) .................. 43

*Fulcher v. Motley,*
444 F.3d 791 (6th Cir. 2006) .......................................................... 15

*Graves v. Cockrell,*
351 F.3d 143 (5th Cir. 2003) .......................................................... 39

*Graves v. Dretke,*
442 F.3d 334 (5th Cir. 2006) ........................................................... 40

*Hall v. Quarterman,*
534 F.3d 365 (5th Cir. 2008) ............................................................. 2

*Hooks v. Workman,*
689 F.3d 1148 (10th Cir. 2012) ...................................................... 36

*Johnson v. Dretke,*
394 F.3d 332 (5th Cir. 2004) .......................................................... 39

*Martinez v. Dretke,*
404 F.3d 878 (5th Cir. 2005) ..................................................... 32, 33

*Moore v. Johnson,*
194 F.3d 586 (5th Cir. 1996) .......................................................... 34

*Moore v. Secretary Pennsylvania Dept. of Corrections,*
457 F. App'x. 170 (3d Cir. 2012) (unpublished) ............................ 16

*Owens v. United States,*
483 F.3d 48 (1st Cir. 2007) .............................................................. 1

*Rose v. Lee,*
252 F.3d 676 (4th Cir. 2001) .......................................................... 15

*Taylor v. Charter Med.Corp.,*
162 F.3d 827 (5th Cir. 1998) .......................................................... 48

*Trottie v. Stephens,*
720 F.3d 231 (5th Cir. 2013) .......................................................... 16

*Tucker v. Johnson,*
242 F.3d 617 (5th Cir. 2001) ..................................................... 12, 13

*United States v. Bartholomew,*
    974 F.2d 39 (5th Cir. 1992) ...................................................... 11, 12

*United States v. Bernard,*
    299 F.3d 467 (5th Cir. 2002) ........................................................ 37

*United States v. Bourgeois,*
    2013 WL 3972699 (5th Cir. 2013) (unpublished) ......................... 11

*United States v. Hall,*
    455 F.3d 308 (5th Cir. 2006) ........................................................ 10

*United States v. Havens,*
    450 F. App'x. 363 (5th Cir. 2011) (*per curiam*) (unpublished) ........ 3

*United States v. Jackson,*
    636 F.3d 687 (5th Cir. 2011) ................................................ 9, 10, 14

*United States v. Kohring,*
    637 F.3d 895 (9th Cir. 2011) ........................................................ 48

*United States v. Santiago,*
    46 F.3d 885 (9th Cir. 1995) ......................................................... 50

*United States v. Sipes,*
    388 F.3d 471 (5th Cir. 2004) ........................................................ 43

*United States v. Wilson,*
    237 F.3d 827 (7th Cir. 2001) ........................................................ 50

*Walbey v. Quarterman,*
    309 F. App'x. 795 (5th Cir. 2009) (unpublished) ............... 29, 30, 34

FEDERAL DISTRICT COURT CASES:

*United States v. Atwater,*
    No. 1:08CR384-1 (M.D. N.C) ....................................................... 25

*United States v. Dennis,*
      Crim. No. 3:96CR66-05 (E.D. Va.) ...................................................34

*United States v. Jones,*
      Crim. No. 3:97CR169 (E.D. Va.) .....................................................35

STATE CASES:

*Averhart v. State,*
      614 N.E.2d 924 (Ind. 1993) ............................................................26

*Commonwealth v. Collins,*
      888 A.2d 564 (Pa. 2005) .................................................................26

*Ex parte Gonzales,*
      204 S.W.3d 391 (Tex. Crim. App. 2006).........................................26

*Hall v. McPherson,*
      663 S.E.2d 659 (Ga. 2008).............................................................26

FEDERAL STATUTES:

Title 18, United States Code,
      Section 3592(a)(4).........................................................................45
      Section 3593(c) ..............................................................................45
      Section 5032 ..................................................................................48

Title 28, United States Code,
      Section 561(a) ................................................................................49
      Section 2253(c)(2) ...........................................................................4
      Section 2254 ..................................................................................12
      Section 2255 ................................................................ 1, 2, 11, 13

## Rules:

Federal Rules of Evidence,
 Rule 201 ................................................................................... 48


## Miscellaneous:

*Bourgeois v. United States*,
 No. 11-70024 (5th Cir.), Brief of Respondent-Appellee ................. 11

Sarah Frier, "Death Penalty Dropped for Atwater in Eve Carson
 Case, The Daily Tar Heel (April 20, 2010) ..................................... 24

Suzan Clarke, "UNC Student Eve Carson Begged Captors to Pray
 With Her Before They Killed Her, Says Murder Trial
 Witness, ABC News (December 14, 2011)(available at
 http://abcnews.go.com/blogs/headlines/2011/12/unc-student-
 eve-carson-begged-captors-to-pray-with-her-before-they-
 killed-her-says-murder-trial-witness/) ......................................... 25

I. **Because the District Court clearly erred in denying a hearing and discovery, this Court should grant a COA on those issues and order a hearing. Alternatively, this Court should grant COA on all claims.**

Applying the COA standard to the claims before the Court is impossible because the record remains undeveloped. A hearing is guaranteed under § 2255 unless the record "conclusively" refutes the movant's claims. In making that determination, the District Court was required to assume the truth of Bernard's factual allegations. *Blankenship v. United States*, 159 F.3d 336, 337 (8th Cir. 1998) (a 2255 motion can be dismissed without a hearing only if the movant's allegations, "*accepted as true*, would not entitle [him] to relief," or "cannot be accepted as true because they are contradicted by the record, inherently incredible, or conclusions rather than statements of fact") (emphasis supplied; citation omitted).[1]

Rather than follow this procedure, the District Court effectively demanded conclusive proof of Bernard's claims before it would grant a

---

[1] This Court likewise must take Bernard's allegations as true. *Owens v. United States*, 483 F.3d 48, 57 (1st Cir. 2007) (in reviewing denial of a hearing under 2255, "we take the petitioner's credible allegations as true"); *Diaz v. United States*, 930 F.2d 832, 834 (11th Cir. 1991) (same).

hearing. That was error. *Aron v. United States*, 291 F.3d 708, 715 n.6 (11th Cir. 2002) ("to be entitled to an evidentiary hearing, a petitioner need only *allege* – not prove – reasonably specific, non-conclusory facts that, if true, would [require] relief. If the allegations are not affirmatively contradicted by the record and the claims are not patently frivolous, the District Court is required to hold an evidentiary hearing. It is in such a hearing that the petitioner must offer proof."); *Armienti v. United States*, 234 F.3d 820, 823 (2d Cir. 2000) (to obtain a hearing, a 2255 movant need only show "a 'plausible' claim of ineffective assistance of counsel;" "[a]t this preliminary stage," he need not "establish that [his claim] will necessarily succeed," because "if he could presently prove that proposition, no hearing would be necessary") (citation omitted).

Without allowing Bernard to call a single live witness, the District Court resolved factual disputes, determined credibility, and weighed evidence. Such a review cannot fairly resolve disputes of fact in a habeas case; a hearing is required. *Hall v. Quarterman,* 534 F.3d 365, 390 (5th Cir. 2008) (Higginbotham, J., concurring) (a hearing "offers the opportunity to expose the very core of the evidence, its accuracy, and its

weight," and reflects a commitment to fair procedure "two centuries" old and now "a central part of this country's democratic tradition").

Where "contested factual issues [are] material to [an] ineffective assistance claim . . . the district court abuse[s] its discretion in denying relief without conducting an evidentiary hearing." *United States v. Havens*, 450 F. App'x. 363, 365 (5th Cir. 2011) (*per curiam*) (unpublished). Below, Bernard presented detailed allegations supported by documentary evidence that were not affirmatively contradicted by the record. As such, no reasonable jurist could conclude that his claims were implausible. The District Court accordingly abused its discretion by denying relief without a hearing.

The absence of a fully developed evidentiary record makes it impossible to review Bernard's claims at this stage. The fairest and most expeditious resolution of this appeal is to grant a COA on this issue and, without addressing the other issues presented, remand for a hearing and discovery.

If the Court is not yet convinced that it must send this case back for a hearing, it must issue a COA on each of Bernard's claims. Even the preliminary examination of Bernard's allegations permitted at this

stage by *Miller-El v. Cockrell*, 537 U.S. 322 (2003), reveals the Government's position – that the Court should deny COA because, in its view, Bernard will not prevail on the merits after full consideration – as tainted by the same legal and factual mistakes that colored the decision below.

First, the Government's arguments obscure the applicable legal standard. The question is *not* whether Bernard ultimately will prevail if a COA is granted, but simply whether a single reasonable jurist would find that Bernard has made a substantial showing of the denial of a federal right. *Slack v. McDaniel*, 529 U.S. 473, 484 (2000); 28 U.S.C. 2253(c)(2). This threshold inquiry "does not require full consideration of the [claims'] factual or legal bases." *Miller-El*, 537 U.S. at 336. *Miller-El* emphasized that "a court … should not [deny a] COA merely because it believes the applicant will not demonstrate an entitlement to relief." *Id*. at 337. Indeed, a claim can be debatable even though *every reasonable jurist* might, after full consideration, reject it. *Id*. at 338. Conflating a COA analysis with a merits analysis "undermines the concept of a COA," because "[t]he question [at this stage] is the debatability of the underlying … claim, not the resolution

of that debate." *Miller-El*, 537 U.S. at 342.  The Government barely gestures at these controlling precedents.  *See*, *e.g.*, GB.15.[2]

The Government not only muddies the law but distorts the facts.  For example, it treats Bernard's conduct as indistinguishable from Vialva's, *see*, *e.g.*, GB.63 (arguing that "Bernard ... reject[ed the Bagleys'] pleas to spare their lives," when those pleas were made to Vialva), despite the fact that Vialva directed all the events of the crime and was personally responsible for the most heinous ones.  Treating Bernard and Vialva as interchangeable ignores the fact that the jury found Bernard less culpable than Vialva.  The jurors sentenced Bernard to death on only one count, and struggled over giving him even that death sentence.  In contrast, the jury immediately sentenced Vialva to death on all three counts.[3]

---

[2] Bernard cites his opening brief as BBOB, the Government's brief as GB, and the appellate record as ROA.case#.volume#:page#

[3] Deliberations began around 4:15 p.m. on June 12; jurors sent a note indicating they intended to "work until 7:00 p.m." ROA.13-70013.v2.297;v5.1038;v26.3278.  They retired about that time on June 12 and renewed deliberations the next morning.  ROA.13-70013.v5.1040.  The special findings forms reflect that on the first day of deliberations, June 12, jurors decided on all three of Vialva's death sentences *and* reached their decision about Bernard's two life sentences.  ROA.13-70013.v2.318;v2.331;v2.344;v2.358;v2.371.  Only after further deliberations on June 13 did jurors finally reach their sole death verdict regarding Bernard.  ROA.13-70013.v2.383.

Moreover, we *know* jurors regarded the question of who set the fire, and the degree of Bernard's moral culpability for Stacie Bagley's death as a consequence, as pivotal issues – because they specifically asked for the autopsy report on Ms. Bagley, ROA.13-70013.v2.298, after the Government had insisted at sentencing that only Bernard could have set fire to the Bagley's vehicle and that this fire resulted in a cruel and heinous death for Ms. Bagley. ROA.13-70013.v26.3202-04;v26.3269-70;v26.3272;BBOB.26-34. Thus, the evidence Bernard proffered below shows that the very facts that led to his death sentence – how the fire was set and what (if any) impact it had on Stacie Bagley's death – were not reasonably investigated or challenged by the defense.

Regarding how the fire started, prosecution witness Terry Brown was not meaningfully impeached with statements that directly contradicted the Government's theory that only Bernard could have lit the fire. Moreover, Bernard submitted an analysis below from a chemist with extensive fire investigation experience, of a type readily available to, but not pursued by, Bernard's trial counsel, that further undermines the Government's theory. ROA.13-70013.v9.335-344. Bernard also submitted expert opinion from the Chief Medical

Examiner for Galveston County, Texas, likewise available to trial counsel but not pursued, raising grave doubts about the Government's theory that the fire contributed to Ms. Bagley's death. ROA.13-70013.v9.345-350. The court below completely ignored the testimony of these two experts. Given the jury's struggle to reach its sentencing verdict for Bernard, a reasonable jurist could conclude that the related issues of ineffective assistance of counsel and withheld *Brady*[4] evidence deserve encouragement to proceed further.

Attempting to avoid this result, the Government presents unwarranted assumptions as if they were established facts. For example, the Government asserts that Bernard's trial counsel had a "strategic" basis for their many questionable decisions. As detailed below, that claim has no basis in the record – indeed, it's contradicted by the extensive evidence Bernard has proffered. The Government also asserts legal theories that are baseless. For example, the Government insists that no COA should issue on Bernard's IAC or *Brady* claims because Bernard cannot show that counsels' errors and omissions (or the evidence suppressed by the Government) "would have altered the

---

[4] *Brady v. Maryland*, 373 U.S. 83 (1963).

outcome [of] trial." GB.45. That assertion misstates the law, as does the Government's suggestion, GB.98, that defense counsel should have discovered on their own the impeaching evidence that the Government withheld. And the Government's ultimate fallback position – that prejudice is absent because any information Bernard's counsel failed to develop, or the trial prosecutors suppressed, was "cumulative," GB.13, 50 – cannot survive serious scrutiny. A COA should therefore issue on each of Bernard's claims, which independently and cumulatively "deserve encouragement to proceed further."

## II. The District Court's systematic errors infected its analysis of every claim that Bernard advanced.[5]

The Government repeats the District Court's findings that "many of the challenged actions [by trial counsel] fell within the categories of strategy and tactics or were otherwise objectively reasonable," that "many of [Bernard's IAC] claims were speculative and conclusory," and that Bernard failed to show "outcome changing prejudice." GB.19-20. But the first of these conclusions lacks any supporting evidence, the

---

[5] Unsurprisingly – given that a "blanket denial of discovery is an abuse of discretion if discovery is indispensable to a fair, rounded, development of the material facts," *East v. Scott*, 55 F.3d 996, 1001 (5th Cir. 1995) (internal quotation marks omitted; citation omitted) – the Government offers no defense of the District Court's wholesale denial of discovery. GB.17.

second depends on ignoring evidence that contradicts it, and the third imposes a requirement the Supreme Court expressly rejected in *Strickland.* Together or separately, they show that the District Court abused its discretion in denying a hearing. *See United States v. Jackson,* 636 F.3d 687, 692 (5th Cir. 2011) (trial court abuses its discretion "when its ruling is based on an erroneous view of the law or a clearly erroneous assessment of the evidence").

## A. There is no evidence that the challenged actions of trial counsel were actually deliberate strategic decisions made after a professionally reasonable investigation.

Reading the Government's brief, one might think that the record contained evidence showing Bernard's trial counsels' choice of a particular trial and mitigation strategy. *E.g.,* GB.19,57,99,107 (variously attributing counsels' actions to "strategy").[6] In fact, the record contains no evidence from Bernard's trial counsel in any form – whether declarations, affidavits, depositions, or hearing testimony – explaining their actions. Nor did the Government submit any other

---

[6] Genuinely strategic decisions can only be made after a thorough investigation. *Williams v. Taylor,* 529 U.S. 362, 396 (2000) (focusing on Williams's voluntary confessions as the cornerstone of the mitigation case could not be justified as tactical where counsel had not "fulfill[ed] their obligation to conduct a thorough investigation of [his] background") (citation omitted); *Wiggins v. Smith,* 539 U.S. 510, 522 (2003) (same).

evidence from any source defending counsels' performance. Denying a hearing on the speculative assumption that counsels' performance reflected any particular "strategy" was "a clearly erroneous assessment of the evidence," and therefore an abuse of discretion. *Jackson*, 636 F.3d at 692; *see also Harrington v. Richter*, 131 S. Ct. 770, 790 (2011) (reviewing courts "may not indulge '*post hoc* rationalization' for counsel's decision-making that contradicts the available evidence") (citation omitted).

This absence of evidence distinguishes the cases cited by the Government. For example, the Government spends several pages discussing *United States v. Hall*, 455 F.3d 308 (5th Cir. 2006), but *Hall* undermines the Government's position that no hearing was required here. GB.20-23. In *Hall*, the Government "provided affidavits [from] trial counsel" rebutting Hall's allegations. *Hall*, 455 F.3d at 518 and n. 9 (quoting extensively from one affidavit). And Hall's *own* declarations showed that his attorneys possessed the very information he accused them of failing to develop. *Id*. at 518-19. Contrary to the Government's position, what *Hall* actually illustrates is that an IAC claim cannot be resolved without a full record of counsels' actions. It therefore

10

highlights the District Court's abuse of discretion in refusing a hearing here.

The Government further argues that in *United States v. Bourgeois*, 2013 WL 3972699 (5th Cir. 2013) (unpublished), this Court "affirmed the denial of ... a full hearing" as to one aspect of Bourgeois' IAC claim. GB.23.n.4. While literally true, that characterization omits the more significant fact that the District Court permitted extensive post-conviction evidentiary development on Bourgeois' other IAC allegations. It both held a four-day in-court evidentiary hearing and "generously and repeatedly expanded the time and manner in which Bourgeois could present evidence and make a complete record" – including "permitt[ing] Bourgeois to depose a number of witnesses both before and after [the] hearing." Brief of Respondent-Appellee, *Bourgeois v. United States*, No. 11-70024 (5th Cir.) at 8. Moreover, it let Bourgeois depose a witness on the very issue as to which this Court affirmed the denial of a hearing. *Id*.

*United States v. Bartholomew*, 974 F.2d 39 (5th Cir. 1992), *see* GB.23, also offers the Government no help. Bartholomew appealed *pro se* the denial of a hearing on his 2255 motion, making four IAC

allegations. The first – that trial counsel didn't investigate Bartholomew's mental health – failed because the record showed that counsel knew of those facts (indeed, argued them at sentencing). 974 F.2d at 42. The second, counsel's failure to consider a lack-of-intent defense, failed because the only proffered supporting evidence – a prisoner's declaration attributing a statement to Bartholomew's co-defendant – was less credible than Bartholomew's sworn admissions in pleading guilty. *Id.* The third, "a general claim that [counsel's plea] advice … was based on insufficient investigation and information," was insufficiently specific. *Id.* The fourth, that counsel failed to review the PSI, could have constituted deficient performance if proven, but was harmless because the District Court based Bartholomew's sentence "solely on the factual basis of the crimes as stated by the government." *Id.* Because Bartholomew's claims were refuted by the record of his plea and sentencing or otherwise incredible, a hearing was unnecessary. *Id.* Bernard's IAC claims – detailed, specific, and supported by extensive evidence – could not be more different.

Why the Government cites *Tucker v. Johnson*, 242 F.3d 617 (5th Cir. 2001), is unclear. GB.24. *Tucker* arose under 2254 and thus was

not governed by 2255's hearing provisions; the relevant facts had been developed in state court, and the District Court had *granted* COA. *Tucker*, 242 F.3d at 620. Thus, *Tucker* – a fact-specific merits appeal involving neither application of the COA standard nor interpretation of 2255's hearing requirement – is irrelevant to the issues currently before the Court.

### B. Bernard's allegations were supported by detailed, sworn evidence.

Bernard's claims were anything but "speculative and conclusory." GB.20. For example – in contrast to the complete absence of evidence that trial counsels' acts were "strategic" – Bernard submitted a detailed declaration from respected capital defense attorney David Ruhnke. Ruhnke has tried more federal death penalty cases to verdict than any other lawyer in the United States, and has taught for years at capital defense trainings around the country, including in Texas. These experiences give him an unparalleled familiarity with the relevant standard of practice. Ruhnke's declaration alleges specifically and in detail that trial counsels' performance fell below prevailing professional standards. ROA.13-70013.v4.875-878;v5.914-918. For example, Ruhnke observes that the record suggests Bernard's counsel spent too

little time preparing, ignored potential challenges to the government's forensic evidence, failed to complete an investigation of Bernard's background, and more. *Id.* Other evidence corroborates Ruhnke's views. Two sentencing witnesses say that counsel did not prepare them. Numerous favorable mitigation witnesses – who could have recounted, *e.g.*, Bernard's remorse for the crime, his successful adjustment to confinement, and his positive response to structure and supervision when sanctioned as a juvenile – went unidentified due to counsels' deficient investigation. ROA.13-70013.v5.986-989;v6.1379-82;v6.1385-86;v6.1388-89.[7]

The District Court abused its discretion in denying Bernard a hearing, based on the theory that his claims were "speculative and conclusory," since that assessment of the evidence, on this record, was clearly erroneous. *Jackson*, 636 F.3d at 692.[8]

---

[7] Further corroborating Ruhnke's declaration are the contemporaneous capital defense training materials Bernard submitted below, establishing the contours of an adequate mitigation investigation in 1999-2000. ROA.13-70013.v9.179-334

[8] As explained *infra*, no reasonable jurist could dismiss as "cumulative" the varieties of mitigating evidence Bernard's trial counsel failed to develop. Thus, to the extent the District Court refused a hearing on that theory, its assessment was clearly erroneous. *Jackson*, 636 F.3d at 692.

**C.** **The District Court applied an incorrect legal standard in requiring Bernard to show "outcome changing prejudice" to obtain a hearing.**

The Government's brief repeatedly claims that the court below committed no error in ruling that Bernard did not provide evidence that would have proved a different outcome. *E.g.*, GB.20,30,32. But it was an abuse of discretion to require Bernard to show such "outcome changing prejudice" to obtain a hearing. In *Strickland v. Washington*, 466 U.S. 688, 693 (1984), the Court expressly rejected a standard that would have required "show[ing] that counsel's deficient conduct more likely than not altered the outcome." Instead, *Strickland* adopted a "reasonable probability" standard that asks whether counsel's deficient performance undermines the reviewing court's confidence in the verdict. *Id.* at 694. The difference is not just semantic; courts routinely reject as "objectively unreasonable" the interpretation of *Strickland* that the District Court applied below. *Rose v. Lee,* 252 F.3d 676, 689 (4th Cir. 2001) (requiring proof of prejudice by a preponderance of the evidence was "contrary to" *Strickland*); *Fulcher v. Motley*, 444 F.3d 791, 799 (6th Cir. 2006) (a state court that "required the petitioner to show prejudice by a preponderance of the evidence" would unreasonably

apply *Strickland*); *Trottie v. Stephens*, 720 F.3d 231, 244 n.7 (5th Cir. 2013) (suggesting the same); *Moore v. Secretary Pennsylvania Dept. of Corrections*, 457 F. App'x. 170, 182-83 (3d Cir. 2012) (unpublished) (same).

As demonstrated above, multiple systemic errors led the District Court to deny relief.[9] We turn next to the impact of these errors with regard to several of Bernard's specific claims.[10]

## III. The District Court's systemic errors led to mistaken conclusions in analyzing Bernard's specific claims.

### A. Discovery and a hearing were warranted on Bernard's claim that his counsel were ineffective for not challenging the source of the fire and its impact on Stacie Bagley's death.

Bernard has alleged that he was entitled to an evidentiary hearing to address trial counsels' failures in challenging the theory that directly led to his death sentence: that he set the Bagleys' car on fire and that the fire resulted in a tortuous death for Stacie Bagley. BBOB.26-34.

---

[9] The District Court's legally erroneous view that Bernard's *Brady* claims were "procedurally defaulted," GB.101, likewise rendered its denial of a hearing an abuse of discretion. *See infra* at Section III.D.2.b.

[10] Bernard does not waive any of the arguments advanced in his opening brief, whether or not this brief specifically addresses them.

The Government now retreats from the position it took at trial –
implying, for example, that its arson expert only called it "possible" that
the fire started in the passenger area. GB.41-42. But the record shows
that the Government relentlessly hammered its "torture by fire" theme,
using leading questions to obtain its preferred responses and then
weaving those responses repeatedly into its summation:

- ROA.13-70013.v19.1930 (Government's leading question to Brown
  suggests that "only" Bernard was "positioned…to light the fire");

- ROA.13-70013.v20.2062-63 (repeated questioning of medical
  examiner regarding opinion that "smoke inhalation" and "thermal
  injuries" contributed to Stacie Bagley's death, concluding with the
  leading question "Meaning it's possible that some of the thermal
  injuries could've been sustained …while she was still alive?");

- ROA.13-70013.v20.2084 (leading question to arson investigator,
  emphasizing his testimony that "the source of the flames is
  somewhere on the inside in the passenger – in the interior of the
  vehicle, correct?");

- ROA.13-70013.v20.2086 (leading question to arson investigator,
  highlighting that it would be "possible" for "someone … standing

on this side of the vehicle" [where Brown had placed Bernard] to "throw a match" or otherwise "do something [to] … light[] the fire" inside the Bagley's car);

- ROA.13-70013.v23.2610, lines 10-11 (guilt phase closing: "After [Vialva] shot at them, Brandon Bernard immediately lit the fire. Brandon Bernard is the only person that's in position to light the fire");

- ROA.13-70013.v23.2610, lines 16-17 (guilt phase closing: relying on arson investigator's testimony to argue that the "only person who could have lit the fire was Brandon Bernard" and that "[w]hen Brandon Bernard lit that fire, Stacie Bagley was still living. She was still alive");

- ROA.13-70013.v23.2610-11 (guilt phase closing: "…Brandon Bernard did not know whether those folks were dead when he lit that fire, and Stacie was not dead");

- ROA.13-70013.v26.3202-03 (penalty phase closing: "Stacie Bagley…was intentionally killed by Brandon Bernard"; "the medical examiner [testified] that Stacie was still living when that fire was set [and] that Stacie continued to live for a period of time

18

after she was shot"; when Bernard "lit that fire, he intentionally did an act that brought about [her] death"; the medical examiner testified that she "die[d] from a gunshot wound and also from the smoke inhalation");

- ROA.13-70013.v26.3269 (penalty phase closing: "Now as to Stacie Bagley, the Government intends [sic] that Brandon Bernard – that the evidence shows that he intentionally killed the victim, Stacie Bagley, 'Yes,' because you now know that's a contributing cause of her death – that you knew from the medical examiner");

- ROA.13-70013.v26.3270 (penalty phase closing: "Now, recall when talking about Mr. Bernard, as well, what the evidence is regarding the torture and physical abuse. Recall that he set the fire and burned the bodies…"); and

- ROA.13-70013.v26.3272 (penalty phase closing: "Mr. Bernard set the fire").

Despite the evident importance of this issue, Bernard's trial counsel failed to impeach Brown or Lewis with prior statements that undermined the Government's claim that Bernard set the fire. Lewis had told the Government before trial that Bernard was not in a position

19

to have set the fire, endorsing a diagram that placed Bernard far from the Bagley's car. ROA.13-70013.v3.594. Brown had told the Government both that Bernard was not in a position to have lit the fire, ROA.13-70013.v3.586, and that Bernard actually *did* light the fire, but did so in a manner at odds with the forensic evidence (*i.e.,* by throwing a match through a closed window), ROA.13-70013.v5.1076;v20.2094. Bernard's counsel left all these matters unaddressed. BBOB.31-33.

Bernard also alleged that counsel failed to challenge the forensic evidence that the Government urged as supporting its theories about the fire's origin and its impact on Ms. Bagley's death.

The Government calls Bernard's argument that testimony from an arson expert would have assisted his defense "purely speculative." GB.43. But Bernard's contention was supported by a detailed sixteen-page declaration from fire expert Gerald Hurst, PhD, who explained that "post-flash over burning" made it impossible to "draw a scientifically reliable inference about precisely where the fire started." ROA.13-70013.v9.344. Dr. Hurst also found the physical evidence "just as consistent with the inference that the fire started in the trunk" – where Vialva was standing – "[as] with the inference that it started in

20

the passenger compartment," near where Brown testified Bernard had stood. ROA.13-70013.v9.344.

The Government also dismisses as "speculation" Bernard's claim that testimony from a pathologist would have strengthened his defense. GB.44. On this point, Bernard submitted a declaration from Dr. Stephen Pustilnik, the Chief Medical Examiner for Galveston County, Texas. Dr. Pustilnik made it clear that agonal respiratory effort and agonal circulation, occurring subsequent to Ms. Bagley's death, provided "an equally plausible and more likely explanation" than breathing that occurred while she was alive. ROA.13-70013.v9.349. Consequently, "the fire may not have contributed to Mrs. Bagley's death" at all. ROA.13-70013.v9.349.

The Government ignores Dr. Pustilnik's declaration, simply declaring that "solid medical evidence" shows that Stacie Bagley "inhaled smoky sooty material" as she died. GB.44. But the question in this proceeding is not whether the jury could have credited the Government's interpretation of the evidence (although that is unlikely, given the powerful proof to the contrary). The question is whether, had trial counsel presented a contrary expert view, the jury might have

21

concluded that the Government had failed to prove that Bernard lit the fire or that the fire caused Stacie Bagley to suffer, and on that basis spared Bernard's life. The answer, on this record, is "yes."

The Government also suggests that any errors and omissions by Bernard's attorneys were ultimately inconsequential, echoing the District Court's ruling that counsel need not have pursued fruitless challenges, and that challenging the Government's evidence could even have proved harmful. GB.40-41;ROA.13-70013.v8.135-136. But the Hurst and Pustilnik expert declarations show that attacking the Government's forensic claims would have strengthened Bernard's defense; trial counsel's inaction, in contrast, gave the Government free rein to hammer on the apparent mutual corroboration of Brown's testimony and that of the prosecution's experts.

Had defense counsel confronted these contentions with the kind of evidence represented in Hurst's and Pustilnik's declarations, it is reasonably probable that at least one juror would have rejected the Government's theory of culpability. Because these contentions provided a key part of the Government's case for condemning Bernard to die, a

22

reasonable jurist could view Bernard's related IAC claims as warranting further development.

**B. Reasonable jurists could find that counsel's desultory two-page letter to the DOJ fell below prevailing professional standards, and that had counsel performed properly, it is reasonably likely that the Government would not have sought Bernard's execution.**

The Government defends counsel's lackadaisical efforts to avert a death prosecution against Bernard, praising counsel's letter and its claim that "at least eighty people [were] willing to come to court and testify that [Bernard was] not violent and would not initiate an incident such as this." GB.29.

Reasonable counsel would not have relied exclusively on impressing the DOJ by brandishing the number of potential witnesses alone; that hardly constitutes "cogent[ly] set[ting] forth" the "arguments for Bernard's diminished culpability." GB.30. Counsel's letter was flat and superficial.[11] It lacked the information essential to persuading the Government not to seek Bernard's execution, because counsel had failed

---

[11] Moreover, counsel's claim was untrue – many people on that list did not know Bernard or lacked any meaningful information about him. ROA.13-70013.v3.610-v4.634. Sadly, counsel's decision to base an important argument to the DOJ on an unvetted list of witnesses is representative of the lack of care taken in developing and presenting Bernard's case.

to conduct the thorough mitigation investigation required by prevailing professional standards.

The District Court found the Government's case on guilt so strong, and the crime so "heinous," that "the death penalty would have been authorized for Bernard regardless of what [might have been argued on his behalf]." GB.30. That conclusion is mistaken for two reasons. First, it fails to acknowledge how the jury struggled with Bernard's sentence. *See supra.* Second, it cannot be squared with the fact that in other highly aggravated cases, diligent performance by defense counsel has persuaded the Government not to seek death, or to withdraw a pending notice of intent to do so.

For example, the Government, after initially authorizing a capital prosecution, ultimately agreed to a negotiated plea in the highly publicized case of Demario Atwater, who kidnapped and killed Eve Carson, former student body president at the University of North Carolina.[12] Atwater had tortured Carson, killed her to obtain something of pecuniary value, substantially planned and premeditated

---

[12] *See* Sarah Frier, "Death Penalty Dropped for Atwater in Eve Carson Case," The Daily Tar Heel (April 20, 2010) (available at http://www.dailytarheel.com/article/2010/04/death_penalty_dropped_for_atwater_in_eve_carson_case).

her murder, obstructed justice afterward, and had a "very significant criminal history."  Government's Notice of Intent to Seek the Death Penalty, *United States v. Atwater*, No. 1:08CR384-1 (M.D. N.C), Dkt. 22.  Moreover, Atwater – not his co-defendants – killed Carson, shooting her in the head with a shotgun at close range.  *Id*. at 5.  Like the Bagleys, Ms. Carson while captive had begged Atwater to pray with her and was "beloved" in the community.[13]  Cases like *Atwater* refute the view that Bernard's role in this case was so highly aggravated that no such outcome was conceivable for him.[14]

### C.  A reasonable jurist could find Bernard's counsel ineffective for failing to develop and present the wealth of available mitigating evidence.

The Government defends trial counsels' multiple failures by suggesting that counsel consciously decided not to address entire areas of mitigation, such as the turbulent home environment of Bernard's youth, his mild cognitive impairment, and his positive responses to

---

[13] *See* Suzan Clarke, "UNC Student Eve Carson Begged Captors to Pray With Her Before They Killed Her, Says Murder Trial Witness," ABC News (December 14, 2011)(available at http://abcnews.go.com/blogs/headlines/2011/12/unc-student-eve-carson-begged-captors-to-pray-with-her-before-they-killed-her-says-murder-trial-witness/).

[14] This conclusion does not require assuming the same outcome for Vialva. Given Bernard's comparatively diminished culpability, the Government might well have continued to pursue Vialva's execution while agreeing to spare Bernard.

supervision and incarceration. This is simply elaborate speculation; nothing in the record reflects that counsel undertook the investigation necessary to choose a mitigation theory or actually settled on any such theory.[15]

The only declarations in the record support Bernard's allegation that no reasonable investigation was performed and that as a result, counsel's presentation was incomplete, undeveloped, and unpersuasive. Because Bernard's mitigation IAC claims have extensive factual support, a reasonable jurist could conclude that they warrant full development. Because we have already addressed some of these areas

---

[15] The Government suggests that Bernard's attorneys' prior experience forecloses a finding of deficient performance. GB.28. Much of the cited experience (*i.e.*, state murder trials where death was not on the table, or non-capital state-court felony trials) was irrelevant to this case, where the sentencing hearing would likely be the most critical part of the trial. Counsel were also complete strangers to the Federal Death Penalty Act; their only capital experience coming in cases under Texas's capital sentencing statute, which employs completely different procedures. Indeed, counsel's apparent surprise upon learning that federal courts do not follow Texas' unique practice of "shuffling" prospective jurors before voir dire, ROA.13-70013.v28.18-19, suggests unfamiliarity with federal practice generally. And, of course, experience cannot guarantee adequate performance in any event. *Ex parte Gonzales*, 204 S.W.3d 391 (Tex. Crim. App. 2006) (finding IAC for failing to investigate mitigation, noting that counsel had tried "quite a few capital cases"); *Commonwealth v. Collins*, 888 A.2d 564 (Pa. 2005) (same; counsel had defended more than 100 murder cases and six prior capital trials); *Hall v. McPherson*, 663 S.E.2d 659, 661 (Ga. 2008) (same; lead counsel was "experienced in death penalty cases"); *Averhart v. State*, 614 N.E.2d 924, 929-31 (Ind. 1993) (same; counsel had "considerable" criminal defense experience, "including capital cases").

in depth, BBOB.34-72, we limit the discussion here to a few discrete issues.

> 1. The Government fails to cite, much less distinguish, *Sears v. Upton*, 130 S. Ct. 3259 (2010) – unsurprisingly, since *Sears*'s rationale and outcome cannot be reconciled with the Government's argument.

The Government asserts that counsels' decision to delegate key decisions about the mitigation investigation and presentation to Bernard's mother was reasonable because Ms. Bernard, "a lieutenant colonel in the United States Army Reserves," was "competent to direct" the mitigation investigation. GB.50. While no one would denigrate Ms. Bernard's military service, nothing about it prepared her to play that role in this case. More important, the Government's position is squarely foreclosed by *Sears v. Upton*, a controlling decision the Government pointedly ignores.

*Sears* presents a scenario remarkably similar to the case at bar. Counsel performed a "cursory" mitigation investigation, limited to interviewing "witnesses selected by [Sears's] mother" – and the Supreme Court strongly endorsed the conclusion that such an investigation was "on its face … constitutionally inadequate." 130 S.

Ct. at 3264. Based on this superficial investigation, Sears's counsel presented seven witnesses at sentencing who portrayed Sears's "middle-class background" as "stable, loving, and essentially without incident," and those who knew Sears as "shocked and dismayed" by his crime. *Id.* at 3261-62. Post-conviction investigation revealed a range of other mitigating evidence that an adequate independent investigation would have uncovered. *Id.* at 3262-64.

Bernard's case is indistinguishable. Here, too, counsel confined their investigation *entirely* to the names Ms. Bernard provided, BBOB.37-38, and as a consequence missed a range of critically important potential mitigation, including evidence of cognitive problems and a troubled family background. Bernard's counsel hired Criterion Investigations to play some part (exactly what role is unknown, due to the District Court's refusal of a hearing) in pursuing the potential witnesses Ms. Bernard identified, but it is undisputed that no one on the defense team performed any independent investigation – their entire focus was on the set of names provided by Ms. Bernard.

Contrary to the Government's claim, Bernard's argument is not "that counsel should have hired an investigating agency with more

28

experience in developing mitigation evidence." GB.47. Criterion Investigations may have been capable of undertaking an appropriately broad and independent mitigation investigation, but Bernard's counsel failed to ensure that such an investigation *was, in fact, conducted.*[16] That constituted deficient performance, as cases that predate *Sears* recognize. *Walbey v. Quarterman*, 309 F. App'x. 795, 801 (5th Cir. 2009) (unpublished) (finding counsel ineffective for, *inter alia*, "delegating ... to an expert" the task of choosing a mitigation defense). Had counsel taken the investigatory reins – as they were obligated to do – a wealth of powerful mitigating evidence would have been discovered. BBOB.50-72.

*Sears* is also instructive because it repudiates the view – on display throughout the Government's brief – that counsel can make "strategic" decisions about what to present without first thoroughly investigating the defendant's background. Decisions are not "strategic" if they result from an inadequate investigation that leads to a

---

[16] The Government accuses Bernard of "claim[ing] that the contacts provided by Bernard's mother were insufficient in providing leads." GB.47. Bernard has never denied that at least *some* contacts provided at least *some* important leads. BBOB.36-37. The problem lay not with Ms. Bernard or Criterion Investigations, but with *trial counsel* – who failed to discharge their responsibility for recognizing those potentially relevant leads and ensuring they were followed up.

"haphazard" choice of defense theory, *even if that theory might be reasonable in the abstract.* *Sears*, 130 S. Ct. at 3265 (citing *Wiggins*, 539 U.S. at 522, and *Williams*, 529 U.S. at 396); *see also Walbey*, 309 F. App'x. at 801 (strategic decision-making requires more than "mere possession of *some* information with respect to [the defendant's] background").

### 2. The jury knew nothing of the turbulence in Bernard's home environment.

The Government maintains that "many of the claimed omissions [of important facts about Bernard's background] were, in fact, covered at the punishment phase." GB.48. This claim distorts the record and misrepresents the meager and confused mitigation case actually presented at sentencing.

For example, the Government asserts that Bernard's mother "discussed her divorce ..., her open-heart surgery, and Bernard's move to his father's residence." GB.48. In actuality, Bernard's mother's testimony was exceedingly brief, covering just eight pages. Nearly three of those pages comprise a rambling expression of her religious beliefs and grief over the victims' fate, rather than any information about Bernard's background. ROA.13-70013.v25.3147-3150. Moreover,

the entirety of Ms. Bernard's testimony that "discussed" her divorce, her surgery, and Bernard's move was as follows: "And, then, when [Bernard] came back [to] Temple High, he went to live with his dad then. Because in '92, his dad and I divorced. And then in '92, I had open-heart surgery, and we divorced in September." ROA.13-70013.v25.3151. In other words, Bernard's mother *mentioned* these facts in passing, but defense counsel made *absolutely no* attempt to show how these events affected Bernard. Reasonable counsel would have developed the readily available evidence showing how Bernard's reaction to the turbulence in the family home, exacerbated by depression and isolation, led him into trouble with the law and eventually into the robbery plot that ended with the Bagleys' murder. ROA.13-70013.v5.972-1001.

### 3. No evidence supports the speculation that counsels' failure to investigate or present evidence of Bernard's cognitive impairment was "strategic."

The Government protests that presenting evidence about Bernard's neurocognitive impairment would not have been "congruent" with the "good young man" theory it attributes to counsel. GB.52. On the contrary, such evidence would have helped answer the key question

31

of why Bernard, despite being basically "good," made no effort to stop this horrible crime. This is a question that reasonably effective counsel would have anticipated and attempted to answer. *See* Section III.C.5, *infra*.

*Martinez v. Dretke*, 404 F.3d 878 (5th Cir. 2005), cited by the Government, GB.51, is inapposite. First, in *Martinez* – unlike here – this Court had a sufficient record to assess trial counsel's performance, because lead counsel had submitted an affidavit in state court explaining his strategy, and the federal habeas court itself had conducted a live evidentiary hearing. *Martinez*, 404 F.3d at 883, 889. Moreover, the fully developed record showed that Martinez's trial counsel deliberately decided to emphasize one mitigation theory (that state actors failed to help Martinez when he was in their care), as opposed to another (Martinez's neurological impairment), only after fully investigating and evaluating all options. *Id.* at 887-890. By contrast, Bernard's counsels' investigative failure left them ignorant of the facts pointing to the need for a neuropsychological evaluation. ROA.13-70013.v5.919-922. And contrary to the Government's position here, this Court *granted* COA on Martinez's IAC-mitigation claim

(though, as noted, it did not ultimately grant relief). 404 F.3d at 887. Bernard's case is at least as COA-worthy, as the record here is silent about what, if any, "strategy" counsel had.

Finally, suggesting that evidence of Bernard's cognitive impairment was "cumulative" of other mitigating evidence at trial is specious. Nowhere in the record was such evidence even hinted at.

### 4. Counsel's failure to develop and present readily available *Skipper* evidence prejudiced Bernard.

The Government does not defend trial counsels' failure to investigate evidence of Bernard's successful prior adjustment to supervision and confinement. Instead, it argues that Bernard suffered no prejudice because Bernard had committed other crimes after being on juvenile probation, and Matthew Mitchell testified that Bernard had found "peace" in jail after being arrested for murder. GB.57. The Government's positions are illogical.

If the fact that a defendant eventually committed another crime rendered moot the mitigating value of his earlier, successful adjustment to supervision or confinement, there would be no basis for the many

cases finding IAC for failure to develop *Skipper*[17] evidence. *See*, *e.g.*, *Walbey*, 309 F. App'x. at 801 (counsel ineffective for failing to present, *inter alia*, evidence that defendant had "thrived in a structured environment" prior to the capital crime); *Moore v. Johnson*, 194 F.3d 586, 614-622 (5th Cir. 1996), (counsel ineffective for failing, *inter alia*, to develop and present mitigating evidence that defendant had earned early release from a prior prison sentence).

The jury at sentencing had only two options: killing Bernard, or condemning him never again to live outside prison. Bernard's prior successful periods of supervision and incarceration would have undermined the Government's case for death by showing that Bernard could be confined safely and productively, whatever his out-of-custody behavior. *Moore*, 194 F.3d at 621 (defendant's prior successful adjustment to confinement is "clearly relevant on the issue of future dangerousness"). Indeed, jurors in numerous federal capital cases have imposed life sentences based in part on *Skipper* evidence, even in cases involving multiple murders and other significant aggravating factors, such as *United States v. Dennis*, Crim. No. 3:96CR66-05 (E.D. Va.)

---

[17] *Skipper v. South Carolina,* 476 U.S. 1 (1986).

(double homicide); *United States v. Jones*, Crim. No. 3:97CR169 (E.D. Va.) (murder during bank robbery; Jones had multiple prior convictions for violent crimes, and had "expressly exhibited" a lack of remorse for the murder).

Mitchell's testimony that Bernard said he felt "at peace" in jail did not effectively communicate the information counsel failed to develop. Such testimony is weak compared to evidence of good behavior from impartial sources like probation officers and jail records. *Skipper*, 476 U.S. at 7-8 (jailers' testimony was not "merely cumulative" of testimony from the defendant and his wife describing his good behavior in jail, because jurors would "quite naturally" give "much greater weight" to the testimony of "disinterested witnesses"). In fact, the Government complained that Mitchell's testimony deserved little weight because Mitchell had insignificant recent contact with Bernard, ROA.13-70013.v24:2880-81, emphasizing that Mitchell was the only person who even suggested Bernard had any remorse and that Bernard's "remorse" was really only regret over being caught. ROA.13-70013.v26.3273;BBOB.51.n.17.

### 5. Counsel performed deficiently in making no attempt to account for Bernard's involvement in the crime.

The Government claims that counsel aimed to portray Bernard as a "basically good" person and feared that telling the jury about Bernard's problems as a youth (violent confrontation with his father, truancy) "would not have furthered or been in accord" with that claimed theory. GB.48.

Even putting aside whether counsel had any such strategy, placing such limitations on the mitigation presentation would have been deficient.[18] Reasonable counsel in 1999-2000 understood that persuading a death-qualified jury to spare a defendant requires more than presenting a few casual acquaintances to describe his "smiling face." GB.48. An adequate mitigation case must seek to "explain to the jury why [the] defendant may have acted as he did," and to "connect the dots between … [the] defendant's mental problems, life circumstances, and personal history and [the] crime." *Hooks v. Workman*, 689 F.3d 1148, 1204 (10th Cir. 2012).

---

[18] *Strickland* prejudice is not precluded simply because an appropriately wide-ranging investigation could have uncovered some "adverse" evidence in the defendant's background. *Sears*, 130 S. Ct. at 3264; *see also Porter v. McCollum*, 558 U.S. 30, 43 (2009) (sentencer would not have dismissed defendant's positive military

6. Counsels' failure to seek a limiting instruction concerning Dr. Coons' future dangerousness predictions harmed Bernard.

The record belies the Government's claim that "[t]here was never any doubt that Dr. Coons' testimony related only to Vialva." GB.56. The trial prosecutors effectively communicated the impression that Coons' damaging conclusions applied equally to Bernard – a false impression to which *this Court* likewise fell prey on direct appeal. BBOB.58-60; *United States v. Bernard*, 299 F.3d 467, 482 n.11 (5th Cir. 2002) (invoking Dr. Coons' testimony as a basis for affirming *Bernard*'s death sentence).

**D. The Court erred by denying discovery and an evidentiary hearing on Bernard's *Brady* claims.**

### 1. Summary of *Brady* argument in reply

The Government has never affirmatively declared that it was not in possession of the information that forms the basis for Bernard's *Brady* claims. It submitted no declaration below disputing the factual accuracy of Bernard's allegations. Instead, the Government tries to dodge the issue by making arguments that impermissibly shift the

---

record simply because a full investigation would also have revealed that he more than once "went AWOL").

burden onto Bernard or incorrectly declare the suppressed evidence immaterial.

### 2. The Government misstates the law.

#### a. The Government fails to apply the COA standard.

Ignoring the standard for a COA and for when an evidentiary hearing should be granted, the Government argues Bernard's *Brady* claims on their merits – as if Bernard had received a full opportunity to develop them. GB.82-84. The proper question at this stage is whether a reasonable jurist – accepting Bernard's allegations as true – could believe that his claims warrant further encouragement. *Miller-El*, 537 U.S. at 327; *Aron*, 291 F.3d at 715 n.6; *Section I, supra.*

#### b. The Government's attempts to block development of Bernard's *Brady* allegations lack legal support.

The Government contends that no COA should issue because (1) Bernard's *Brady* allegations were procedurally defaulted, since the defense supposedly could have found this information on its own (GB.83, 99-100), and (2) the withheld information is immaterial because it would be cumulative or inadmissible (GB.63,83-84,90,93).

First, Bernard's *Brady* claims rely on evidence that was not part of the trial record because the Government allegedly suppressed it.

Bernard cannot therefore be faulted for not presenting his *Brady* claims on direct appeal, particularly given that the Government declared an "open file" discovery policy at trial. *Strickler v. Greene*, 527 U.S. 263, 283 and n.23-24 (1999) (where prosecution has "open file" discovery policy, defendant has "cause" for not having previously challenged the suppression of any exculpatory or mitigating evidence the "open file" omitted); *Banks v. Dretke*, 540 U.S. 668, 691-93 (2004) (same); *Johnson v. Dretke*, 394 F.3d 332, 337 (5th Cir. 2004) (rejecting procedural default argument in granting COA, stating that where the State has a duty to disclose evidence, the evidence's presence "in the public record … is immaterial" to the procedural default issue).

Even absent the "open file" assertion, *Brady* claims are not procedurally defaulted if the information was unavailable at the time of the earlier proceeding. *Graves v. Cockrell*, 351 F.3d 143, 154 (5th Cir. 2003) (granting COA, even though *Brady* claim not raised in state appeal or initial state habeas, because petitioner apparently did not learn of alleged violation until later, and cause for procedural default exists where external factors impeded ability to raise claim earlier;

*Brady* claim ultimately found meritorious, *Graves v. Dretke*, 442 F.3d 334, 339 n.3 (5th Cir. 2006) (reversing district court)).

*Strickler*, *Banks*, and simple logic all foreclose finding that Bernard's *Brady* claims have been procedurally defaulted. Yet this is exactly what the District Court ruled, and the Government argues that this Court should perpetuate that error. GB.101.

Second, evidence that impeaches a key government witness on an essential issue can rarely be considered cumulative, *Banks*, 540 U.S. at 700-01;BBOB.77 (citing additional cases), and this is not one of those rare cases. The jury struggled to return a death sentence for Bernard, and that sentence hinged on Brown's credibility. Much of the suppressed evidence related to Brown, such as his violent criminal past, his major mental illness, and his associated psychotropic drug use. Nothing comparable to this suppressed evidence was presented or suggested at trial, so it cannot fairly be characterized as "cumulative."

3. The specific *Brady* violations, when measured against the proper legal standard, require remand for an evidentiary hearing, or at least a COA.

a. Impeachment of Terry Brown regarding the source of the fire

Bernard alleged that the Government withheld vital impeachment evidence relating to Brown's explanation about who started the fire that consumed the Bagleys' car. This *Brady* allegation was supported by Terry Brown's attorney's notes of a Governmental debriefing. Those notes reflect that Brown told the Government that Bernard had lit the fire by throwing a match through the car's open window, ROA.13-70013.v5.1076. But the Government's own forensic evidence showed that this window had in fact been closed during the fire. ROA.13-70013.v20.2094. Consequently, Brown's claim that Bernard lit the fire by throwing a match through a window was demonstrably false.

Brown's credibility regarding the source of the fire is a highly consequential fact. The Government relied exclusively on Brown's testimony to argue that Bernard was the "only person" who could have started the fire. The Government also argued that "Stacie Bagley was still living" when the fire was set, that her fiery death amounted to "torture," and that justice demanded that Bernard be condemned to

41

death since he brought about that torture by setting the car on fire. ROA.13-70013.v23.2610-11;v26.3202-03,v26.3269-70.

Despite the fact that Lewis was involved in the actual abduction and both Brown and Lewis participated in dousing the car with lighter fluid, the Government contended that Bernard's having set the fire rendered him more culpable than either Brown or Lewis. Thus, it urged, jurors should reject the statutory mitigating factor that others who might be equally culpable in the Bagleys' deaths were not facing death. ROA.13-70013.v26.3272;BBOB.79.

The Government now asserts that the alleged *Brady* violation concerning the fire's source is immaterial because "Brown stated at trial that he did not see Bernard start that fire," GB.13, and that accordingly "whether there was a prior statement [by Brown] that a match came through a window, or another way, is not material[.]" GB.63,96.

The Government's response fails to recognize the significant impeachment value of Brown's earlier statement. The Government argued to the jury that it should trust Brown's testimony because, although he initially lied, he ultimately decided to tell the truth. ROA.13-70013.v23.2694-2696. But this particular falsity – and Brown's

42

subsequent abandonment of it – could have led the jury to conclude to the contrary, that Brown simply altered his lies to be sure they conformed to the other evidence. As such, it could have undercut the credibility of *all* of his testimony, and in particular, his testimony about the fire's source. *Cf. Enying Li v. Holder*, — F.3d —, 2013 WL 6851028, at *3 (9th Cir. Dec. 31, 2013) (referring to "'long recognized' law that a witness 'deemed unbelievable as to one material fact may be disbelieved in all other respects,' also known by the maxim '*falsus in uno, falsus in omnibus*'"; citation omitted). Given that impact, Brown's prior statement is indisputably material. *See United States v. Sipes*, 388 F.3d 471, 478 (5th Cir. 2004) (evidence is material if it "would seriously undermine the testimony of a key witness on an essential issue").

The Government's "immateriality" argument lacks credibility in any event, given the inconsistent positions it has taken regarding Brown's testimony. At trial, the Government purposefully led Brown into declaring that Bernard "was the only person who positioned in [sic] this car to light the fire inside the vehicle", ROA.13-70013.v19.1930; it then used Brown's answer as the foundation of its argument for executing Bernard. ROA.13-70013.v23.2610-11;v26.3202-03;v26.3269-

70;v26.3272.  Here, the Government suggests early in its brief that Brown's testimony regarding the source of the fire is immaterial, GB.13, but takes the exact opposite position 30 pages later, declaring Brown's testimony regarding the source of the fire so credible that even expert testimony could not have undermined it.  GB.43.  The pretzel logic of these irreconcilable arguments underscores the COA-worthiness of Bernard's *Brady* allegations.

### b.  Brown's criminal history

Bernard provided ample evidence that the Government knew Brown had committed several violent acts – including a beating, a shooting, and a shotgun-wielding assault – and hid these facts from defense counsel.  ROA.13-70013.v5.1076;BBOB.74.

In open court, the Government led the jury to believe that Brown had no such history.  At the guilt phase, it noted that he had a single misdemeanor conviction and no felony convictions.  ROA.13-70013.v19.1859-60.  At sentencing, it disclosed Brown's involvement in a number of burglaries, but again never suggested any history of violence.  ROA.13-70013.v24.2787-2798.

After presenting an inaccurate portrayal of Brown's criminality, the Government argued that Bernard's past acts of stealing bolt cutters and an ATM card made him a "sophisticated career criminal" who lacked a conscience and therefore deserved death. ROA.13-70013.v26.3208;v26.3251;v26.3260-61;v263272-77. This misleading presentation gave the jury a basis for rejecting the statutory mitigating factor that other equally blameworthy individuals would not face death. ROA.13-70013.v2.378; 18 U.S.C. 3592(a)(4).

Despite all this, the Government asks that its failure to disclose Brown's violent past be excused because the evidence would not have been admissible. GB.98.n.18. This argument is incorrect. The evidence would have been admissible to correct the Government's false portrayal of Brown's character. BBOB.78-79 and n.27. It also would have been admissible at sentencing, where the rules of evidence do not apply, 18 U.S.C. 3593(c), to support the mitigating factor that equally culpable individuals were not facing death. That factor requires jurors to evaluate the relative "culpability" of participants in a crime, making evidence of their respective bad acts relevant. Finally, given a hearing,

45

Bernard could show that, had this evidence been disclosed, he would have discovered other admissible evidence as a result.

The Government also contends that full development of this claim should be foreclosed because Bernard failed to show that he could not have discovered "Brown's past criminal activity" with "reasonable diligence." GB.98. This response turns *Brady* on its head. The Government cannot play a game of "the Government can hide and the defendant must seek" when purporting to allow open file discovery. *Banks*, 540 U.S. at 696. And Bernard, denied a hearing below, had no opportunity to prove his diligence in any event. The Government never suggests what would constitute such diligence, but presumably it believes that Bernard's counsel should have interviewed Brown. Yet when Bernard calls trial counsel ineffective for not interviewing Brown, the Government contends that he has failed to prove that such an interview would have been possible. ROA.13-70013.v7.1533. The Government's contradictory positions (Bernard should have interviewed Brown/Bernard could not have interviewed Brown) show yet again that review of this case without further factual development is unfair.

46

Finally, the Government declares that any *Brady* violation is harmless because the evidence is "cumulative of Brown's criminal gang conduct." GB.13;99. As noted, impeachment evidence of a key government witness can rarely be considered cumulative, BBOB.77, and this evidence was not cumulative because nothing before the jury suggested that Brown had committed other *violent* crimes. Moreover, the Government's actions at trial belie its suggestion that a violent past could be considered cumulative at sentencing, since the Government there argued that Bernard's non-violent criminal past justified executing him.

### c. Brown's mental illness

Bernard has alleged that the Government suppressed both (1) Brown's mental health evaluation that demonstrated that he would deflect and deny responsibility for his own conduct, and (2) the fact that he was taking psychotropic medications during the crime and the trial.

The Government maintains that Bernard has not proven that it possessed the information or that *Brady* compelled its disclosure. GB.99-100. But the District Court's order for the evaluation – issued in response to the Government's motion to have Brown tried as an adult

47

under 18 U.S.C. 5032 – stated that the court would disseminate the resulting report to the appropriate parties.[19]  The Government was a party to that proceeding and has never denied receiving the report.  The very nature of a 5032 evaluation, along with the order's wording, makes it likely that the Government received the report, certainly likely enough to require a hearing.

The Government's claim that the evidence of Brown's mental illness was cumulative of "other impeachment evidence" is untrue.  No other evidence even suggested that Brown suffered from a major mental illness that could distort his perceptions both during the crime *and when he testified*.  This evidence thus possesses a "different character" and cannot be deemed cumulative of the offered impeachment evidence. *See Banks*, 540 U.S. at 702; *United States v. Kohring*, 637 F.3d 895, 904 (9th Cir. 2011) (holding, and describing *Banks* as holding, that suppressed impeachment evidence was not "merely cumulative" where it had "a different character than evidence already known to the defense").

---

[19] Under Fed. R. Evid. 201, this Court may take judicial notice of that sealed order (filed July 16, 1999 in *United States v. Brown*, Criminal No. W-99-CR-061 (W.D. Tex.)).  *See Taylor v. Charter Med. Corp.*, 162 F.3d 827, 830 (5th Cir. 1998); *Burns v. Mayes*, 369 F. App'x. 526, 527 & n.4 (5th Cir. 2010).  Bernard so requests.

Not only was this evidence not cumulative – its different nature rendered it critically important. The Government's theory at trial was that Brown had initially lied to investigators but by the time of trial had chosen to tell the truth. A juror could choose to credit that story, because whether a witness lies or tells the truth is within his own power to decide. But a mentally ill witness has no "choice" about whether his active mental illness (or the medications he takes in an attempt to control its symptoms) affects his perceptions, and a juror would understandably be more skeptical of crediting such a witness.

The Government's response questions whether "evidence of medications in Brown's prison records" constituted *Brady* evidence. GB.100. Bernard's claim, however, rests not on "prison records" but on jail records that were in the possession of the United States Marshals Service during the trial. ROA.13-70013.v6.1357-1371. These records support the inference, and a hearing would have shown, that the trial prosecutors were aware that Brown was being administered psychotropic drugs throughout the trial. Even if prosecutors were personally unaware, the Marshals Service is part of the DOJ, *see* 28 U.S.C. § 561(a), and its knowledge of such administration would have

49

been properly imputed upon them under *Brady* and its progeny. *United States v. Wilson*, 237 F.3d 827, 832 (7th Cir. 2001) (imputing to prosecutor the U.S. Marshals Service's knowledge that Government witness failed drug tests); *United States v. Santiago*, 46 F.3d 885, 894 (9th Cir. 1995) ("case law indicates that Bureau of Prison files are within the possession and control of the United States Attorney"). And because the Government was obligated to disclose that Brown was on psychotropic medications, that fact would likely have led to other discoverable evidence, such as the nature of Brown's major mental illness and the mental health evaluation identified above.

The Government insists that information about Brown's use of other illegal drugs "would have been cumulative and not material." GB.100. But what the jury did not know was that Brown was taking *psychotropic medications in addition to* illegal drugs. Had that fact been disclosed, the defense could have presented evidence about the synergistic destructive impact of those substances – particularly when coupled with Brown's undisclosed major mental illness – on Brown's ability accurately to recall the events surrounding the crime.

A COA should issue for these claims; the Supreme Court has long urged caution in declaring any withheld impeachment evidence to be cumulative, because subtle factors influence jurors' estimation of a witness's truthfulness and reliability. *Napue v. Illinois*, 360 U.S. 264, 269 (1959). And a witness's major mental illness can assume pivotal importance. *East v. Johnson*, 123 F.3d 235, 237-240 (5th Cir. 1997) (reversing death sentence where, due to prosecution's failure to disclose records, jury was unaware of mental disorders of prosecution's penalty-phase witness); BBOB.80-81 (collecting cases re: mental illness).

### IV. Given the jury's struggle to return a single death verdict against Bernard, a reasonable jurist could believe that his allegations warrant further development.

Brandon Bernard is under a sentence of death for crimes that occurred when he was only eighteen. He did not originate the plan that led to the Bagleys' deaths; he did not abduct them nor fire the shots that killed them. He was nevertheless sentenced to death because the Government led jurors to believe that he lit the fire that engulfed the car and that this fire tortured Stacie Bagley. Bernard has advanced four specific allegations that directly undermine that theory, namely:

51

1. That his counsel unreasonably failed to impeach Brown regarding how the fire was set;

2. That the Government suppressed evidence impeaching Brown's testimony about how the fire was set;

3. That counsel were ineffective for not securing an expert to challenge the Government's claim that the forensic evidence bolstered Brown's testimony that only Bernard could have set the fire; and

4. That his counsel was ineffective for not retaining a forensic pathologist.

Bernard supported all four claims with documentary evidence, including sworn declarations from forensic experts and an expert on prevailing norms for performance of defense counsel in federal death penalty cases.

Beyond these four issues, Bernard submitted declarations from a legal expert and a mitigation expert highlighting the numerous deficiencies surrounding trial counsels' grossly inadequate mitigation investigation and the impoverished mitigation case that resulted. And the Government's response concerning the adequacy of trial counsels' performance – that Bernard's mother was competent to direct the

mitigation investigation – runs exactly contrary to decisions of the Supreme Court. *See Sears*, supra.

Because a reasonable jurist could believe that Bernard's claims warrant further encouragement, this Court should remand this case for an evidentiary hearing. Alternatively, this court should grant COA on all claims.

Respectfully submitted,

*/s Robert C. Owen*
Robert C. Owen,
Bluhm Legal Clinic
Northwestern University School of Law
375 East Chicago Avenue
Chicago, IL  60611
Phone: (312) 503-0135
Email:Robert.owen@law.northwestern.edu

*s/ John Carpenter*
John Carpenter,
Asst. Federal Public Defender
1331 Broadway, Suite 400
Tacoma, Washington  98402
Phone: (253) 593-6710
Email: John_Carpenter@fd.org

# CERTIFICATE OF COMPLIANCE

Counsel certifies that:

1.      Exclusive of the portions exempted by 5th Cir. R. 32.2.7(b)(3), this brief contains 9,895 words printed in a proportionally spaced typeface.

2.      This brief is printed in a proportionally spaced, serif typeface using Century 14 point font in text and Century 12 point font in footnotes.

3.      Upon request, undersigned counsel will provide an electronic version of this brief and/or copy of the word printout to the Court.

4.      Undersigned counsel understands that a material misrepresentation in completing this certificate, or circumvention of the type-volume limits in 5th Cir. R. 32.2.7, may result in the Court's striking this brief and imposing sanctions against the person who signed it.

*s/ John Carpenter*
John Carpenter, Wash. Bar No.: 23301
Assistant Federal Public Defender
Western District of Washington
1331 Broadway, Suite 400
Tacoma, Washington  98402
Phone: (253) 593-6710 / Fax: (253) 593-6714
Email:  John_Carpenter@fd.org

## CERTIFICATE OF SERVICE

I hereby certify that on January 6, 2014, I electronically filed the foregoing Defendant-Appellant Brandon Bernard's Reply to His Application for Certificate of Appealability with the Clerk of the Court using the CM/ECF system which will send notification of filing to Assistant United States Attorney Joe Gay.

*s/ John Carpenter*
John Carpenter, Wash. Bar No.: 23301
Assistant Federal Public Defender
Western District of Washington
1331 Broadway, Suite 400
Tacoma, Washington  98402
Phone: (253) 593-6710 / Fax: (253) 593-6714
Email:  John_Carpenter@fd.org